## UNITED STATES DISTRICT COURT

### For The

### District Of Massachusetts

| | |
|---|---|
| KRANTHI SAGAR PACHIKORU,<br><br>Plaintiff,<br><br><br>v.<br><br><br>VERTEX PHARMACEUTICALS INC.,<br><br>Defendant. | Case No._____ |

### COMPLAINT

### (Jury Trial demanded)

Plaintiff Kranthi Sagar Pachikoru ("Mr. Pachikoru" or "Plaintiff"), filing *pro se*, by way of Complaint against Defendant Vertex Pharmaceuticals Inc. ("Vertex" or "Defendant"), alleges as follows:

### I. PARTIES

1. Plaintiff Kranthi Sagar Pachikoru resides in Milford, Massachusetts. At all relevant times, he was employed by Vertex in Boston, Massachusetts.

2. Defendant Vertex Pharmaceuticals Inc. is a global biotechnology company with its principal place of business located at 50 Northern Avenue, Boston, MA 02210.

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States, including the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. §§ 1589 and 1595, and 42 U.S.C. § 1981.

4. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the Plaintiff's related state-law claims, as they arise from the same common nucleus of operative facts as the federal claims asserted herein. These supplemental claims consist of violations of Massachusetts statutory law (M.G.L. c. 149, § 52C) and Massachusetts common law, including claims for Wrongful Termination, Fraudulent Inducement, Fraudulent Misrepresentation, Promissory Estoppel and Intentional Infliction of Emotional Distress (IIED).

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant Vertex maintains its principal place of business in this District, Boston, MA, and a substantial part of the events giving rise to the claims occurred here.

## III. INTRODUCTION

6. Plaintiff, Mr. Pachikoru brings this action against Defendant, Vertex alleging exploitation of his immigration status, retaliation in violation of public policy and whistleblower statutes, wrongful termination and related claims arising from his termination after he reported VX-548 (Journavx Medication) manufacturing product quality and patient safety concerns.

7.  The allegations herein are based on Mr. Pachikoru's personal knowledge as to his own actions and on information and belief as to all other matters. This information and belief is derived from his experiences and communications with current and former employees. The facts alleged are those known prior to discovery, as key evidence from policies, procedures, Electronically Stored Information (ESI) and internal communications, exclusively controlled by Vertex. Mr. Pachikoru anticipates discovery will yield substantial evidentiary support for his claims and reserves the right to amend this Complaint to reflect the evidence.

## IV. STATEMENT OF FACTS

8.  Mr. Pachikoru is a highly qualified individual in pharmaceutical formulation and sciences, and federal drug safety regulations. His qualifications include a Bachelor's and Master's in Pharmaceutical Sciences, specializing in chemical synthesis and formulations, an MS in Drug Regulatory Affairs, an MS in Project Management, and nearly a decade of experience. It was because of this specialized expertise in Good Manufacturing Practices (GMP) and FDA regulations that Vertex recruited Mr. Pachikoru for a technical Quality Assurance (QA) and managerial role.

**Recruitment Based on Sponsorship Promises and H-1B Visa Filing**

9. During the recruitment process in March 2023, Mr.Pachikoru specifically inquired about his green card sponsorship. Vertex explicitly, verbally promised Mr. Pachikoru's immediate Green Card sponsorship, a critical factor that influenced his decision to accept the position. Relying on these unequivocal promises made by Cheryl Greenfield ("Ms. Greenfield"), Human Resources (HR) Recruiter on March 1, 2023, by Claudia Lee ("Ms. Lee") QA Senior Manager, on March 16, 2023; and by Sue Miles ("Ms. Miles") QA Operations Senior Director on March 21, 2023, and by Ms. Greenfield again on March 29 and April 3, 2023, Mr.Pachikoru accepted the job offer.

10. Mr. Pachikoru applied for Manager, GMP Operational Quality, REQ-17609 on March 16, 2023, which requires advanced skill application of scientific and regulatory principles in the field of Pharmaceutics, corresponding to SOC code 11-3051.01 ("Quality Control Systems Manager").

11. Relying on Vertex's promise of immediate green card, Mr. Pachikoru renounced his Prevailing Wage Determination (PWD) with his previous employer and accepted Vertex's employment offer on April 4, 2023.

12. Vertex filed a Labor Condition Application (LCA), for Mr. Pachikoru with the Department of Labor (DoL) using SOC Code 13-1082.00 ("Project Management Specialists") at level III for prevailing wage, which was lower than the SOC Code 11-3051.01 for the role Mr. Pachikoru accepted.

4

13. On May 4, 2023, the United States Citizenship and Immigration Services (USCIS) issued a Request for Evidence (RFE) for the H-1B petition filed in Form I-129, challenging the qualification of the role's "specialty occupation" per the Occupational Code (OCC) "030" for systems analysis and programming which is a part of broader computer related occupations.

14. Mr. Pachikoru inquired with Vertex on the application of SOC code 13-1082.00 on May 9, 2023. To which, Attorney Jennifer McGill ("Ms. McGill") of Berry Appleman & Leiden LLP (BAL), immigration counsel for Vertex, advised Mr. Pachikoru to emphasize on his Project Management degree stating it was a natural fit and conceal his MS in Regulatory Affairs in the RFE worksheet provided. Relying on the assurances made by Vertex's counsel BAL, Mr. Pachikoru joined Vertex on May 22, 2023.

15. On June 21, 2023, Mr.Pachikoru was officially assigned to oversee product quality and compliance in external manufacturing of Journavax's Active Pharmaceutical Ingredient (API) and Spray Dried Dispersion (SDD) Teams.

16. On June 23, 2023, Ms. Lee materially altered Mr. Pachikoru's job duties in the RFE worksheet, including Oracle Process Manufacturing (OPM) System upgrade and product disposition responsibilities. These responsibilities were neither discussed during his interview nor included in the job offered to Mr. Pachikoru. Moreover, they were not filed as the "bonafide job" in the DoL's LCA and the H-1B petition to the USCIS. Vertex submitted the altered RFE response to USCIS on July 5, 2023; without Mr. Pachikoru's consent.

17. After Mr. Pachikoru's H-1B petition approval on July 10, 2023, Mr. Pachikoru followed up on Vertex's promise of green card sponsorship. On July 18, 2023, Emily Jacobs ("Ms. Jacobs") from Vertex's Global Immigration and Mobility team acknowledged that Vertex knew "Kranthi's green card support would likely need to start in advance of meeting the eligibility requirements due to the remaining time on his H1-B," confirming Vertex's awareness of the urgency. Yet, she deferred the initiation of the green card process to January 2024.

18. On July 21, 2023, Ms. Lee materially altered Mr. Pachikoru's job duties; added product disposition in OPM, and removed people management responsibilities. Ms. Lee arranged the altered job description for Mr. Pachikoru for his signature in DocuSign and uploaded it to Vertex's Workday.

19. During his tenure, Mr.Pachikoru directly managed three contractor workers and oversaw another employee's Performance Improvement Plan (PIP), who directly reported to Ms. Lee.

**Initial Product Quality Escalations and Emergence of Sponsorship Barriers**

20. From August to September 2023, Mr. Pachikoru was assigned to lead Quality Event (QE), a product quality investigation QE-014740, into cross-contamination related to Tezacaftor SDD, a drug product intermediate. Mr. Pachikoru requested OPM "Sandbox" access as it was required to investigate the GMP batch discrepancies. Though he was not provided access, Mr. Pachikoru diligently collaborated with Vertex's Data, Technology, and Engineering ("DTE") and uncovered systemic issues not only in external GMP manufacturing operations at Hovione but also with Vertex's handling of GMP operations, including OPM.

21. Ms. Lee assigned Mr. Pachikoru a significantly higher workload relative to his white American counterparts, this included requiring him to work during Vertex's 2023 Thanksgiving and Christmas Eve holidays; his extra time and efforts were necessary to ensure Safety, Identity, Strength, Purity, and Quality (SISPQ) to support accelerated business timelines for validating the manufacturing process of Journavx's API.

22. Mr. Pachikoru was consistently denied professional development and travel opportunities. These opportunities were regularly extended to his white American counterparts, QA Manager, Alexis Bond ("Ms. Bond"), Senior QA Specialist, Brooke Schnitzer ("Ms. Schnitzer"), Senior QA Specialist, Marcus Braudis ("Mr. Braudis"), as well as to his manager, Ms. Lee, on numerous occasions.

23. Upon joining Vertex in September 2023, Ms. Bond was immediately provided with opportunities for professional development and travel. Mr. Pachikoru, who joined Vertex earlier on May 22, 2023, was neither offered nor allowed to pursue any such opportunities upon request.

24. Ms. Lee sent a cross-functional and departmental email to introduce Ms. Bond. However, no such email was sent to introduce Mr. Pachikoru.

25.  During November and December 2023, Mr. Pachikoru identified and documented GMP violations at Olon, the Journavx API manufacturer, in an Inspection Readiness (IR) report. After he submitted this report, management removed the Journavx API project from Mr. Pachikoru and transferred it to Ms. Bond. Subsequently, contamination (QE-017596) occurred during the third Journavx API validation batch, consistent with the risks identified in Mr. Pachikoru's IR report. Senior Director Quality Systems, Dionna DiPierro's ("Ms. DiPierro") team consulted Mr. Pachikoru after Ms. Lee and Ms. Bond did not respond to their requests on QE-017596. Between December 2023 and January 2024, Ms. Lee and Ms. Bond traveled to Olon to inspect the issues Mr. Pachikoru had documented.

26.  During January and February 2024, Ms. Lee assigned Mr. Pachikoru to develop a tracker for QA product releases and supply chain tracking; later, in March 2024, she abruptly removed Mr. Pachikoru from the project without his consent and reassigned it to Mr. Braudis. When Mr. Pachikoru inquired Ms. Lee, she stated that it was for Mr. Braudis's professional growth and benefit.

27.  On March 13, 2024, during a one-on-one training, Mr. Pachikoru identified a GMP violation with OPM's inability to retrieve necessary change controls, questioning the compromised integrity of data acquired from OPM's query. When Mr. Pachikoru sought Ms. Lee's input, she responded, "that is how OPM works". Subsequently Ms. Lee initiated a DTE ticket for a "quick fix" and authorized the release of the product.

28. Between March 15, 2024, to April 25, 2024, while on approved Paid Time Off (PTO) Mr. Pachikoru traveled to India to take care of his mother's health. During this time, Ms. Lee assigned him two additional SDD products. This required him to work extended hours daily, across Indian (IST) and US (EST) time zones with five different projects and project leads. In April 2024, Mr. Pachikoru reported Ms. Lee's indifference and hostile treatment to Ms. Miles.

29. On March 27, 2024, during a one-on-one Zoom meeting, Mr. Pachikoru followed up with Ms. Lee on  the March 13, 2024 OPM's data integrity failure and her rationale behind authorizing the release of medicinal product without a GMP investigation to which Ms. Lee abruptly ended the meeting without addressing his questions.

30. From January 8, 2024 to April 16, 2024, Mr. Pachikoru repeatedly inquired Ms. Lee about starting his green card sponsorship process, but received no response. Mr. Pachikoru took the initiative to fill the sections of Vertex U.S Immigration Policy, Version 1.0 ("Repayment Form"), an action required by his manager, Ms. Lee.

31. The Vertex U.S. Immigration Policy mandates:

    a. The employee's performance rating must be at "leading" at least for one year, or alternatively, at least "strong" for two years from the day of joining; and

    b. The employee must sign the Vertex U.S. Immigration Policy, agreeing to repay the company $15,000 to $30,000 if they leave the company during or after the sponsorship.

    c. The Vertex U.S. Immigration Policy must be signed and approved by the

        i. The non-immigrant worker's immediate Manager

      ii.    The non-immigrant worker's line management, Vice President (VP)

      iii.    The non-immigrant worker, the employee

      iv.    Global Mobility And Immigration Department

    d.    Waiver of the eligibility requirements will be at the discretion of the department's VP and HR; and will be based on business needs.

32. Mr. Pachikoru was never informed of any of the conditions listed in the above paragraph during the interview process or before accepting employment.

33. On May 8, 2024, after Mr. Pachikoru's multiple iterative requests about green card sponsorship, Ms. Lee stated, "Sue and I both agreed that we are not going to sponsor you for a year." Ms. Lee further tied the sponsorship to a long-term service commitment, "We are investing $ 20,000 to $30,000. Since we are putting money on you, we want you to stay at least a minimum of 10 years here, and want you to meet our expectations." She simultaneously invoked another employee who was placed in a PIP during this conversation. Ms. Lee approved the sponsorship form on May 23, 2024.

34. Between May 22 and May 24, 2024, Mr. Pachikoru inquired with Ms. Schnitzer about the "manual constraint" application's broader use in OPM. Ms. Schnitzer stated that OPM's inability to retrieve certain QEs for e.g. QE-017882 was a "known OPM system's failure." She further stated that management's direction was to "release the products without any delays and open a DTE ticket later."

35. Although afraid, Mr. Pachikoru consistently reported the hostile and disparate treatment he experienced. On June 18, 2024, Mr. Pachikoru reported Ms. Lee's behavior and its detrimental effect on him to her manager, QA Director, Susan Tyskwicz ("Ms. Tyskwicz").

36. Furthermore, Mr. Pachikoru communicated these issues through six internal pulse surveys (administered by glint), as well as directly to Ms. Miles in four independent one-on-one meetings.

**Escalation of Journavx SDD Failures and Management's Threats to Visa Status**

37. In late June 2024, following the completion of the Journavx SDD process validation, Mr. Pachikoru escalated significant software and equipment malfunctions to QA management. These issues caused a deviation, resulting in sudden temperature increases during the Journavx SDD commercial spraying process. Ms. DiPierro, responded with a further inquiry, to which Mr. Pachikoru explained the reason, but she did not provide any direction on the issue.

38. During this time frame:

    a. Mr. Pachikoru made multiple attempts following up since May 23, 2024, with the QA management, to seek approval on the green card sponsorship form, and Ms. Lee cited budget reasons that were later confirmed to be resolved by Ms. Doss's Administrative Assistant, Rachele Galletta ("Ms. Galletta") on June 14, 2024.

    b. On June 17, 2024, Mr. Pachikoru attempted to expedite the Green card approval process by requesting a meeting with Ms. Miles, but she declined.

c. The internal form for sponsorship was approved on July 2, 2024, by Geny Doss ("Ms. Doss"), QA Small Molecule Vice President. The signed repayment form was shared with Ms. Jacobs for final approval on July 3, 2024, after.

39. Due to Ms. Miles and Ms. Lee's inaction on the serious GMP violations, Mr. Pachikoru escalated GMP operational failures at Hovione, impacting Journavx SDD cleaning process validation batches to Ms. Doss, directly on July 3, 2024.

40. On July 10, 2024, during a one-on-one meeting, Ms. Miles informed Mr. Pachikoru that escalating Hovione issues to Ms. Doss was unnecessary, as Ms. Doss had been aware of these issues for over a decade. Ms. Miles also stated that his visa was at risk if he did not meet management's expectations.

41. During the same meeting, she instructed Mr. Pachikoru to emulate certain Indian colleagues she highly respected, specifically QA Associate Director, Rupesh Malhotra, and Process Engineering Director, Sreedhar Shapally.

42. On July 15, 2024, Mr. Pachikoru met with Mr. Malhotra, as instructed by Ms. Miles. During this meeting, Mr. Malhotra informed Mr. Pachikoru that another employee of Indian descent was experiencing similar immigration related issues.

43. On July 24, 2024, Mr. Pachikoru followed up with Ms. Jacobs and Ms.McGill in an email for an update on his green card sponsorship. Ms. McGill responded to his inquiry with a further inquiry whether he preferred a Permanent Labor Certification (PERM) or an EB-2 National Interest Waiver (NIW) immigration pathway, without clarifying the implications of either pathway on Mr. Pachikoru. He continued to request additional details to make an informed decision.

12

44. During a Journavx SDD project meeting between June and July 2024, which Ms. Lee attended in Mr. Pachikoru's absence, she lied to the team, stating that Mr. Pachikoru could not travel citing his visa and that she would be traveling in his stead. Mr. Pachikoru learned about this lie in a subsequent project meeting.

45. On July 18, 2024 in a meeting for which Ms. Lee traveled to Hovione, Cork in Ireland instead of Mr. Pachikoru, she credited and praised Mr. Braudis for the SDD GMP compliance investigation report which Mr. Pachikoru compiled.

46. On July 25, 2024, when Mr. Pachikoru inquired Ms. Lee about the disparate treatment and concealment of travel opportunity, Ms. Lee became agitated, stating "you are going against the group, and your communication isn't good".

47. Mr. Pachikoru tried to move out of "Ms. Miles" line management and applied internally for REQ-22697 (a job opened in the California site) on July 31, 2024, and emailed Ms. Doss expressing his interest.

48. On August 12, 2024, Nikole Desmarais from Human Resources (HR) scheduled a meeting with Mr. Pachikoru and mentioned that the position was predetermined for another candidate, and directed him towards Ms. Miles for career development.

49. The following day, on August 13, 2024, during a one-on-one meeting, Ms. Miles dismissed Mr. Pachikoru's serious complaints about Ms. Lee's behavior, including her interference and micromanagement of his projects. Ms. Miles advised him to accept the situation, stating that "bad bosses are everywhere," and suggested that to be successful, he needed to mimic Ms. Lee's behaviors.

50. The continued hostile behaviors and actions of Ms. Miles and Ms. Lee severely exacerbated Mr. Pachikoru's psychological distress, leading to panic attacks, anxiety, and sleeplessness.

51. Between July and August 2024, a Journavx SDD engineering batch failed to meet product release specifications and was discolored and lumped due to an equipment malfunction that caused a critical deviation at the contract manufacturer, Hovione.

   a. The SDD development batch failure prompted a product investigation, which in turn delayed the Journavx SDD cleaning validation process.

   b. Following this incident, QA Associate Director, Nicole Ricci ("Ms. Ricci"), Journavx Product Quality Lead (PQL), communicated a directive to Mr. Pachikoru at the behest of Product Development, Senior Vice President, Kelley Swinney ("Ms. Swinney"), that commercial QA should look into these matters.

   c. Senior QA management, including Ms. Miles, Ms. DiPierro, and Ms. Doss, had prior knowledge of longstanding serious manufacturing deficiencies at Hovione.

   d. Mr. Pachikoru escalated these issues and the underlying deficiencies to Ms. Lee and Ms. Ricci for further escalation to senior QA management, Ms. Miles, Ms. DiPierro, and Ms. Doss. Despite the cleaning validation failures directly resulting from Hovione's equipment, software malfunctions GMP product compliance investigations 135034, 144474, and 144476 that Mr. Pachikoru had reported—factors entirely beyond Mr. Pachikoru's control—Ms. Lee subsequently cited these failures as a performance deficiency in his PIP.

52. In August 2024, Mr. Pachikoru followed up on his previous inquiry with Ms. Jacobs and Ms. McGill about whether he should plan to depart from Vertex if his green card could not be sponsored. In response to this, Ms. McGill scheduled a meeting with Mr. Pachikoru on August 23, 2024, during which Mr. Pachikoru learned that Vertex had already decided to pursue EB-2 NIW, and that this decision had already been agreed upon with Ms. Lee.

53. Following this meeting, Mr. Pachikoru made repeated inquiries to his manager, Ms. Lee, about the rationale for the EB-2, NIW decision. In response, Ms. Lee scheduled a one-on-one meeting but failed to attend, did not reschedule, and did not provide the requested explanation.

54. On August 23, 2024, Ms. McGill instructed Mr. Pachikoru to complete an EB-2 NIW questionnaire on BAL's immigration portal, "Cobalt," instead of the questionnaire she previously shared via email in July 2024. Mr. Pachikoru completed the questionnaire in the cobalt portal on September 1, 2024.

55. On August 28, 2024, Ms. Lee publicly commended Ms. Schnitzer via an interdepartmental email regarding the release of Journavx SDD batches, a project Mr. Pachikoru was leading and accountable for. Ms. Lee did not similarly recognize Mr. Pachikoru's contributions.

56. In a one-on-one meeting on September 5, 2024, Ms. Miles questioned Mr. Pachikoru regarding his August 29, 2024 email about "unreasonable efforts" required for Journavx and Alyftrek product review and release. Ms. Miles stated that "HR sees that email as employee concerns are not being addressed and taken care of". Then Ms. Miles referenced a former employee, who had also escalated GMP and workload concerns. Ms. Miles stated this reflected poorly on the QA management and Ms. Lee, and noted that the former employee was placed in PIP and terminated.

**Persistent GMP Non-Compliance of OPM and Manufacturing Product Quality; and Vertex's Silence Over Immigration Process**

57. In September 2024, Mr. Pachikoru repeatedly inquired Ms. Lee regarding the handling of API material storage at Hovione, Lumiar warehouse. Mr. Pachikoru asserted that he was not informed of the Regulatory agency's audit finding and subsequent closure of QE-021464 "GMP temperature mapping in warehouse" by Ms. Schnitzer at Ms. Lee's discretion. Specifically, Mr. Pachikoru stressed the lack of a GMP product quality and compliance impact assessment for the Journavx and Alyftrek product launches. Ms. Lee did not respond to these inquiries.

58. On September 11, 2024, Mr. Pachikoru asked Ms. Lee for OPM training and answers regarding previously identified data integrity and GMP issues. Ms. Lee directed him to Ms. Schnitzer. On September 12, 2024, Ms. Schnitzer stated that the non-compliant practices were "general ways of working" learned from Ms. Lee, that management was aware of them, and insisted Mr. Pachikoru conform. Mr. Pachikoru subsequently emailed Ms. Schnitzer and Ms. Lee detailing the risks of these practices.

59. Simultaneously during September 2024, Ms. Bond began holding SDD product release meetings without Mr. Pachikoru's knowledge on the projects he was accountable for.

60. During a one-on-one meeting on September 17, 2024, Mr. Pachikoru requested his own travel and development opportunities, to which Ms. Miles responded by stating "you are technically strong, and Claudia is good with management, and we will put people only where they succeed" Consequently, Ms. Lee had been traveling instead of Mr. Pachikoru.

61. Starting September 2024, the ongoing hostile treatment towards Mr. Pachikoru increased. This included, but was not limited to, excessive micromanagement, the removal of his duties, the dismissal of his concerns, and intimidation from both Ms. Lee and Ms. Miles.

62. In a one-on-one meeting on October 8, 2024, Ms. Miles joined via Zoom and was visibly agitated. Dismissing his concerns about Ms. Lee, she stated "although you have no malicious intent, you are emotional" and "although you are not mal-adaptive, you are not conforming". Mr. Pachikoru, discontinued the recurring meeting series with Ms. Miles that she had originally requested in September 2023 with the November 13, 2024, meeting being last one-on-one in the series.

63. In May 2024 (QE-020300), black particles were observed in Journavx API, failing the appearance specification ('White to off-white solid'). Vertex elected not to perform comprehensive chemical analysis (e.g., LC-MS, NMR, or XRPD) to characterize the contaminants or determine if they were Genotoxic Impurities (GTI). When the black particles recurred in October 2024 (QE-023896), Vertex management maintained their original decision to not proceed with the testing.

17

64. On November 13, 2024, during the last one-on-one meeting, Ms. Miles aggressively confronted Mr. Pachikoru about a presentation regarding QA staffing resource challenges constraining SDD product release that was demonstrated and discussed in a Tier II leadership meeting, assuming he had prepared the presentation. Though Mr. Pachikoru immediately conveyed that he had no involvement or prior knowledge about the presentation, Ms. Miles continued her rhetoric claiming that a junior employee, such as him, would not understand her importance in the hierarchy. The pattern of harassment heightened, when Mr.Pachikoru complained about Mr. McDonagh's behaviour to silence him regarding the Journavx black API issues; Ms.Miles dismissed his complaints stating "that is your perception". Subsequently, Ms. Miles ended the conversation, instructing Mr. Pachikoru to immediately begin releasing products in OPM, which effectively contradicted her previous directives from her February and June 2024 one-on-one meetings with him.

65. Around Q4 of 2024, Ms. Schnitzer was allowed to travel to participate in the manufacturing technology transfer of Tezacaftor SDD to Esteve Quimica in Spain, a new external site. She went in place of Mr. Pachikoru, who was accountable for the project.

66. On November 15, 2024, Mr. Pachikoru, who was on approved PTO, led a crucial meeting between Vertex and Hovione to support an urgent U.S. FDA's inquiry received by Vertex. Journavx wet-state SDD material did not have any method to test microbial content, and the FDA's inquiry was specific to the data availability of a "65-day hold" period of wet SDD. This meeting was also joined by Ms. Lee and QA Senior Director, Yeimy Garcia ("Ms. Garcia") who came in the absence of Ms. Ricci.

67. Mr. Pachikoru was concerned since two Journavx SDD validation batches were subject to product complaints regarding human and animal hair contamination reported by Catalent. By the end of November 2024, Ms. Ricci instructed Mr. Pachikoru to cease all discussions regarding the microbial assessment of Journavx wet SDD, stating that Ms. Miles had decided to consult the regulatory head regarding testing requirements.

68. In late November 2024, Mr. Pachikoru reiterated his request for OPM training to Ms. Lee. When he again pointed out recurring data integrity issues, Ms. Lee visibly reacted with displeasure, stating he was "not meeting expectations" instead of addressing the GMP issues. She later ascribed the OPM's GMP non-compliance and failures to Mr. Pachikoru's performance shortcomings in the PIP.

69. On November 20, 2024, during a Journavx SDD and API team meeting to discuss the black particles in the Journavx API risk assessment, Ms. Bond argued with Mr. Shapally on what dictated a product quality escalation. Mr. Pachikoru interjected to clarify the governing rules on what constituted escalation, and the framework to be applied. Ms. Bond adamantly directed her arguments against both Mr. Pachikoru and Mr. Shapally, although API Director Micheal Reynolds ("Mr. Reynolds") and API Associate Director Frederic Jos ("Mr. Jos") resonated with Mr. Pachikoru's evaluation.

70. Later in the same meeting, Mr. Pachikoru inquired whether Olon had started a product quality investigation. In response to Mr. Pachikoru's inquiry, the API Director, Michael Reynolds ("Mr. Reynolds"), referred to Ms. Bond since she was the QA lead for API, to which she deflected those responsibilities to Mr. Pachikoru, and remained silent. Subsequently, in the PIP, Ms. Lee attributed these failures to Mr. Pachikoru, stating, "responsibilities have been deflected to MS&T or upstream teams instead of a successful collaboration."

71. In late November 2024, Mr. Reynolds explicitly opposed Mr. Pachikoru's suggestion to investigate forced degradation data of Journavx API and its stability in relation to observed black particles. Mr. Reynolds stated that such an investigation could challenge Vertex's adherence to GMP and Regulatory Compliance practices and question the product's entire control strategy as filed with the Health Regulatory Agency.

72. On December 9, 2024, Ms. Lee rejected the service ticket, RITM0395299 for OPM system training and access that was requested by Mr. Pachikoru, while he was on PTO that day. This action directly contradicted Ms. Miles' directive from November 13, 2024 instructing Mr. Pachikoru to start releasing products in OPM.

73. On December 10, 2024, Mr. Pachikoru proposed a GMP compliant solution for the black particles in the Journavx API in an exclusive meeting he scheduled with Ms. Lee, Ms. Miles, Ms. Bond, and Ms. Ricci. Ms. Miles rejected the proposal, stating that it would undermine Journavx's manufacturing process validation, which was also mirrored by Ms. Lee.

74. Further into the meeting, Ms. Miles instructed Mr. Pachikoru, not to use the terms "safety" or "patient safety" and prohibited him from taking notes. Additionally, she stated, "I don't want you telling our technical partners what to do or provide guidance different than what I said," and insisted the discussion remain confidential. Subsequently, Ms. Lee characterized Mr. Pachikoru's objections, raised during this meeting as "GMP non-compliance" in the PIP.

**Reclassification of Contaminants as TUP and De-Stabilization of Immigration Status**

75. On December 17, 2024, during a meeting with Hovione, Mr. Pachikoru, in the presence of Ms. Lee and other participants, challenged Hovione's Qualified Person (QP) regarding the decision to accept some bags deemed as safe for patients while rejecting others from the contaminated Journavx API batch. Hovione did not respond.

76. On January 6, 2025, in a meeting to resolve the ongoing black particle contamination of Journavx API; Mr. Pachikoru, in accordance with his QA duties and expertise, ascertained the need to perform analytical characterization of the black particles to which John McDonagh, Executive Director, API ("Mr. McDonagh") and his team publicly reprimanded Mr. Pachikoru in the presence of Ms. Lee, Ms. Bond, and Mr. Shapally.

77. After the meeting, Mr. Shapally advised Mr. Pachikoru, out of concern for his well being, to disengage from the matter, warning that Executive Vice President Morrey Atkinson was seeking to assign blame to some individual for the delays caused to the Journavx release. He cautioned that Mr. Pachikoru's continued involvement could jeopardize his employment.

78. During a one-on-one meeting with Ms. Lee on January 9, 2025, Mr. Pachikoru raised concerns about the behavior of Mr. McDonagh and his team, pertaining to the January 6, 2025, meeting. Ms. Lee dismissed his concerns, stating along the lines that they are good and they meant well.

79. On January 10, 2025, and again on January 16, 2025, Mr. Pachikoru emailed as well as messaged Ms. Lee in MicroSoft (MS) Teams, regarding the External Manufacturing Associate Director, Paul Kyriacopulous's ("Mr. Kyriacopulous") prioritization of batch releases over product quality and patient safety issues, contradicting Mr. Pachikoru's concerns with GMP product quality investigations. Ms. Lee did not respond.

80. On January 14, 2025, Ms. Jacobs followed up with Mr. Pachikoru on the status of the Green card EB-2 NIW questionnaire she shared on July 24, 2024, contradicting Ms. McGill's directive to Mr. Pachikoru on August 23, 2024. In the course of the email exchanges, Ms. McGill responded to the email thread on January 15, 2025, and explicitly stated, "We are really under significant pressure to seek the I-140 for you, given that your 6-year maximum date is December 7, 2025. Had we been proceeding with a PERM, we would have needed to submit a PERM for you by December 7, 2024."

81. Between January 17 and January 22, 2025, Ms. Lee rephrased and deleted parts of the API risk assessment related to black particles in the Journavx API. Concurrently, Executive Director, Drug Product, Joseph Medendorp ("Mr. Medendorp"), deleted information related to "Patient Safety" and its impact. Mr. Pachikoru's efforts towards collective and informed decision, involving Hovione and additional reviews, led to the reinstatement of the "Patient Safety" terminology and further meetings. Subsequently, Ms. Lee characterized this event as Mr. Pachikoru's "Lack of robust Quality decision-making". She cited this incident in the PIP for "sharing a Vertex Risk Assessment draft with Hovione CMO before finalization internally."

82. On January 21, 2025, Mr. McDonagh dismissed Mr. Pachikoru's efforts to streamline alignment with Hovione on the risk assessment. In an email, Mr. McDonagh confirmed escalation of this delay in closure of the risk assessment to the Tier II leadership meeting, attended by Ms. Miles, and further escalated to the Tier I leadership meeting, attended by Ms. Doss; and asked technical and external manufacturing management, copied in the email, to do the same.

83. On January 23, 2025, in another meeting with Hovione, Ms. Lee and Vertex's QP, Orla Deady ("Ms. Deady") joined to facilitate Hovione's acceptance of contaminated API bags with limited or no additional testing. Mr. Pachikoru intervened and explained to Ms. Lee that one of her assumptions that filtration processes in spray drying does not function as a Corrective and Preventive Action (CAPA); while simultaneously inquiring Hovione's rationale for inconsistently accepting some API bags, following up on his previously unanswered question from December 17, 2024. Hovione's Business Development Director, Christina Cruz ("Ms. Cruz") intervened and stated "we will discuss this during the management meeting that Ms. Lee is planning with Vertex's senior leadership" and abruptly ended the call.

84. Later that same day, on January 23, 2025, in a one-on-one meeting, Ms. Lee explicitly ordered Mr. Pachikoru to cease all communication about the contamination issue.

85. On January 27, 2025, Ms. Lee excluded Mr. Pachikoru from a crucial senior leadership meeting between Vertex and Hovione; a follow up that was scheduled in response to the unresolved matter from January 23, 2025 regarding the Journavx black particle in API and resumption of SDD process. Following this meeting, Vertex reclassified the black particle contaminants in API as Technically Unavoidable Particles ("TUP") modifying the API risk assessment.

86. Mr. Pachikoru objected to approve the altered risk assessment that classified the contaminants as TUP. Subsequently, on January 27, 2025, Ms. Lee approved the assessment and authorized a memo to resume Journavx SDD manufacturing. She then approved an updated version of the risk assessment on January 31, 2025, followed by an updated memo on February 11, 2025.

24

87. During this timeframe, on January 17, 2025, Mr. Pachikoru attended a QA competency model meeting at the directive of Ms. Lee and subsequently drafted the assigned QA competency model at Ms. Miles' behest. Then, during a one-on-one meeting requested by Ms. Miles which occurred on January 31, 2025, Ms. Miles explicitly stated that Mr. Pachikoru "was not capable of leadership" and dismissed his competency model draft, saying she did not have to follow something modeled by him. Following the meeting he shared the competency model and "respectful meeting ideation" details, as instructed, via email to both Ms. Lee and Ms. Miles, and received no response. Ms. Lee, later cited in the PIP issued to Mr. Pachikoru as being "philosophical" and wasting time and resources.

88. From January 21, 2025, to March 3, 2025, in Tier III meetings, Mr. Kyriacopulous and his manager, External Manufacturing Director, Jonathan Hutchinson ("Mr. Hutchinson"), repeatedly pressured Mr. Pachikoru to approve QE-023896 in order to release Journavx SDD batches. During a Tier III meeting, Mr. Hutchinson stated that Ms. Miles had assured him there were no objections to the approval and subsequent batch release.

## Reassignment of Duties, Downgraded Performance Rating, Issuance of PIP; and Permanent Loss of Immigration Status

89.    On January 30, 2025, Journavx was approved by the FDA. On February 4, 2025 morning, Ms. Lee announced via an interdepartmental email that effective immediately she transitioned into Continuous Improvement (CI) Lead directly reporting to Ms. Miles; in that email Ms. Lee posted a smartsheets link seeking everyone's input to list systematic GMP issues along with proposed resolutions and Mr. Pachikoru completed the form listing the ongoing problems that were later inferred in the PIP as Mr. Pachikoru's incompetencies. That evening, after 6 PM, she sent a meeting invite to Mr.Pachikoru, with Ms. Miles as an optional attendee for the "external QA reorganization meeting" scheduled for 11:35 AM on February 5, 2025.

90.    On February 5, 2025, Ms. Miles joined the reorganization meeting scheduled by Ms. Lee. In this meeting, Ms. Miles informed Mr. Pachikoru of several changes, effective immediately:

a.    Mr. Pachikoru was no longer responsible for the SDD projects and they were reassigned to Ms. Schnitzer and Ms. Bond. Instead, he was reassigned to a slower-moving project, Kalydeco granules. During the meeting, Ms. Miles also informed Mr. Pachikoru that Ms. Lee was joining remotely because she was at Esteve, Spain, to lead Deutivacaftor SDD manufacturing technology transfer validation meeting, a project Mr. Pachikoru was leading at that moment and was accountable for. Ms. Lee never informed Mr. Pachikoru of the travel related to Deutivacaftor SDD.

b. Edward Fasano, QA Associate Director ("Mr. Fasano"), replacing Ms. Lee, is Mr. Pachikoru's new manager.

c. Ms. Lee is now the Continuous Improvement (CI) lead, reporting directly to Ms. Miles.

d. Ms. Schnitzer was slated for promotion to Manager and would take over Mr. Pachikoru's oversight of Hovione.

e. Scott Ibrahim, a new QA Director, has been hired as a technical resource for QA to lead process validation.

f. These changes will be effective in Vertex's Workday on March 3, 2025, aligning with HR requirements.

91. On February 12, 2025, Mr. Pachikoru met Mr. Fasano for a one-on-one meeting in which Mr. Fasano, most notably stated "I don't want you telling me that I am wrong in front of Geny".

92. On February 13, 2025, in a one-on-one meeting, Ms. Lee delivered Mr. Pachikoru's annual performance review, downgrading his rating from "strong" to "building." This downgrade reduced his bonus and annual compensation. It also immediately disqualified him from Green Card sponsorship under Vertex's Immigration policy and prevented his internal mobility.

93. On February 19, 2025, in a one-on-one meeting Mr. Pachikoru inquired QA Senior Manager, Margaret Bernstein ("Ms. Bernstein") about a change control query related to Kalydeco where OPM failed to retrieve QE-018579 as "impacted changed control". Ms. Bernstein acknowledged the system failure but stated that since the product was already released, no GMP compliance investigation was required. When Mr. Pachikoru shared this with Mr. Fasano in his one-on-one meeting on February 20, 2025; Mr. Fasano concurred with Ms. Bernstein's assessment, since such failures are known, and do not warrant a GMP compliance investigation. Ms. Lee later, labeled OPM's systemic implementation failures and GMP non-compliant training as Mr. Pachikoru's intellectual incompetency, in the PIP.

94. In the early hours of February 20, 2025, through Hovione's email response to the comments made by Mr. Pachikoru in Hovione's Report 159272 (part of Vertex's QE-023896), Mr. Pachikoru discovered that the contaminated Journavx API batches had been accepted and released for further SDD manufacturing. This release was authorized based on the January 27, 2025, meeting, the contents of which were never revealed to Mr. Pachikoru, and the TUP risk assessment, which Mr. Pachikoru had refused to approve. Within hours of this email from Hovione, Mr. Shapally privately replied to Mr.Pachikoru that Mr.Pachikoru cannot challenge what Vertex's management had already decided.

95. On the same day, February 20, 2025, Mr. Pachikoru was pressured on a decision regarding yellow particle contamination, QE-025131 for Journavx API, a decision that was between Ms. Lee, Ms. Bond and Ms. Miles; and Mr. Pachikoru followed up with Ms. Lee for the third time seeking an update. Ms. Lee did not respond. Subsequently this was inferred as Mr. Pachikoru's incompetence in the PIP.

96. Later that afternoon on February 20, 2025, Mr. Pachikoru met with Ms. Schnitzer in a one-on-one meeting he scheduled for project transition and shared a detailed list (via SharePoint and email) of projects and concerns, inclusive of QE-023896 and QE-025453 (equipment/ software failures causing temperature excursions at Hovione). On February 27, 2025, Ms. Schnitzer emailed him regarding these issues but focused on internal ways of working rather than the underlying GMP product quality and compliance violations at Hovione. Ms. Schnitzer directed Mr. Pachikoru to work with process engineering leadership for quick resolution as it was holding a product release. Later Ms. Lee characterized these systematic GMP problems as coordination issues and attributed them to Mr. Pachikoru's incompetence.

97. On February 24, 2025, Mr. Pachikoru requested OPM training in a one-on-one meeting with QA Senior Manager Katerina Flater ("Ms. Flater"). Ms. Flater stated that the OPM "Sandbox" (training environment) no longer exists and was inadvertently lost in the beginning of 2023 and could not be retrieved anymore. She further stated that Ms. Lee had developed procedures to bypass the GMP training requirements by granting approvals directly to the GMP "PROD" environment. Ms. Flater directed him to train with Ms. Bernstein and other drug product QA team members, as soon as possible.

98. On February 28, 2025, Mr. Pachikoru had a one-on-one meeting with Mr. Fasano during which:

   a. Mr. Pachikoru shared details about the problems and conversations he had regarding OPM with Ms. Flater.

b. Mr. Pachikoru shared a PowerPoint presentation with Mr. Fasano about the Journavx SDD development manufacturing batch's stability QE-026003, which was impacted due to uncontrolled equipment heating issues. Subsequently, the PIP cited that the QE-026003 was discovered by the QA management; attributing QE-026003 related issues to Mr. Pachikoru's incompetence.

c. Mr. Fasano is scheduled to follow up with QA management on March 4, 2025, regarding the escalation for QE-026003. Additionally, Mr. Fasano confirmed he will discuss QE-026003 and the transfer of its workload with both Ms. Lee and Ms. Miles. He will then update Mr. Pachikoru.

d. Mr. Fasano advised Mr. Pachikoru to transfer all the projects by March 15, 2025.

e. Mr. Fasano later inquired with additional questions from Ms. Miles about QE-026003, which was ongoing at Hovione.

99. Additionally, in the one-on-one meeting on February 28, 2025, Mr. Pachikoru personally shared and notified Mr. Fasano of his need to travel to India in April 2025 because of his grandmother's passing away and the severe impact it had on his father's health, which was in accordance with "Paid Medical, Bonding, and Family Caregiver Leave" at Vertex Pharmaceuticals.

100. On March 3, 2025 over a series of email exchanges inclusive of Mr. Fasano, Ms. Lee approved Mr. Pachikoru's goals in Workday and Ms. Lee further instructed him to work with Mr. Fasano.

101.  Between March 3 and March 6, 2025, Ms. Bond and Ms. Schnitzer utilized a DTE service ticket to remove Mr. Pachikoru from the QE-023896 product quality investigation. This circumvented the standard VeeQMS process, which allows the current assignee to reassign. Mr. Pachikoru followed up with Ms. Bond and Ms. Schnitzer, to see if there were any additional concerns he might not be aware of that could warrant escalation, but he received no response.

102.  On March 6, 2025, Mr. Pachikoru met with Ms. Schnitzer in person to discuss Journavx SDD product quality investigation QE-023896 and understand Ms. Schnitzer's rationale for preferring a CAPA and escalation. This discussion further continued again in the early hours of March 7, 2025, via Zoom and MS Teams, at Ms. Schnitzer's request.

103.  Mr. Fasano sent a group email regarding the inconsistent practices within QA, on March 19, 2025. However, Ms. Lee characterized such inconsistent practices exclusive to Mr. Pachikoru in the PIP and stated that he failed to follow the escalation pathway (WI VV-QUAL-44070).

104.  On March 7, 2025, at 12 PM, in a sudden and unannounced manner, Ms. Lee and Ms. Kayla Burke ("Ms. Burke"), Employee Relations (ER) Manager, joined a regular one-on-one scheduled by Mr. Pachikoru with Mr. Fasano, and Ms. Lee issued Mr. Pachikoru a 60-day PIP, in the presence of Mr. Fasano.

105.  Per Ms. Miles directive, Ms. Lee was no longer Mr. Pachikoru's authorized manager, since 11:57 AM, February 5, 2025; and according to Vertex's official Workday records Ms. Lee was no longer Mr. Pachikoru's manager, since 5:50 PM, March 6, 2025.

**Retaliation Report to HR and Ultimatum Issued, "Comply or Resign"**

106. On March 7, 2025, Mr. Pachikoru requested a meeting with Ms. Burke, according to Vertex's Code of Conduct.

107. On March 10, 2025, while on sick leave, Mr. Pachikoru met with Ms. Burke. During this meeting, he formally reported that Ms. Lee and Ms. Miles had fabricated the PIP in retaliation for his advocacy regarding product quality and patient safety concerns, which included, but were not limited to, the issues listed below:

   a. The GMP non-compliance reports he raised on Journavx SDD and OPM.

   b. The concerns he had previously raised in the HR pulse survey, and the negative impact of Vertex's actions on his immigration status and life.

   c. PIP contradicts the Vertex Outstanding Contribution Award Program (VOCAP) Bronze and Silver awards he received in September and October 2024 for the same projects mentioned in the PIP.

108. Ms. Burke approved Mr. Pachikoru's leave from March 11 to March 14, 2025. She committed to escalating his concerns regarding the potential permanent loss of his immigration status and promised to respond to his request for an internal legal portal to upload evidence supporting his retaliation claim.

109. This matter was escalated by Ms. Burke, leading to an ER investigation by Alisa Stedt ("Ms. Stedt") on March 11, 2025. Simultaneously, Mr. Fasano, scheduled daily 30 minute PIP meetings on March 13, 2025.

110. On March 17, 2025, during the ER investigation meeting with Ms. Stedt, Mr. Pachikoru shared all the concerns he previously raised with Ms. Burke, including the permanent loss of immigration status, per "Vertex's Code of Conduct". Ms. Stedt, who initially scheduled from 9:30 AM to 10:15 AM, continued the meeting until 11:15 AM. However, Ms. Stedt concluded the meeting encouraging Mr. Pachikoru to resign. No details were provided on his request for the legal portal or details of the HR investigation or case number.

111. On the same day, BAL announced that it could no longer guarantee Mr. Pachikoru's H-1B extension. However, they are expediting efforts to submit the EB-2 NIW case.

112. On March 19, 2025, Mr. Pachikoru notified Ms. Stedt that he will file a formal internal legal complaint regarding the PIP through Vertex's Ethics & Compliance Alert Line, "App.Convercent." However, Ms. Stedt repeated her ultimatum: comply with the PIP or resign.

113. Mr. Pachikoru emailed Ms. Doss on the evening of March 19, 2025, for a one-on-one meeting request to convey the truth but received no response.

114. On March 20, 2025, at 11:20 A.M., Mr. Pachikoru, unable to bear the trauma and endure any further hostile and inhumane treatment, emailed Mr. Fasano to cancel the daily PIP meetings and expressed his intent to resign that day or the next. Concurrently, Mr. Pachikoru prepared to file an internal legal complaint in "App.Convercent" and also in Workday per Vertex's Code of Conduct.

115. At 11:25 AM, Mr. Fasano replied, "canceling the daily PIP meetings per your email."

116. At 12:18 P.M., Mr. Fasano initiated a new email thread, copying Mr. Pachikoru's personal email, stating: "Vertex will accept this notice as your resignation, effective immediately." Vertex immediately severed Mr. Pachikoru's system access, which prevented him from filing an internal legal complaint, violating Vertex's Code of Conduct.

**Post-Termination Actions and Characterization of Separation**

117. Vertex provided Mr. Pachikoru with his final paycheck on March 21, 2025.

118. Mr. Pachikoru documented his concerns on March 23, 2025, in the exit form issued by Vertex "Office of Business Integrity and Ethics (OBIE)".

119. Vertex never shared the recommendation letters for the EB-2 NIW, despite assurances in the follow-up emails in February 2025. Vertex canceled Mr. Pachikoru's EB-2 NIW case on March 25, 2025.

120. In response to Mr. Pachikoru's OBIE input, Ms. Stedt reached out to Mr. Pachikoru between March 27, 2025 and April 1, 2025 to schedule a meeting that occurred on April 1, 2025. During the meeting Ms. Stedt inquired Mr. Pachikoru about his input to which he reiterated his concerns; and Ms. Stedt stated the following:

   a. What and how did our actions violate Vertex's Code of Conduct?

   b. The PIP guidance you were referring to was the guidance I gave you in the email, correct?

   c. What are the five claims you mentioned?

   d. Who are the other employees you mentioned were put in PIP?

   e. Your termination is within Vertex's guidelines

   f. You did not give us more time to investigate

   g. You did not apply for any vacation

h.  You did not take more vacation

i.  Vertex cannot hire you back

j.  I wish you all the best on whatever you do in your future

121. After the meeting with Ms. Stedt, Mr. Pachikoru inquired in an email to Vertex's Employee Services team about notice of termination for non-immigrant workers to which Kathryn Arigo ("Ms. Arigo") responded on April 14, 2025, stating that "Vertex does not provide this document in the case of voluntary termination." Vertex paid Mr. Pachikoru, accrued PTO, and Employee Stock Purchase Plan (ESPP) deductions on April 4, 2025.

122. Vertex did not effectuate the steps required for bona fide termination for the H-1B non-immigrant worker.

123. Vertex characterized Mr. Pachikoru's separation from employment as a voluntary termination. Vertex failed to offer Mr. Pachikoru the reasonable costs of return transportation to his last place of foreign residence.

124. Vertex never paid Mr. Pachikoru, Gold VOCAP, a one-time bonus of $750.00 that he earned and was marked for pay on the day of his termination.

125. Mr. Pachikoru was involuntarily terminated on March 20, 2025 (¶116). In the alternative, the conditions imposed by Vertex, including the retaliatory PIP (¶104) and ER's ultimatum to "comply with the PIP or resign" (¶¶110, 112), created intolerable working conditions that forced Mr. Pachikoru's resignation, amounting to a constructive discharge.

# V. STATEMENT OF CLAIMS

## COUNT I

### Wrongful Termination in Violation of Public Policy - Massachusetts Common Law

126. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

127. Vertex violated the clear public policy of Massachusetts by retaliating against and terminating Mr. Pachikoru for engaging in protected activities. These activities included raising and escalating complaints to senior management about significant drug product manufacturing quality and patient safety issues that he reasonably believed violated U.S. Food and Drug Administration (FDA) regulations under 21 C.F.R and posed a risk to public health and safety.

**Protected Activity: Escalating Drug Product Manufacturing Contamination and Patient Safety Issues**

128. Mr. Pachikoru fulfilled his duties and acted in defense of public policy by repeatedly challenging manufacturing and quality control failures. His protected activities included, but were not limited to:

   a. Challenging API Contamination: Raising concerns about recurring black particle contamination in Journavx API and objecting to the failure to reject API components that did not conform to GMP requirements (¶¶ 63, 64, 70, 73, 76, 77), a violation of 21 C.F.R. § 211.84(d)(2).

b. Requesting Investigation: Seeking a thorough product quality investigation into the recurring black particles, as required by 21 C.F.R. § 211.192, and advising analytical characterization to assess patient safety impact (¶¶ 73, 76), consistent with 21 C.F.R. § 211.160.

c. Objecting to "TUP" Classification: Objecting to and refusing to approve management's classification of the unknown contaminant as TUP. Mr. Pachikoru asserted this classification was used to bypass obligations to conduct a thorough investigation and implement GMP controls (¶¶ 85, 86, 94), as required by 21 C.F.R. § 211.100 and § 211.160.

d. Management's Override: Management's decision to overrule his reasoned refusal to approve the TUP assessment undermined the Quality Control Unit's responsibilities under 21 C.F.R. § 211.22 and resulted in the improper acceptance and use of non-conforming material (¶ 86), in violation of 21 C.F.R. § 211.165(f), § 211.101, and § 211.25.

e. Raising Microbial Concerns: Raising concerns regarding the lack of microbial method validation for Journavx wet SDD, especially after product complaints of human and animal hair contamination in manufacturing process validation batches, which posed a risk of microbial contamination (¶¶ 66, 67), in violation of 21 C.F.R. § 211.113.

**Protected Activity: Escalating OPM Data Integrity and Supply Chain Traceability Issues**

129. Mr. Pachikoru further engaged in protected activity by repeatedly raising concerns and objecting to systemic GMP and data integrity violations related to the OPM system used for pharmaceutical product release.

130.    These violations, which Mr. Pachikoru reported, compromised the chain of custody and traceability required for patient safety (¶¶ 20, 27, 29, 34, 58, 68, 93, 97). His objections noted that these practices and system failures violated federal regulations, including:

    a.  A lack of proper, learner-based training and qualified trainers for the OPM system, which led to non-compliant practices such as trainers applying signatures in the "PROD" environment without a valid audit trail of the trainee's logical decisions in violation of 21 C.F.R. §§ 11.10(e), 11.10(i), 211.22, 211.25 and 211.192 .

    b.  The lack of a validated OPM system capable of demonstrating data integrity, and management's directive to use non-compliant mechanisms to circumvent OPM failures in order to release products, in violation of 21 C.F.R. §§ 11.10(f) and 211.68(b).

    c.  Pervasive system failures, including OPM's instability, data loss, and synchronization errors, and the subsequent use of 'DTE tickets' as an improper, non-compliant mechanism to release drug products, in violation of 21 C.F.R. §§ 11.10(b), 11.10(c), 11.10(k), and 211.68(b).

**Retaliation and Wrongful Termination**

131.    In direct response to Mr. Pachikoru's protected activities, Vertex management actively suppressed his efforts. Management warned him against using the term "patient safety", deleted "patient safety" language from risk assessments, and instructed him to cease communications about the contamination issues (¶¶ 69, 75, 81, 82, 84, 85).

132. The causal connection between Mr. Pachikoru's protected activities and his termination is demonstrated by the immediate temporal proximity of his escalations and Vertex's adverse actions, which included:

   a. Dismantling his role and reassigning his key projects immediately after he refused to approve the TUP assessment (¶ 90);

   b. Delivering downgraded performance rating, which disqualified him from green card sponsorship (¶ 92);

   c. Issuing a fabricated 60-day PIP, by a manager who no longer supervised him (¶ 104).

   d. Vertex's proffered reasons for its adverse actions were pretextual. The PIP falsely characterized Mr. Pachikoru's protected complaints about Journavx contamination and OPM data integrity failures as his "incompetencies". This pretext is further evidenced by the fact that Mr. Pachikoru received Bronze, Silver, and Gold VOCAP awards for his work on the very projects criticized in the PIP.

133. As a direct and proximate result of Vertex's violation of Massachusetts public policy, Mr. Pachikoru has suffered significant damages, including but not limited to lost wages, lost benefits, severe emotional distress, and reputational harm.

## COUNT II

### Fraudulent Inducement - Massachusetts Common Law

134. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

135. During Mr. Pachikoru's recruitment in March-April 2023, Vertex, through its representatives Ms. Greenfield, Ms. Lee, and Ms. Miles, falsely represented that Vertex would "immediately" sponsor Mr. Pachikoru's Green Card upon joining the company (¶¶ 9, 10).

136. Vertex knew that immediate sponsorship was a critical factor for his decision whether to accept employment with Vertex, given the fact, that his H-1B status expiring in December 2025, made false representations and intentionally concealed material preconditions including but not limited to (¶¶ 31, 32):

   a. One to two years of required service before eligibility;

   b. Specific individual performance rating requirements; and

   c. A repayment agreement of $15,000-$30,000 before initiation of sponsorship.

137. Vertex misrepresented the facts with the deliberate intention of deceiving Mr. Pachikoru. This deception was designed to induce him to accept the employment offer at a suppressed wage and promise of immediate green card sponsorship, capitalizing on his expiring H-1B status.

138. Mr. Pachikoru justifiably relied on these representations. In direct reliance, Mr. Pachikoru accepted Vertex's offer and ceased the ongoing PERM process initiated by his previous employer, formally withdrawing from that process in May 2023 shortly before joining Vertex (¶ 11, 14).

40

139. As a direct and proximate result of Vertex's fraudulent inducement, Mr. Pachikoru suffered damages, including the loss of securing PERM, a priority date for I-140, job portability opportunity, substantial economic loss, and the permanent and irreparable loss of his lawful immigration status.

## COUNT III

### Fraudulent Misrepresentation - Massachusetts Common Law

140. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

141. Vertex recruited Mr. Pachikoru specifically for the position of "Manager, GMP Operational Quality", REQ-17609, requiring specialized expertise in pharmaceutical sciences and federal drug safety regulations (¶ 10). This position corresponds to SOC Code 11-3051.01 ("Quality Control Systems Manager").

142. Despite the awareness of the true nature of this specialized role, Vertex knowingly submitted a fraudulent LCA to the DoL and secured certification on April 18, 2023, falsely under SOC Code 13-1082.00 ("Project Management Specialists")—a materially different classification commanding a significantly suppressed prevailing wage (¶ 12).

143.    Vertex falsely classified the H-1B petition for Mr. Pachikoru under the computer-related occupation category "030." This was a misrepresentation material to both the wage determination and the specialty occupation classification, as Mr. Pachikoru's actual qualifications, skills, and experience are in pharmaceutical sciences and regulatory affairs. His offered role required scientific pharmaceutical quality control and GMP product quality assurance, not computer programming, directly contradicting the "030" classification. (¶ 13).

144.    When USCIS issued a Request for Evidence on June 23, 2023, challenging the "specialty occupation" nature of the misrepresented position, Vertex furthered its fraudulent conduct rather than correcting the record.

145.    Vertex, through its immigration counsel BAL, instructed Mr. Pachikoru to conceal his most relevant qualification—his MS in Regulatory Affairs (¶ 14)—and emphasize his Project Management degree in the RFE worksheet, constituting a deliberate manipulation of evidence.

146.    On June 23, 2023, Ms. Lee materially altered Mr. Pachikoru's RFE worksheet without his consent (¶ 16), fabricating job duties including "OPM System upgrades" and "pharmaceutical product disposition", the duties that were never a part of:

   a.   The original job requisition REQ-17609;

   b.   The interview discussions;

   c.   The LCA certified with DoL; or

   d.   The I-129 petition filed with USCIS.

147. Vertex submitted this falsified RFE response to USCIS on July 5, 2023, without Mr. Pachikoru's consent. Concurrently, Vertex materially altered Mr. Pachikoru's internal job description (POS-701219) to align with the fabricated duties listed in the RFE, concealed the material changes and never amended the LCA and the H-1B petition.

148. Vertex intended for DoL and USCIS to rely on these misrepresentations to approve the LCA and visa petition. Vertex further intended for Mr. Pachikoru to rely on its representations that his legal status was being secured lawfully, thereby inducing his continued employment under a fraudulently obtained visa that gave Vertex leverage to exploit his vulnerability.

149. As a direct and proximate result of Vertex's fraudulent misrepresentation Mr. Pachikoru suffered damages including, Mr. Pachikoru suffered damages, including: wage suppression, negation of his ability to mitigate damages and permanent loss of lawful immigration opportunity to work and reside in the US.

## COUNT IV

### Racial Discrimination, Hostile Work Environment, and Retaliation

### 42 U.S.C. § 1981

150. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

151. Throughout his employment, Vertex, through its agents and management, intentionally discriminated against Mr. Pachikoru based on his Indian race by subjecting him to disparate treatment compared to his similarly situated white American colleagues, creating a hostile work environment, and retaliating against him for complaining about the discriminatory treatment.

152. Mr. Pachikoru was qualified for his position and performed his duties satisfactorily, and was a recipient of Bronze and Silver VOCAP in September and October 2024; and a Gold VOCAP on the day of this termination (¶¶ 107.c, 125).

153. Vertex management, specifically Ms. Miles and Ms. Lee, exploited and weaponized Mr. Pachikoru's dependence on his H-1B visa—a critical factor inextricably linked to his Indian racial background—to exert discriminatory control and enforce subservience. They threatened his visa status, as a tool to silence his legitimate concerns. (¶¶ 17, 33, 40, 44).

154. Vertex management evaluated Mr. Pachikoru's individual performance, based on racial stereotypes rather than objective standards. Ms. Miles explicitly directed Mr. Pachikoru to "emulate specific Indian colleagues she held in high regard" (¶ 41).

155.   Vertex subjected Mr. Pachikoru to less favorable terms and conditions of employment than his white American counterparts, Ms. Bond, Ms. Schnitzer, and Mr. Braudis. This disparate treatment included, but was not limited to:

   a.   Markedly better treatment of Ms. Bond, who received a formal introduction email, immediate travel opportunities and professional development despite the fact that she joined after Mr. Pachikoru (¶¶ 23, 24, 25, 90a); Mr. Braudis was given Mr. Pachikoru's projects explicitly for his "professional growth" (¶¶ 26, 45); Ms. Schnitzer was praised for the work accomplished by Mr. Pachikoru and Ms. Schnitzer was slated for promotion to Manager and his responsibilities were transferred to her (¶¶ 55, 90a, 90d).

   b.   Active concealment of travel opportunities and sending white American employees to travel for projects Mr. Pachikoru was leading (¶¶ 44, 90).

   c.   Assignment of significantly higher workload to Mr. Pachikoru compared to his white American colleagues and was required to work during the 2023 Thanksgiving, Christmas Eve holidays and also while on approved PTO in India tending to his ill mother (¶¶ 21, 28).

   d.   After Mr. Pachikoru sought an internal job transfer to escape the hostility of Ms. Lee and Ms. Miles, Vertex denied his request, asserting the position had been predetermined. This action forced him to remain under their supervision. Vertex knew that Mr. Pachikoru was subjected to a hostile work environment but neither offered him alternative internal transfer opportunities nor took steps to improve his treatment or resolve the issue. (¶¶ 47, 48, 49).

156. Vertex engaged in complex and multivariate retaliation against Mr. Pachikoru for his protected activity. This retaliation included: dismissing his complaints; intensifying the pervasive disparate treatment and hostile behaviors he was experiencing; downgrading his performance rating; issuing a pretextual PIP; and wrongfully terminating his employment.

157. Whether through involuntary termination or constructive discharge (¶126), Vertex's discriminatory actions constituted an adverse employment action that altered the terms and conditions of Mr. Pachikoru's employment and ultimately ended his employment.

158. As a direct and proximate result of Vertex's intentional violation of 42 U.S.C. § 1981, Mr. Pachikoru has suffered significant damages, including economic loss, humiliation, reputational harm and prolonged psychological distress.

## COUNT V

### Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)

### 18 U.S.C. §§ 1589 & 1595

159. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

160. Vertex obtained and maintained Mr. Pachikoru's labor through the abuse of the lawful immigration process by:

    a. Filing a LCA using a SOC code 13-1082.00 that was for a lower-paying role than the one Mr. Pachikoru was hired for 11-3051.01 (¶¶ 10, 12);

    b. This fraudulent LCA formed further basis for H-1B petition with OCC code "030" that was neither Mr. Pachikoru's background, skills and expertise nor the "bonafide job" offered (¶ 13).

    c. When USCIS challenged the speciality occupation, Vertex knowingly and wilfully submitted an altered RFE response that materially changed the job duties and submitted to USCIS without Mr. Pachikoru's review or consent; furthermore, his job duties were altered officially in Workday, post H-1B approval (¶¶ 16, 18); and

    d. Instructing Mr. Pachikoru to conceal his MS in Regulatory Affairs to fit the improperly filed "Project Management" specialty occupation (¶ 14).

161. Vertex recruited Mr. Pachikoru with explicit verbal promises of "immediate Green Card sponsorship", knowing this was a critical factor in his decision to accept the position as his H-1B was due to expire on December 6, 2025 (¶¶ 9, 17, 80).

162. After inducing Mr. Pachikoru's employment, Vertex intentionally and wilfully delayed the internal green card sponsorship process and subsequently imposed new, coercive, and undisclosed conditions. These conditions included subjective performance rating, mandatory agreement to repayment and layered management approvals (¶¶ 9, 17, 31, 33, 32).

163. Vertex intentionally and repeatedly delayed Mr. Pachikoru's Green Card process despite Vertex's explicit knowledge of his H-1B expiration and missed the critical PERM deadline; and pivoted to EB-2 NIW process, with no intent to sponsor a greencard, ever (¶¶ 17, 30, 39, 53, 80, 119).

164. Vertex's management, Ms. Lee and Ms. Miles, explicitly threatened Mr. Pachikoru with serious harm of loss of his visa and immigration sponsorship to compel his continued skilled labor and talent, in silence. Ms. Miles directly stated that "his visa was at risk if he did not meet management's expectations" immediately after he escalated serious GMP violations. Ms. Miles specifically referenced the termination of a previous employee who also reported to Ms. Lee. That employee had raised similar concerns, was subsequently put on a PIP, and was then terminated. (¶¶ 40, 56).

165. These threats and delays were intended to silence Mr. Pachikoru from fulfilling his statutory and ethical obligations as a GMP QA Manager. Specifically, this included preventing him from escalating significant concerns regarding GMP product quality and patient safety, such as the black particle contamination found in Journavx API and pervasive systemic failures within the OPM (¶¶ 20, 27, 64, 67, 77, 86).

166. To compel Mr. Pachikoru's labor and silence his GMP concerns, Vertex schemed to make him believe he would suffer the serious harm of losing his immigration status. Vertex executed this coercive threat by abusing the legal immigration process. By deliberately delaying and failing to file his I-140 petition, and by actively preventing his internal transfer away from the managers who exerted coercive conditions (¶ 47, 48), Vertex rendered Mr. Pachikoru completely dependent and foreclosed his professional mobility; thereby ensuring any perceived non-compliance with its demands would result, as it ultimately did, in the catastrophic loss of his lawful immigration status (¶¶ 11, 48, 92).

167. When Mr. Pachikoru refused to cease his efforts to ensure GMP product quality and patient safety, Vertex actualized the threat. It fabricated a pretextual PIP and downgraded his performance rating to "building," immediately disqualifying him from Green Card sponsorship per Vertex's policies. At this time, Mr. Pachikoru had eight months remaining on his H-1B visa, no filed I-140 petition, and no job portability—circumstances that would compel a reasonable person in his position to submit to Vertex's demands.

168. Vertex knowingly benefited from Mr. Pachikoru's specialized labor—compelling excessive work on holidays and across time zones—while using the hostile and coercive environment to suppress his GMP contamination and product safety concerns that threatened Journavx's timely launch. Vertex's knowledge is demonstrated by Ms. Jacobs' acknowledgment of Mr. Pachikoru's urgent green card timeline, Ms. McGill's admission that PERM required December 2024 submission; simultaneous awareness of longstanding GMP violations by management (¶¶ 17, 28, 75, 80, 85, 86, 87).

169. Whether through involuntary termination or constructive discharge (¶126), Vertex's extreme conduct was designed to end his employment while inflicting maximum psychological harm (¶¶ 107, 110, 112, 119, 120, 121). Vertex further abused the legal process post-termination by intentionally delaying the H-1B revocation until Ms. Stedt's meeting on April 1, 2025; and characterizing the separation as "voluntary" in an attempt to evade its legal obligation of bonafide termination, including the requirement to pay return transportation (¶ 120, 122, 123).

170. As a direct and proximate result of Vertex's violations of 18 U.S.C. § 1589(a)(2), (a)(3), and (a)(4), actionable under 18 U.S.C. § 1595(a), Mr. Pachikoru has suffered, and continues to suffer, severe emotional distress, psychological harm, loss of income, loss of future earning capacity, and permanent and irreparable loss of lawful status to work and stay in the U.S.

## COUNT VI

### Wrongful Termination in Violation of Public Policy (M.G.L. c. 149, § 52C)

171. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

172. The Commonwealth of Massachusetts establishes a clear and well-defined public policy, codified in M.G.L. c. 149, § 52C, that an employee has a statutory right to rebut false or disputed information contained in their personnel record by submitting a written statement.

173. On March 7, 2025, Vertex placed a pretextual and fabricated PIP in Mr. Pachikoru's personnel record (¶ 104).

174. Mr. Pachikoru engaged in protected activity consistent with this public policy when he challenged the fabricated PIP, reported it as retaliation to Employee Relations, and was in the process of filing a formal internal complaint and rebuttal per Vertex's Code of Conduct through Vertex's Ethics & Compliance Alert Line (¶¶ 106, 107, 108, 112, 114).

175. Vertex, knowing that Mr. Pachikoru was actively exercising his statutory right to rebut the fabricated PIP, terminated him on March 20, 2025. This termination was executed to preempt and prevent Mr. Pachikoru from completing his formal rebuttal in Vertex's legal portal "App.Convercent", in direct violation of the public policy established by M.G.L. c. 149, § 52C (¶¶ 110, 113, 114, 115, 116).

176. Mr. Pachikoru was involuntarily terminated on March 20, 2025 (¶116). In the alternative, the conditions imposed by Vertex, including the retaliatory PIP (¶104) and ER's ultimatum to "comply with the PIP or resign" (¶¶110, 112), created intolerable working conditions that forced Mr. Pachikoru's resignation, amounting to a constructive discharge.

177. As a direct and proximate result of Vertex's wrongful termination in violation of public policy, Mr. Pachikoru has suffered significant damages, including lost wages, benefits, emotional distress, and reputational harm.


## COUNT VII

### Promissory Estoppel - Massachusetts Common Law

178. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

179. In March and April 2023, during the recruitment process and in response to Mr. Pachikoru's specific inquiries, Vertex made explicit, clear, and unambiguous promises to induce him to accept employment. Specifically, an unequivocal promise of immediate Green Card sponsorship upon his commencement of employment was repeatedly affirmed verbally by Vertex's authorized agents Ms. Greenfield, Ms. Lee and Ms. Miles (¶ 9).

180. Vertex made these promises with the intent that Mr. Pachikoru would rely upon them. Vertex knew that immediate sponsorship was a critical factor in Mr. Pachikoru's decision and acknowledged internally that his sponsorship needed to start immediately due to the limited time remaining on his H-1B visa (¶ 17).

181.    Mr. Pachikoru reasonably and foreseeably relied on Vertex's explicit promise of immediate Green Card sponsorship to his significant detriment. In direct reliance, Mr. Pachikoru accepted Vertex's offer of employment and left the active PERM Green Card process underway with his previous employer (¶ 11, 14);

182.    After Mr. Pachikoru detrimentally relied on the promise and commenced employment, Vertex breached its commitment. Instead of initiating immediate sponsorship, Vertex unilaterally deferred the process (¶ 17).

183.    Furthermore, Vertex subsequently imposed onerous, previously undisclosed conditions for sponsorship that were never communicated to Mr. Pachikoru before he accepted the offer. These conditions included subjective performance rating requirements, a mandatory repayment agreement and layered management approvals (¶¶ 17, 31).

184.    Vertex management actively obstructed the sponsorship process. Ms. Lee explicitly told Mr. Pachikoru, "Sue and I both agreed that we are not going to sponsor you for a year," and demanded an unreasonable "minimum of 10 years" commitment of labor services in exchange for the promised sponsorship (¶ 33).

185.    Vertex's protracted delay and failure to honor its promise resulted in Mr. Pachikoru missing the critical December 7, 2024 deadline required for a PERM application, a fact acknowledged by Vertex's counsel (¶ 80). Ultimately, Vertex never filed Mr. Pachikoru's PERM application or EB-2 NIW petition (¶ 119).

186.    As a direct and proximate result of his detrimental reliance on Vertex's broken promise, Mr. Pachikoru suffered substantial and irreparable harm, including:

   a.    The permanent and irreparable loss of his lawful immigration status and ability to work in the United States;

b.  The loss of his employment, wages, and future earning capacity; and

c.  Severe psychological distress.

## COUNT VIII

### Intentional Infliction of Emotional Distress (IIED) - Massachusetts Common Law

187.  Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

188.  Vertex, through the actions of its management and agents, including Ms. Lee, Ms. Miles, and Ms. Stedt, engaged in a course of conduct that was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

189.  Vertex management acted with the intent to cause Mr. Pachikoru severe emotional distress, or acted with reckless disregard of the high probability that such distress would result. Vertex was acutely aware of Mr. Pachikoru's specific vulnerability—his precarious H-1B visa status and his total dependence on Vertex for his continued legal presence in the United States.

190.  Vertex intentionally exploited this known vulnerability and abused its position of power over Mr. Pachikoru in an extreme and outrageous manner, characterized by a sustained campaign of coercion, retaliation, and humiliation including but not limited to:

a.  Using the Green Card sponsorship process as a tool of coercion, whereby Ms. Lee and Ms. Miles imposed unconscionable demands and pervasive expectations that left Mr. Pachikoru in a state of extreme psychological distress and helplessness;

54

b. Subjecting Mr. Pachikoru to repeated denigration and humiliation, including Ms. Miles asserting her hierarchy (¶ 64), labeling him as "emotional" and "not conforming" (¶ 62), explicitly telling him he "was not capable of leadership" (¶ 87), and his being publicly reprimanded by senior leadership for performing his QA duties (¶ 76);

c. Actively preventing his internal transfer away from the managers who exerted coercive conditions, causing the distress (¶ 47, 48, 49).

d. Manufacturing a fabricated PIP by maliciously misrepresenting Mr. Pachikoru's conscientious efforts to resolve systemic GMP failures as his own shortcomings. The PIP's true purpose was not improvement but to maliciously cause distress, disqualify him from Green Card sponsorship, and establish a pretext for termination; and

e. Responding to Mr. Pachikoru's reports of retaliation and his fear of the "permanent loss of his immigration status" with further outrageous conduct. Specifically, ER investigator Ms. Stedt repeatedly encouraged him to resign, demonstrating callous indifference to the catastrophic consequences. The culmination of this harmful conduct was the involuntary termination or constructive discharge of Mr. Pachikoru. The misconduct continued post-employment with the deliberate intent to mischaracterize his termination, thereby evading the H-1B program's legal obligations. This entire scheme was calculated to end his employment while simultaneously inflicting the most severe psychological distress possible (¶¶107, 109, 110, 112, 119, 120, 121).

191. As a direct and proximate result of Vertex's extreme and outrageous conduct, Mr. Pachikoru suffered severe emotional distress. The hostile behaviors and actions of management severely exacerbated his psychological distress, leading to panic attacks, anxiety, and sleeplessness.

## VI. PRAYER FOR RELIEF

WHEREFORE, Mr. Pachikoru respectfully requests that this Court:

A. Enter judgment in favor of Mr. Pachikoru and against Vertex on all Counts;

B. Award Mr. Pachikoru compensatory damages, including back pay, front pay, lost benefits and other economic losses in an amount to be determined at trial;

C. Award Mr. Pachikoru damages for emotional distress, humiliation, and reputational harm in an amount to be determined at trial;

D. Award Mr. Pachikoru punitive damages for Vertex's actions of willful, malicious, and reckless conduct, as permitted by law under the TVPRA and 42 U.S.C. § 1981;

E. Award Mr. Pachikoru pre-judgment and post-judgment interest as permitted by law;

F. Award Mr. Pachikoru the costs of this action, including reasonable attorneys' fees where applicable;

G. Grant comprehensive injunctive and equitable relief ordering Vertex to:

    a. Correct Mr. Pachikoru's employment records to reverse the pretextual "Building" performance rating, remove the fabricated PIP, and reflect the nature of his separation as an involuntary termination;

b. Provide accurate employment verification letters to Mr. Pachikoru and any requesting third party that reflect his actual job duties, positive performance, and true circumstances of separation; and

c. Take all necessary and appropriate steps to correct the material misrepresentations made to DoL, USCIS and any other relevant government agency regarding Mr. Pachikoru's H-1B petition and employment.

H. Issue a judicial declaration that the termination was unlawful; and

I. Grant such other and further relief as the Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

Mr. Pachikoru demands a trial by jury on all issues so triable.

Dated: November 12, 2025

Respectfully submitted,

Kranthi Sagar Pachikoru,

Plaintiff, Pro Se

Kranthi Sagar Pachikoru,

200 Deer St, Apt 3414, Milford, MA 01757

Phone Number: 571-570-3607

Email Address: kranthi@tuta.io