**UNITED STATES DISTRICT COURT**

**For The**

**District Of Massachusetts**

KRANTHI SAGAR PACHIKORU,

Plaintiff,

v.

VERTEX PHARMACEUTICALS INC.,

Defendant.

Civil Action  No.: **4:25-CV-40184-MRG**

**FIRST AMENDED COMPLAINT**

**(Jury Trial demanded)**

Plaintiff Kranthi Sagar Pachikoru ("Mr. Pachikoru" or "Plaintiff"), filing *pro se*, by way of Complaint against Defendant Vertex Pharmaceuticals Inc. ("Vertex" or "Defendant"), alleges as follows:

**I. PARTIES**

1.   Plaintiff Kranthi Sagar Pachikoru resides in Milford, Massachusetts. At all relevant times, he was employed by Vertex in Boston, Massachusetts.

2.   Defendant Vertex Pharmaceuticals Inc. is a global biotechnology company with its principal place of business located at 50 Northern Avenue, Boston, MA 02210.

## II. JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States, including the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. §§ 1589 and 1595, and 42 U.S.C. § 1981.

4.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the Plaintiff's related state-law claims, as they arise from the same common nucleus of operative facts as the federal claims asserted herein. These supplemental claims include violations of Massachusetts statutory law (M.G.L. c. 149, § 52C), the Massachusetts Wage Act (M.G.L. c. 149, §§ 148, 150), and Massachusetts common law claims for Wrongful Termination in Violation of Public Policy, Fraudulent Misrepresentation - Pre-Employment, Fraudulent Misrepresentation - Immigration Filing, Promissory Estoppel, and Intentional Infliction of Emotional Distress.

5.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant Vertex maintains its principal place of business in this District, Boston, MA, and a substantial part of the events giving rise to the claims occurred here.

## III. INTRODUCTION

6.  Plaintiff, Mr. Pachikoru brings this action against Defendant, Vertex alleging exploitation of his labor and immigration status, retaliation in violation of public policy and whistleblower statutes, wrongful termination and related claims arising from his termination after he reported VX-548 (Journavx Medication) manufacturing product quality and patient safety concerns.

7. The allegations herein are based on Mr. Pachikoru's personal knowledge as to his own actions and on information and belief as to all other matters. This information and belief is derived from his experiences and communications with current and former employees. The facts alleged are those known prior to discovery, as key evidence – including policies, procedures, Electronically Stored Information ("ESI"), and internal communications – exclusively controlled by Vertex. Mr. Pachikoru anticipates discovery will yield substantial evidentiary support for his claims and reserves the right to amend this Complaint to reflect the evidence.

## IV. STATEMENT OF FACTS

8. Mr. Pachikoru is a highly qualified individual in pharmaceutical formulation and sciences, and federal drug safety regulations. His qualifications include a Bachelor's and Master's in Pharmaceutical Sciences, specializing in chemical synthesis and formulations, an MS in Drug Regulatory Affairs, an MS in Project Management, and nearly a decade of experience. It was because of this specialized expertise in Good Manufacturing Practices ("GMP") and U.S. Food and Drug Administration ("FDA") regulations that Vertex recruited Mr. Pachikoru for a technical Quality Assurance ("QA") and managerial role.

3

**Recruitment Based on Sponsorship Promises and H-1B Visa Filing**

9.  During the recruitment process in March 2023, Mr. Pachikoru specifically inquired about his green card sponsorship. Vertex explicitly, verbally promised Mr. Pachikoru's immediate Green Card sponsorship, a critical factor that influenced his decision to accept the position. Relying on these unequivocal promises made by Cheryl Greenfield ("Ms. Greenfield"), Human Resources ("HR") Recruiter on March 1, 2023 between 12:15 PM to 12:30 PM via phone call; by Claudia Lee ("Ms. Lee") QA Senior Manager, on March 16, 2023 between 9 AM to 9:30 AM via Zoom Meeting; and by Sue Miles ("Ms. Miles") QA Operations Senior Director on March 21, 2023, between 9:30 AM to 10:00 AM via Zoom Meeting. Again by Ms. Greenfield again on March 29, 2023 around 8 PM, EST and April 3, 2023 at 2:30 PM, EST via phone call.

10. Mr. Pachikoru applied for Manager, GMP Operational Quality, REQ-17609 on March 16, 2023, which requires advanced application of scientific and regulatory principles in the field of Pharmaceutics,  corresponding to SOC code 11-3051.01 ("Quality Control Systems Manager").

11. In reliance on Vertex's promise, Mr. Pachikoru accepted employment on April 4, 2023, and withdrew from Prevailing Wage Determination (PWD), P-100-22306-564519, a critical step in the Labor Certification Process ("PERM") with his previous employer; and joined Vertex on May 22, 2023.

12. On April 6, 2023 Mr. Pachikoru signed a "Disclosure and Consent to Joint Representation" on BAL's Cobalt portal and completed the questionnaires required for H-1B petition.

13. Mr. Pachikoru, a chemist by training with approximately 29 months remaining on his H-1B six-year period, relied on Vertex and later Berry Appleman & Leiden LLP ("BAL")'s assurances that the H-1B transfer would be handled competently.

14. Vertex filed a Labor Condition Application  (LCA) I-200-23101-920831, for Mr. Pachikoru with the United States Department of Labor (USDOL) using SOC Code 13-1082.00 ("Project Management Specialists") at level III which corresponds to a lower prevailing wage than SOC Code 11-3051.01 for which Mr. Pachikoru was recruited on April 18, 2023.

15. H-1B petition is filed on April 20, 2023; On May 4, 2023, the United States Citizenship and Immigration Services (USCIS) issued a Request for Evidence ("RFE") for the H-1B petition, IOE8429937781 filed in Form I-129, challenging the qualification of the role's "specialty occupation" per the Occupational Code ("OCC"), "030" for systems analysis and programming which is a part of broader computer related occupations.

16. BAL refused to share the copy of the RFE with Mr. Pachikoru despite his request around 9 AM and 11 AM, on May 4, 2023.

17. Mr. Pachikoru inquired with BAL on the application of SOC code 13-1082.00 on the LCA on May 9, 2023, after the fact the H-1B petition had been filed and the RFE was issued. To which, Attorney Jennifer McGill ("Ms. McGill") from BAL, immigration counsel for Vertex, advised Mr. Pachikoru to emphasize on his Project Management degree stating it was a natural fit and conceal his MS in Regulatory Affairs in the RFE worksheet provided.

18. On June 21, 2023, Mr. Pachikoru was officially assigned to oversee product quality and compliance in external manufacturing of Journavax's Active Pharmaceutical Ingredient ("API") and Spray Dried Dispersion ("SDD") Teams.

19. On June 23, 2023, Ms. Lee shared the finalized RFE response; which was significantly different from the job Mr. Pachikoru applied for, and the RFE included Oracle Process Manufacturing ("OPM") System upgrades and product disposition responsibilities. These responsibilities were neither discussed during his interview nor a part of the bona fide job offered to Mr. Pachikoru. Furthermore, they were not part of the "bona fide job" in the DOL's LCA and the H-1B petition to the USCIS. Vertex submitted the altered RFE response to USCIS on or about July 5, 2023; without Mr. Pachikoru's knowledge or awareness.

20. After Mr. Pachikoru's H-1B petition approval on July 10, 2023, Mr. Pachikoru inquired about Vertex's promise of green card sponsorship.

   a. On July 18, 2023, Ms. Jacobs from Vertex's Global Mobility and Immigration ("VGMI") team confirmed in an email that Vertex had discussed green card sponsorship as a pre-requisite prior to hiring Mr. Pachikoru, stating "Kranthi's green card support would likely need to start in advance of meeting the eligibility requirements due to the remaining time, which is on his H-1B".

   b. Despite this acknowledged urgency, Ms. Jacobs deferred initiation of the green card process to January 2024.

   c. None of these preconditions were communicated to Mr. Pachikoru — verbally, in writing, or electronically — at any time during the recruitment process or before his acceptance of the offer on April 4, 2023.

6

21. Vertex maintains an internal policy and/ or training/ directive, titled "Immigration overview for talent acquisition by Shannon Holt, dated June 2021", which instructs talent acquisition personnel and hiring managers to offer only verbal support on green card and never to promise it in writing or in the offer letter.

22. Within weeks of joining Vertex, Mr. Pachikoru observed that management expected him to accept directives without question, refrain from questioning the handling of his H-1B petition or raising concerns about GMP compliance or operational practices, and defer to colleagues and seniors regardless of his professional merit. When Mr. Pachikoru did not conform to these expectations of unquestioning deference, Ms. Lee's demeanor toward him shifted — becoming dismissive, withholding of information and professional courtesies that were extended to his white American counterparts. On June 26, 2023, Mr. Pachikoru submitted approximately 33 comments in a Vertex internal Glint pulse survey (which Vertex claims to be anonymous) documenting management's conduct and its impact on him. However, on August 15, 2023, Ms. Lee directly questioned Mr. Pachikoru about whether he had submitted the survey comments. In subsequent one-on-one meetings, the survey comments were also referenced by Ms. Lee's immediate manager, QA Director Susan Tyskwicz ("Ms. Tyskwicz") on August 29, 2023, and by Ms. Miles on September 14, 2023.

23. On July 21, 2023, Ms. Lee materially altered Mr. Pachikoru's job duties by adding product disposition in OPM and removing people management responsibilities on paper. Ms. Lee transmitted a different Job Description to Mr. Pachikoru via DocuSign through Cecilia Morales ("Ms. Morales"). This altered Job Description was later uploaded into Vertex's Workday for POS-701219 associated with Employee ID 636457, and differed substantially from REQ-17609, the job posting which Mr. Pachikoru applied to and was hired for.

24. During his tenure, Mr. Pachikoru directly managed three contractor workers and oversaw another employee's Performance Improvement Plan ("PIP"), who directly reported to Ms. Lee.

**Product Quality Escalations and Emergence of Sponsorship Barriers**

25. From August to September 2023, Mr. Pachikoru was assigned to lead Quality Event ("QE"), a product quality investigation QE-014740, into cross-contamination related to Tezacaftor SDD, a drug product intermediate. Mr. Pachikoru requested OPM "Sandbox" access as it was required to investigate the GMP batch discrepancies. Though he was not provided access, Mr. Pachikoru diligently collaborated with Vertex's Data, Technology, and Engineering ("DTE") and uncovered systemic issues not only in external GMP manufacturing operations at Hovione but also with Vertex's handling of GMP operations, including OPM.

26. Ms. Lee assigned Mr. Pachikoru a significantly higher workload relative to his white American counterparts, this included requiring him to work during Vertex's 2023 Thanksgiving and Christmas Eve holidays; his extra time and efforts were necessary to ensure Safety, Identity, Strength, Purity, and Quality ("SISPQ") to support accelerated business timelines for validating the manufacturing process of Journavx's API.

27. Mr. Pachikoru was consistently denied professional development and travel opportunities. These opportunities were regularly extended to his white American counterparts, QA Manager, Alexis Bond ("Ms. Bond"), Senior QA Specialist, Brooke Schnitzer ("Ms. Schnitzer"), Senior QA Specialist, Marcus Braudis ("Mr. Braudis"), as well as to his manager, Ms. Lee, on numerous occasions.

28. Upon joining Vertex in September 2023, Ms. Bond was immediately provided with opportunities for professional development and travel. Mr. Pachikoru, who joined Vertex earlier on May 22, 2023, was neither offered nor allowed to pursue any such opportunities upon request.

29. Ms. Lee sent a cross-functional and departmental email to introduce Ms. Bond. However, no such email was sent to introduce Mr. Pachikoru.

30. During November and December 2023, Mr. Pachikoru identified and documented GMP violations at Olon, the Journavx API manufacturer, in an Inspection Readiness (IR) report. After he submitted this report, management removed the Journavx API project from Mr. Pachikoru and transferred it to Ms. Bond. Subsequently, contamination (QE-017596) occurred during the third Journavx API validation batch, consistent with the risks identified in Mr. Pachikoru's IR report. Senior Director Quality Systems, Dionna DiPierro's ("Ms. DiPierro") team consulted Mr. Pachikoru after Ms. Lee and Ms. Bond did not respond to their requests on QE-017596. Between December 2023 and January 2024, Ms. Lee and Ms. Bond traveled to Olon to inspect the issues Mr. Pachikoru had documented.

31. Due to accelerated product launch timelines, excessive workload and increased regulatory scrutiny requirements surrounding Journavx API manufacturing process validation and its setup, Mr. Pachikoru was unable to use his accrued Paid Time Off ("PTO") towards the end of 2023 and forfeited it.

32. During November 2023, while Mr. Pachikoru was the assigned QA lead on the Journavx API external manufacturing at Olon, John McDonagh, Senior Director, API ("Mr. McDonagh") publicly reprimanded Mr. Pachikoru during an external meeting with Olon for inquiring Olon on deficiencies in their vendor qualification, raw material procurement processes, and secondary redundant verification processes in batch records and QC testing laboratories —  stating that Vertex's management had already established a consensus with Olon. Furthermore, Mr. McDonagh directly stated to Mr. Pachikoru that he will discuss this matter directly with Ms. Miles in his next one-on-one meeting.

33.    On January 8, 2024, in response to Mr. Pachikoru's follow-up regarding green card sponsorship, Ms. Jacobs shared "Vertex's U.S. Immigration Policy, Version 1.0 ("VUSIP")" governing and controlling the terms and conditions of nonimmigrant and immigrant employees at Vertex. This document mandates the personnel performance rating requirements, recoupment of immigration costs and layered management approvals, which Mr. Pachikoru had no knowledge of until then.

34.    In early 2024, Ms. Lee assigned Mr. Pachikoru to develop a tracker for QA product releases and supply chain tracking; later, in March 2024, she abruptly removed Mr. Pachikoru from the project without his knowledge or awareness and reassigned it to Mr. Braudis. When Mr. Pachikoru inquired Ms. Lee, she stated that it was for Mr. Braudis's professional growth and benefit.

35.    During a one-one meeting with Ms. Miles on February 9, 2024; Ms. Miles confirmed that Mr. Pachikoru's skills should be focused on complex product investigations given his small molecule chemistry, GMP and regulatory expertise, and that disposition in OPM was not appropriate for Mr. Pachikoru. However, Ms. Lee later in May 2024, stated that OPM is non-negotiable and that Mr. Pachikoru should complete it.

36.    On March 13, 2024, during a one-on-one training, Mr. Pachikoru identified a GMP violation with OPM's inability to retrieve necessary change controls, questioning the compromised integrity of data acquired from OPM's query. When Mr. Pachikoru sought Ms. Lee's input, she responded, "that is how OPM works". Subsequently Ms. Lee initiated a DTE ticket for a "quick fix" and authorized the release of the product.

11

37. In March 2024, Mr. Pachikoru assumed responsibility for coordinating and completing Ms. Bond's Journavx product disposition to ensure the Journavx API release while Ms. Bond was on vacation, even though the API project was not within his assigned scope.

38. Ms. Miles praised Mr. Pachikoru for his succinct two-page draft outlining critical GMP failures and associated risks affecting product quality and product compliance for her upcoming travel to conduct a Mock FDA Pre-Approval Inspection ("PAI") at Hovione, Loures, between April 16 to April 19, 2024; and this was later praised and shared by Ms. Lee with other team members on what ideal QA expectations are.

39. Between March 15, 2024, to April 25, 2024, while on approved PTO Mr. Pachikoru traveled to India to take care of his mother's health. During this time, Ms. Lee assigned him two additional SDD products. This required him to work extended hours daily, across Indian (IST) and US (EST) time zones with five different projects and project leads. In April 2024, Mr. Pachikoru reported Ms. Lee's indifference and hostile treatment to Ms. Miles.

40. On March 27, 2024, during a one-on-one Zoom meeting, Mr. Pachikoru followed up with Ms. Lee on  the March 13, 2024 OPM's data integrity failure and her rationale behind authorizing the release of medicinal product without a GMP investigation to which Ms. Lee abruptly ended the meeting without addressing his questions.

41. From January 8, 2024 to April 16, 2024, Mr. Pachikoru repeatedly inquired Ms. Lee about starting his green card sponsorship process, but received no response. Mr. Pachikoru took the initiative to fill the sections of VUSIP, an action required by his manager, Ms. Lee.

42. VUSIP imposed the following conditions and requirements on nonimmigrant employees seeking green card sponsorship — none of which were communicated to Mr. Pachikoru verbally, in writing, or electronically at any time during the recruitment process or before his acceptance of employment on April 4, 2023:

    a. The employee's performance rating must be at "leading" at least for one year, or alternatively, at least "strong" for two years from the employee's date of hire; and

    b. The employee must sign the VUSIP, agreeing to repay the company $15,000 to $30,000 if they leave the company during or after the sponsorship.

    c. The VUSIP must be signed and approved by the

        i. The non-immigrant worker's immediate Manager

        ii. The non-immigrant worker's line management, Vice President (VP)

        iii. The non-immigrant worker, the employee

        iv. Global Mobility And Immigration Department

    d. Waiver of the eligibility requirements will be at the discretion of the department's VP and HR; and will be based on business needs.

    e. The VUSIP acknowledges that immigration applications are signed under penalty of perjury and that criminal exposure exists for false statements, and assigns managers and HR Business Partners the obligation to ensure accurate information regarding labor certification and job requirements.

43. On March 30, 2024, Ms. Lee sent a cross-functional announcement confirming that Mr. Pachikoru would assume sole responsibility for all matters related to the SDD product portfolio, encompassing oversight of Journavx, Alyftrek, Deutivacaftor and Tezacaftor SDD external manufacturing operations at Hovione. This assignment significantly expanded Mr. Pachikoru's responsibilities beyond his original job scope and was not accompanied by any corresponding reduction in his existing duties or increase in support resources.

44. On April 8, 2024, between 11:30 PM and 12:30 AM, Indian Standard Time ("IST"), Mr. Pachikoru — while on approved PTO in India to care for his mother — met one-on-one with Ms. Miles via Zoom meeting. During this meeting, Mr. Pachikoru outlined the excessive workload across the SDD projects. He also detailed Ms. Lee's ongoing concealment of information and disparate treatment toward him, and described the negative impact these conditions were having on his ability to perform his duties and on his career and well being.

45. On May 2, 2024, after Mr. Pachikoru's repeated follow-ups, Ms. Lee stated she would discuss the green card sponsorship process with Geny Doss ("Ms. Doss"), QA Vice President and Ms. Miles and explore initiating the process. During this same conversation, Ms. Lee stated that she was personally aware of a colleague of Indian ancestry at Vertex who had experienced immigration-related difficulties and had to leave the country for an extended period. Ms. Lee described this individual as a good friend.

46.  On May 8, 2024, after Mr. Pachikoru's multiple iterative requests about green card sponsorship, Ms. Lee stated, "Sue and I both agreed that we are not going to sponsor you for a year." Ms. Lee further tied the sponsorship to a long-term service commitment, "We are investing $ 20,000 to $30,000. Since we are investing money on you, we want you to stay at least a minimum of 10 years here, and want you to meet our expectations." She simultaneously invoked another employee who was placed in a PIP during this conversation. On May 23, 2024, after Ms. Miles's approval from May 22, 2024, Ms. Lee signed the VUSIP.

47.  Between May 22 and May 24, 2024, Mr. Pachikoru inquired with Ms. Schnitzer about the "manual constraint" application's broader use in OPM. Ms. Schnitzer stated that OPM's inability to retrieve certain QEs for e.g. QE-017882 was a "known OPM system's failure." She further stated that management's direction was to "release the products without any delays and open a DTE ticket later."

48.  In a one-on-one meeting on June 4, 2024, Ms. Miles stated that she was implementing a corrective action after Mr. Pachikoru's repeated complaints about Ms. Lee's behavior and its impact on him. Ms. Lee would no longer be his manager and she would soon transition to a new role, and Vertex would bring in a replacement manager. Ms. Miles further advised Mr. Pachikoru to continue providing her with feedback about Ms. Lee's conduct in the interim. This corrective action was never implemented:

   a.  Mr. Pachikoru remained under Ms. Lee's direct management for an additional seven months, during which the retaliatory treatment intensified, until Ms. Miles reassigned Mr. Pachikoru to Edward Fasano, QA Associate Director ("Mr. Fasano") on February 5, 2025.

49. Although afraid, Mr. Pachikoru consistently reported the hostile and disparate treatment he experienced. On June 18, 2024, Mr. Pachikoru reported Ms. Lee's behavior and its detrimental effect on him to her manager, Ms. Tyskwicz.

50. Furthermore, Mr. Pachikoru communicated these issues through six internal pulse surveys (administered by glint that are anonymous), as well as directly to Ms. Miles in four independent one-on-one meetings.

**Escalation of Journavx SDD Failures and Management's Threats to Visa Status**

51. In late June 2024, following the completion of the Journavx SDD process validation, Mr. Pachikoru escalated significant software and equipment malfunctions to QA management. These issues caused a deviation, resulting in sudden temperature increases during the Journavx SDD commercial spraying process. Ms. DiPierro responded with a further inquiry about product compliance investigation QE-019809 (later observed with QE-020252), to which Mr. Pachikoru explained the reason for the unexplained and unprompted temperature excursions observed at Hovione during manufacturing of Journavx SDD process validation batch 2, but she did not provide any direction on the issue.

52. During this time frame:

    a. Mr. Pachikoru made multiple attempts following up since May 23, 2024, with the QA management, to seek approval on the green card sponsorship form, and Ms. Lee cited budget reasons that were later confirmed to be resolved by Ms. Doss's Administrative Assistant, Rachele Galletta ("Ms. Galletta") on June 14, 2024.

b. On June 17, 2024, Mr. Pachikoru requested a meeting with Ms. Miles to expedite Ms. Doss's approval of the green card sponsorship form. Ms. Miles declined the meeting.

c. The internal form for sponsorship was approved on July 2, 2024, by Ms. Doss. The signed repayment form was shared with Ms. Jacobs for final approval on July 3, 2024.

53. Between June 19, 2024 and July 9, 2024, Ms. Lee announced that she was effectively transitioning to a new independent role as Continuous Improvement Lead, reporting directly to Ms. Miles, and that a replacement manager would be brought in for the group. Ms. Lee communicated this transition in both a QA team meeting and a cross-functional inter-departmental meeting. Despite this announcement, Ms. Lee continued to serve as Mr. Pachikoru's direct manager until March 7, 2025, during which the retaliatory treatment intensified.

54. Due to Ms. Miles and Ms. Lee's inaction on the serious GMP violations, Mr. Pachikoru escalated GMP operational failures at Hovione, impacting Journavx SDD cleaning process validation batches to Ms. Doss, directly on July 3, 2024.

55. On July 10, 2024, during a one-on-one meeting with Ms. Miles:

a. Ms. Miles informed Mr. Pachikoru that escalating Hovione issues to Ms. Doss was unnecessary, as Ms. Doss had been aware of these issues for over a decade. Ms. Miles also stated that his visa was at risk if he did not meet management's expectations.

b. Ms. Miles instructed Mr. Pachikoru to emulate specific colleagues of Indian ancestry whom she identified as exemplary, specifically naming QA Associate Director, Rupesh Malhotra ("Mr. Malhotra"), and Process Engineering Director, Sreedhar Shapally ("Mr. Shapally").

56. On July 15, 2024, Mr. Pachikoru met with Mr. Malhotra, as directed by Ms. Miles. During this meeting, Mr. Malhotra informed Mr. Pachikoru that, upon information and belief, another employee of Indian ancestry was experiencing similar immigration-related issues with Vertex.

57. On July 24, 2024, Mr. Pachikoru followed up with Ms. Jacobs and Ms.McGill in an email for an update on his green card sponsorship. Ms. McGill responded to his inquiry with a further inquiry whether he preferred a Permanent Labor Certification ("PERM") or an EB-2 National Interest Waiver ("NIW") immigration pathway, without clarifying the implications of either pathway on Mr. Pachikoru. He continued to request additional details to make an informed decision.

58. During a Journavx SDD project meeting between June and July 2024, which Ms. Lee attended in Mr. Pachikoru's absence; Ms. Lee stated to the team that Mr. Pachikoru could not travel due to his visa status. This statement was false; Mr. Pachikoru's visa status did not preclude travel. Ms. Lee travelled in his stead without Mr. Pachikoru's knowledge or awareness which he learned later in a subsequent project meeting.

59. On July 18, 2024 in a meeting for which Ms. Lee traveled to Hovione, Cork in Ireland instead of Mr. Pachikoru, she credited and praised Mr. Braudis for the SDD GMP compliance investigation report which Mr. Pachikoru compiled.

18

60. On July 25, 2024, when Mr. Pachikoru inquired Ms. Lee about the disparate treatment and concealment of travel opportunity, Ms. Lee became agitated, stating "you are going against the group, and your communication isn't good".

61. Mr. Pachikoru tried to move out of "Ms. Miles" line management and applied internally for REQ-22697 (a job opened in the California site) on July 31, 2024, and emailed Ms. Doss, expressing his interest.

62. On August 12, 2024, Nikole Desmarais from HR scheduled a meeting with Mr. Pachikoru and mentioned that the position was predetermined for another candidate, and directed him towards Ms. Miles for career development.

63. The following day, on August 13, 2024, during a one-on-one meeting:

   a. Ms. Miles dismissed Mr. Pachikoru's serious complaints about Ms. Lee's behavior, including her interference and micromanagement of his projects.

   b. Ms. Miles advised him to accept the situation, stating that "bad bosses are everywhere," and suggested that to be successful, he needed to mimic Ms. Lee's behaviors.

   c. Furthermore, Ms. Miles instructed Mr. Pachikoru that the content of their meetings was to remain private and confidential and that he was not to discuss them with Ms. Lee.

64. The sustained hostile conduct of Ms. Miles and Ms. Lee caused Mr. Pachikoru to experience panic attacks, anxiety, and sleeplessness, which also adversely affected his family.

65. Between July and August 2024, Mr. Pachikoru inquired with Vertex's Cell and Gene Therapy ("VCGT") QA operations team regarding a lateral transfer possibility in an attempt to escape mistreatment and hostility he was enduring under Ms. Miles management.

66. Between July and August 2024, a Journavx SDD engineering batch failed to meet product release specifications and was discolored and lumped due to an equipment malfunction that caused a critical deviation at the contract manufacturer, Hovione.

    a. The SDD development batch failure prompted a product investigation, which in turn delayed the Journavx SDD cleaning validation process.

    b. Following this incident, QA Associate Director, Nicole Ricci ("Ms. Ricci"), Journavx Product Quality Lead (PQL), communicated a directive to Mr. Pachikoru at the behest of Product Development, Senior Vice President, Kelley Swinney ("Ms. Swinney"), that commercial QA should look into these matters.

    c. Senior QA management, including Ms. Miles, Ms. DiPierro, and Ms. Doss, had prior knowledge of longstanding serious manufacturing deficiencies at Hovione.

    d. Mr. Pachikoru escalated these issues and the underlying deficiencies to Ms. Lee and Ms. Ricci for further escalation to senior QA management, Ms. Miles, Ms. DiPierro, and Ms. Doss. Despite the cleaning validation failures directly resulting from Hovione's equipment, software malfunctions GMP product compliance investigations 135034, 144474, and 144476 that Mr. Pachikoru had reported—factors entirely beyond Mr. Pachikoru's control—Ms. Lee subsequently cited these failures as a performance deficiency in his PIP.

20

67. In August 2024, Mr. Pachikoru followed up on his previous inquiry with Ms. Jacobs and Ms. McGill regarding whether he should plan to depart from Vertex if his green card could not be sponsored. In response, Ms. McGill scheduled a meeting for August 23, 2024, with Mr. Pachikoru and Ms. Jacobs; Ms. Jacobs did not attend. During this meeting, Mr. Pachikoru learned that Vertex and BAL had already decided to abandon the PERM process because the time had lapsed and to pursue EB-2 NIW instead. This decision had been discussed and agreed upon between Ms. McGill and Ms. Lee and/or VGMI in a prior meeting, without Mr. Pachikoru's knowledge or input.

   a. When Mr. Pachikoru asked whether it would be feasible to file both PERM and EB-2 NIW concurrently, Ms. McGill stated that doing so would "waste Vertex's resources" and that "BAL has fiduciary responsibility towards Vertex".

   b. Ms. McGill stated that BAL must file the EB-2 NIW on or before December 2024.

   c. Ms. McGill instructed Mr. Pachikoru to complete an EB-2 NIW questionnaire on BAL's immigration portal, "Cobalt," instead of the questionnaire she had previously shared via email in July 2024.

68. Following this meeting, Mr. Pachikoru made repeated inquiries to his manager, Ms. Lee, about the rationale for the  EB-2, NIW decision. In response, Ms. Lee scheduled a one-on-one meeting but failed to attend, did not reschedule, and did not provide the requested explanation.

69. On August 28, 2024, Ms. Lee publicly commended Ms. Schnitzer via an interdepartmental email regarding the release of Journavx SDD batches, a project Mr. Pachikoru was leading and accountable for. Ms. Lee did not similarly recognize Mr. Pachikoru's contributions.

70. On September 1, 2024, Mr. Pachikoru signed a "Disclosure and Consent to Joint Representation" on BAL's Cobalt portal and completed the initial EB-2 NIW questionnaire as instructed by Ms. McGill. As of this date, Mr. Pachikoru had approximately 15 months remaining on his H-1B six-year maximum period.

71. Between August and September 2024, Mr. Pachikoru shared with a trusted colleague his concerns regarding Ms. Lee's repeated insistence that Mr. Pachikoru exhibit subservience and comply with directives from Ms. Schnitzer and Ms. Bond without question, despite their noncooperative and noncollaborative behavior toward him. The colleague cautioned Mr. Pachikoru to be careful, citing examples of prior employees under Ms. Lee who had raised similar concerns and whose employment subsequently ended, and advised him to remain silent about these issues.

72. In a one-on-one meeting on September 5, 2024, Ms. Miles questioned Mr. Pachikoru regarding his August 29, 2024 email about "unreasonable efforts" required for Journavx and Alyftrek product review and release.

   a. Ms. Miles stated that "HR sees that email as employee concerns are not being addressed and taken care of". Then Ms. Miles referenced a former employee, who had also escalated GMP and workload concerns.

   b. Ms. Miles stated this reflected poorly on the QA management and Ms. Lee, and noted that the former employee was placed in PIP and terminated.

73. While thanking the Journavx project team member for bestowing him with the Vertex Outstanding Contribution Award Program ("VOCAP") recognition, Mr. Pachikoru learned that his VOCAP nomination had been withheld at the approval stage by a single manager for an extended period. The Journavx project team member had inquired with HR about the delay, but HR declined to identify the manager responsible. Only after that Journavx team member's further escalation with HR, Mr. Pachikoru's VOCAP was ultimately approved in September 2024.

**Persistent GMP Non-Compliance of OPM and Manufacturing Product Quality; and Vertex's Silence Over Immigration Process**

74. In September 2024, Mr. Pachikoru repeatedly inquired Ms. Lee regarding the handling of API material storage at Hovione, Lumiar warehouse. Mr. Pachikoru asserted that he was not informed of the Regulatory agency's audit finding and subsequent closure of QE-021464 "GMP temperature mapping in warehouse" by Ms. Schnitzer at Ms. Lee's discretion. Specifically, Mr. Pachikoru stressed the lack of a GMP product quality and compliance impact assessment for the Journavx and Alyftrek product launches. Ms. Lee did not respond to these inquiries.

75. On September 11, 2024, Mr. Pachikoru asked Ms. Lee for OPM training and answers regarding previously identified data integrity and GMP issues. Ms. Lee directed him to Ms. Schnitzer. On September 12, 2024, Ms. Schnitzer instructed Mr. Pachikoru to look at QE-016670 and stated that the non-compliant practices were "general ways of working" learned from Ms. Lee; and that management was aware of these practices, and insisted Mr. Pachikoru conform. Mr. Pachikoru subsequently emailed Ms. Schnitzer and Ms. Lee detailing the risks of these practices.

23

76. Simultaneously during September 2024,  Ms. Bond began holding SDD product release meetings without Mr. Pachikoru's knowledge on the projects he was accountable for.

77. During a one-on-one meeting on September 17, 2024, Mr. Pachikoru requested his own travel and development opportunities, to which Ms. Miles responded by stating "you are technically good but Claudia is good at communication and how she presents, and we are going to put you where you are good at, right"; and consequently, Ms. Lee had been traveling instead of Mr. Pachikoru.

78. Starting September 2024, the ongoing hostile treatment towards Mr. Pachikoru increased. This included, but was not limited to, excessive micromanagement, the removal of his duties, the dismissal of his concerns, and intimidation from both Ms. Lee and Ms. Miles.

79. On October 8, 2024, during a one-on-one Zoom meeting, Ms. Miles appeared agitated and dismissed Mr. Pachikoru's concerns. She stated, "although you have no malicious intent, you are emotional" and "although you are not mal-adaptive, you are not conforming." Mr. Pachikoru subsequently discontinued the recurring meeting series with Ms. Miles, with the November 13, 2024 meeting being the last in the series.

80. On October 24, 2024, Ms. Lee directed Mr. Pachikoru to open product quality investigation QE-023645 for a material control and inventory management system ("SAP")'s data integrity failure and inability to generate appropriate significant figures for the updated Certificate of Analysis ("CoA") with updated shelf life expiration date for Jounavx API lots  at Olon — a matter within Ms. Bond's project scope.

24

a. Mr. Pachikoru's reasoning with the project team and Ms. Lee led to the eventual cancellation of QE-023645 by Ms. Lee on November 11, 2024, since the failure originated at Olon. Ms. Lee never directed Ms. Bond to investigate the matter, yet subsequently attributed this issue to Mr. Pachikoru's performance in the PIP.

b. Upon following up with Cayce Soule ("Ms. Soule") regarding the updated Certificates of Analysis (CoAs) for the Journavx API, Ms. Soule was unresponsive. Given the high volume and expedited deadlines for Journavx API to meet SDD requirements, Mr. Pachikoru then escalated the issue to Ms. Bond. Ms. Bond, however, was dismissive, stating that Ms. Soule was "doing a far better job than you" or words to that effect.

81. In May 2024, black particles were observed in Journavx API, product quality investigation "QE-020300", failing the appearance specification of "White to off-white solid". Vertex elected not to perform comprehensive chemical analysis — Liquid Chromatography-Mass Spectrometry ("LC-MS"), Nuclear Magnetic Resonance Spectroscopy ("NMR"), or X-Ray Powder Diffraction ("XRPD") — to characterize the contaminants or determine whether they constituted Genotoxic Impurities ("GTI"). The analytical methods that were employed — infrared spectroscopy and solubility testing — could only confirm that the particles resembled Journavx API but could not identify the mechanism of formation, the source of contamination, or whether the contaminants included genotoxic species. When black particles recurred in October 2024, product quality investigation "QE-023896", Vertex management maintained its decision not to proceed with comprehensive testing.

82. On October 25, 2024, Ms. Doss sent an email specifically to Mr. Pachikoru and two other employees — all three of Indian ancestry and all three under Ms. Miles's management — regarding their progress with performance review submissions. On information and belief, Ms. Doss did not send a comparable email to non-Indian-ancestry employees under Ms. Miles's management regarding their performance review progress.

83. Of the three Indian-ancestry employees Ms. Doss identified in her October 25, 2024 email, two — including Mr. Pachikoru — were subsequently placed on PIPs and terminated.

84. On November 13, 2024, during the last one-on-one meeting with Ms. Miles:

    a. Ms. Miles confronted Mr. Pachikoru about a presentation regarding QA staffing resource challenges constraining SDD product release that was demonstrated and discussed in a Tier II leadership meeting, and stated "do you know how bad that looks on me" assuming he had prepared the presentation.

    b. Though Mr. Pachikoru immediately conveyed that he had no involvement or prior knowledge about the presentation, Ms. Miles continued her statements claiming that a junior employee, such as him, would not understand her importance in the hierarchy.

    c. When Mr. Pachikoru complained about Mr. McDonagh's behaviour to silence him regarding the Journavx black API issues; Ms.Miles dismissed his complaints stating "that is your perception".

d. Subsequently, Ms. Miles ended the conversation, instructing Mr. Pachikoru to immediately begin releasing products in OPM, which effectively contradicted her previous directives from her February and June 2024 one-on-one meetings with him.

85. Around Q4 of 2024, Ms. Schnitzer was allowed to travel to participate in the manufacturing technology transfer of Tezacaftor SDD to Esteve Quimica in Spain, a new external site. She went in place of Mr. Pachikoru, who was accountable for the project.

86. On November 15, 2024, Mr. Pachikoru, who was on approved PTO, led a crucial meeting between Vertex and Hovione to support an urgent U.S. FDA's inquiry received by Vertex. Journavx wet-state SDD material did not have any method to test microbial content, and the FDA's inquiry was specific to the data availability of a "65-day hold" period of wet SDD. This meeting was also joined by Ms. Lee and QA Senior Director, Yeimy Garcia ("Ms. Garcia") who came in the absence of Ms. Ricci.

87. Mr. Pachikoru was concerned since two Journavx SDD validation batches were subject to product complaints regarding human and animal hair contamination reported by Catalent. By the end of November 2024, Ms. Ricci instructed Mr. Pachikoru to cease all discussions regarding the microbial assessment of Journavx wet SDD, stating that Ms. Miles had decided to consult the regulatory head regarding testing requirements.

88. In late November 2024, Mr. Pachikoru reiterated his request for OPM training to Ms. Lee. When he again pointed out recurring data integrity issues, Ms. Lee visibly reacted with displeasure, stating he was "not meeting expectations" instead of addressing the GMP issues. She later ascribed the OPM's GMP non-compliance and failures to Mr. Pachikoru's performance shortcomings in the PIP.

27

89.  On November 20, 2024, during a Journavx SDD and API team meeting to discuss the black particles in the Journavx API risk assessment, Ms. Bond argued with Mr. Shapally on what dictated a product quality escalation. Mr. Pachikoru interjected to clarify the governing rules on what constituted escalation, and the framework to be applied. Ms. Bond adamantly directed her arguments against both Mr. Pachikoru and Mr. Shapally, although API Director Micheal Reynolds ("Mr. Reynolds") and API Associate Director Frederic Jos ("Mr. Jos") resonated with Mr. Pachikoru's evaluation.

90.  Later in the same meeting, Mr. Pachikoru inquired whether Olon had started a product quality investigation. In response to Mr. Pachikoru's inquiry, the API Director, Michael Reynolds ("Mr. Reynolds"), referred to Ms. Bond since she was the QA lead for API, to which she deflected those responsibilities to Mr. Pachikoru, and remained silent. Subsequently, in the PIP, Ms. Lee attributed these failures to Mr. Pachikoru, stating, "responsibilities have been deflected to MS&T or upstream teams instead of a successful collaboration."

91.  In late November 2024, Mr. Reynolds explicitly opposed Mr. Pachikoru's recommendation to investigate forced degradation data of Journavx API and its stability in relation to the observed black particles. Mr. Reynolds stated that such an investigation could challenge Vertex's adherence to GMP and Regulatory Compliance practices and call into question the product's entire control strategy as filed with the Health Regulatory Agency. As of Mr. Pachikoru's termination, the source and phsyio-chemical nature of the black particles remained uninvestigated and uncharacterized.

92.    On December 9, 2024, Ms. Lee rejected the service ticket, RITM0395299 for OPM system training and access that was requested by Mr. Pachikoru, while he was on PTO that day. This action directly contradicted Ms. Miles' directive from November 13, 2024 instructing Mr. Pachikoru to start releasing products in OPM.

93.    On December 10, 2024, Mr. Pachikoru proposed a GMP compliant solution for the black particles in the Journavx API in an exclusive meeting he scheduled with Ms. Lee, Ms. Miles, Ms. Bond, and Ms. Ricci. Ms. Miles rejected the proposal, stating that it would undermine Journavx's manufacturing process validation, which was also mirrored by Ms. Lee.

94.    Further into the meeting, Ms. Miles instructed Mr. Pachikoru, not to use the terms "safety" or "patient safety" and prohibited him from taking notes. Additionally, she stated, "I don't want you telling our technical partners what to do or provide guidance different than what I said," and insisted the discussion remain confidential. Subsequently, Ms. Lee characterized Mr. Pachikoru's objections, raised during this meeting as "GMP non-compliance" in the PIP.

95.    During 2024, Mr. Pachikoru had more than 58 one-on-one meetings with Ms. Lee and 6 one-on-one meetings with Ms. Miles, during which Mr. Pachikoru raised GMP compliance concerns and reported the hostile and disparate treatment he was experiencing, including the impact on his ability to perform his professional duties and on his well being. These meetings provided Ms. Lee and Ms. Miles with direct and repeated notice of hostile and disparate treatment towards him.

**Classification of Contaminants as Technically Unavoidable Particles ("TUP") and De-Stabilization of Immigration Status**

96.    On December 17, 2024, during a meeting with Hovione, Mr. Pachikoru, in the presence of Ms. Lee and other participants, challenged Hovione's Qualified Person (QP) regarding the decision to accept some bags deemed as safe for patients while rejecting others from the contaminated Journavx API batch. Hovione did not respond.

97.    On January 6, 2025, in a meeting to resolve the ongoing black particle contamination of Journavx API; Mr. Pachikoru, in accordance with his QA duties and expertise, ascertained the need to perform analytical characterization of the black particles to which Mr. McDonagh and his team publicly reprimanded Mr. Pachikoru in the presence of Ms. Lee, Ms. Bond, and Mr. Shapally.

98.    After the meeting, Mr. Shapally advised Mr. Pachikoru, out of concern, to disengage from the matter, warning that Executive Vice President, Morrey Atkinson ("Mr. Atkinson") was seeking to assign blame to some individual for the delays caused to the Journavx release. He cautioned that Mr. Pachikoru's continued involvement could jeopardize his employment.

99. During a one-on-one meeting with Ms. Lee on January 9, 2025:

    a. Mr. Pachikoru shared a detailed assessment on GMP product quality mitigation methods linking the approach to patient safety considerations regarding the repeated black particles issue with Journavx API and why such scientific assessment and statistical methods are allowed by the FDA. Ms. Lee subsequently met with Vertex's Qualified Person, Orla Deady. The assessment was later converted and strategized as TUP, and was subsequently approved by Ms. Lee without Mr. Pachikoru's awareness or knowledge.

    b. Furthermore, Mr. Pachikoru raised concerns about the behavior of Mr. McDonagh and his team, pertaining to the January 6, 2025, meeting. Ms. Lee dismissed his concerns, stating along the lines that they are good and they meant well.

100. On January 10, 2025, and again on January 16, 2025, Mr. Pachikoru emailed as well as messaged Ms. Lee in MicroSoft (MS) Teams, regarding the External Manufacturing Associate Director, Paul Kyriacopulous's ("Mr. Kyriacopulous") prioritization of batch releases over product quality and patient safety issues, contradicting Mr. Pachikoru's concerns with GMP product quality investigations. Ms. Lee did not respond.

101. On January 14, 2025, Ms. Jacobs followed up with Mr. Pachikoru on the status of the Green card EB-2 NIW questionnaire she shared on July 24, 2024, contradicting Ms. McGill's directive to Mr. Pachikoru on August 23, 2024. In the course of the email exchanges, Ms. McGill responded to the email thread on January 15, 2025, and explicitly stated, "We are really under significant pressure to seek the I-140 for you, given that your 6-year maximum date is December 7, 2025. Had we been proceeding with a PERM, we would have needed to submit a PERM for you by December 7, 2024."

102. Between January 17 and January 22, 2025, Ms. Lee rephrased and deleted parts of the API risk assessment related to black particles in the Journavx API. Concurrently, Executive Director, Drug Product, Joseph Medendorp ("Mr. Medendorp"), deleted information related to "Patient Safety" and its impact. Mr. Pachikoru's efforts towards collective and informed decision, involving Hovione and additional reviews, led to the reinstatement of the "Patient Safety" terminology and further meetings. Subsequently, Ms. Lee characterized this event as Mr. Pachikoru's "Lack of robust Quality decision-making". She cited this incident in the PIP for "sharing a Vertex Risk Assessment draft with Hovione CMO before finalization internally."

103. On January 21, 2025, Mr. McDonagh dismissed Mr. Pachikoru's efforts to streamline alignment with Hovione on the risk assessment. In an email, Mr. McDonagh confirmed escalation of this delay in closure of the risk assessment to the Tier II leadership meeting, attended by Ms. Miles, and further escalated to the Tier I leadership meeting, attended by Ms. Doss; and asked technical and external manufacturing management, copied in the email, to do the same.

104. Mr. Pachikoru made several comments in the TUP risk assessment, a live SharePoint document being finalized collaboratively. Mr. McDonagh responded to Mr. Pachikoru's comments stating that no further investigation was warranted and that the matter must be closed swiftly to resume Journavx spray drying at Hovione.

105. On January 23, 2025, in another meeting with Hovione, Ms. Lee and Vertex's QP, Orla Deady ("Ms. Deady") joined to facilitate Hovione's acceptance of contaminated API bags with limited or no additional testing. Mr. Pachikoru intervened and explained to Ms. Lee that one of her assumptions that filtration processes in spray drying does not function as a Corrective and Preventive Action (CAPA); while simultaneously inquiring Hovione's rationale for inconsistently accepting some API bags, following up on his previously unanswered question from December 17, 2024. Hovione's Business Development Director, Christina Cruz ("Ms. Cruz") intervened and stated "we will discuss this during the management meeting that Ms. Lee is planning with Vertex's senior leadership" and abruptly ended the call.

106. Later that same day, on January 23, 2025, in a one-on-one meeting, Ms. Lee explicitly ordered Mr. Pachikoru to cease all communication about the contamination issue.

107. By way of background relevant to the events that follow: Journavx API's initial risk assessment "VV-QUAL-146118," completed in June 2024, attributed the occurrence of black particles in Journavx API to a defect in the discharge process of the tumble dryer or the delumping and/or screening step, concluding that an adapter change to the dryer would remediate the issue. The adapter change was planned for implementation between July and August 2024 at Olon; however, it was never implemented as of March 7, 2025.

33

108. The observations of recurrence of black particles in Journavx API bags increased in magnitude and volume starting November 2024. This caused the development of a second risk assessment "VV-QUAL-166876" that concluded the cause of black particles in Journavx API may be resulting from localized heating effects during distillation or crystallization or drying and delumping and/ or screening; however, the black particles were deemed acceptable since they are "technically unavoidable". Vertex deemed the particles acceptable without conducting any statistical evaluation or exhaustive chemical analysis that is required to establish their classification as TUP under GMP commercial manufacturing standards.

109. On January 27, 2025, Ms. Lee excluded Mr. Pachikoru from a crucial senior leadership meeting between Vertex and Hovione from 1 PM to 2 PM, EST in Building 2, Floor 10, Conference E; a follow up that was scheduled in response to the unresolved matter from January 23, 2025 regarding the Journavx black particle in API and resumption of SDD process. Following this meeting, Vertex reclassified the black particle contaminants in API as TUP, modifying the API risk assessment.

110. On January 28, 2025 Ms. Lee conveyed that she was receiving pressure from senior leadership regarding why the SDD spraying had not yet resumed despite her authorization.

111. On January 28, 2025, Mr. Pachikoru, seeking to transfer out of Ms. Miles's management chain due to the hostile treatment, met with a senior member within QA to inquire about an opening in their line management; the senior member informed Mr. Pachikoru that, based on their understanding, his line management would likely not approve or permit his transfer.

112.  Mr. Pachikoru objected and refused to approve the altered risk assessment classifying the black particles as TUP:

a.  Subsequently, on January 27, 2025, between 8 PM to 9 PM, EST., Ms. Lee approved the assessment VV-QUAL-166876 and authorized "Removal of SAP Hold  Memo" to resume Journavx SDD manufacturing with the API containing univestigated and uncharacterized black particles.

b.  Ms. Lee then approved an updated version of the risk assessment on January 31, 2025, between 11 AM to 12 PM, EST.

c.  Ms. Lee reauthorized an updated "Removal of SAP Hold  Memo" on February 11, 2025, between 3 PM and 4 PM, EST to include additional Journavx API batches contaminated with black particles.

113.  From January 21, 2025, to March 3, 2025, in Tier III meetings, Mr. Kyriacopulous and his manager, External Manufacturing Director, Jonathan Hutchinson ("Mr. Hutchinson"), repeatedly pressured Mr. Pachikoru to approve QE-023896 in order to release Journavx SDD batches. During a Tier III meeting, Mr. Hutchinson stated that Ms. Miles had assured him there were no objections to the approval and subsequent batch release.

114.  Between January and February 2025, Mr. Pachikoru sought assistance from two senior QA leaders regarding the pattern of hostile behavior by Ms. Lee and Ms. Miles. The senior leaders acknowledged the pattern but expressed concern that intervening could result in an adverse action towards him.

115.  On January 15, 2025 and January 22, 2025, Mr. Pachikoru organized two lunch events at his personal expense to foster collaboration between cross-functional QA and Technical Operations teams. Ms. Lee attended both events, during which she expressed to colleagues that she would soon be transitioning to a new independent role reporting to Ms. Miles and had been waiting for months for the official announcement from QA leadership. Ms. Miles immediately declined the meeting invitation for the lunch on January 22, 2025.

**Reassignment of Duties and Downgraded Performance Rating**

116.  On January 30, 2025, the US FDA approved Journavx for commercial distribution in the US. Vertex had publicly announced its target launch of Journavx for the first quarter of 2025. The commercial launch required Vertex to manufacture and release sufficient Journavx SDD batches from the same API supply chain in which black particle contamination had been recurring since May 2024. On that same day, Ms. Lee declined Mr. Pachikoru's continuation request for a one-on-one meeting regarding the unresolved black particle contamination and instead directed him to share his concerns via email. Mr. Pachikoru complied, reiterating in writing the problems with the unknown nature of the black particles as impurities, the associated risks, and that he had not been informed how or whether the risk had been mitigated following his exclusion from the January 27, 2025 senior leadership meeting. Ms. Lee did not reply to or follow up on this email.

117.  On February 4, 2025, Ms. Lee announced via interdepartmental email that she had transitioned to Continuous Improvement Lead, reporting directly to Ms. Miles.

    a.  The email included a SmartSheets link soliciting input on systematic GMP issues and proposed resolutions.

36

    b.  Mr. Pachikoru completed the form, reiterating the ongoing GMP problems he had previously reported. Items from his responses were later characterized in the PIP as Mr. Pachikoru's individual performance deficiencies.

    c.  That evening at 6:06 PM, Ms. Lee sent a meeting invite to Mr. Pachikoru, with Ms. Miles as an optional attendee, for a "VX-2030 QA Re-Organization Meeting" the following morning to discuss Mr. Pachikoru's role.

118.  On February 5, 2025, Ms. Miles joined the reorganization meeting scheduled by Ms. Lee. In this meeting, Ms. Miles informed Mr. Pachikoru of several changes, effective immediately:

    a.  Mr. Pachikoru was no longer responsible for the SDD projects and they were reassigned to Ms. Schnitzer and Ms. Bond. Instead, he was reassigned to a slower-moving project, Kalydeco granules. During the meeting, Ms. Miles also informed Mr. Pachikoru that Ms. Lee was joining remotely because she was at Esteve, Spain, to lead Deutivacaftor SDD manufacturing technology transfer validation meeting, a project Mr. Pachikoru was leading at that moment and was accountable for. Ms. Lee never informed Mr. Pachikoru of the travel related to Deutivacaftor SDD.

    b.  Seven months after promising to remove Ms. Lee; Ms. Miles reassigned Mr. Pachikoru to Mr. Fasano as his new manager on February 5, 2025 — around the immediate timeframe Mr. Pachikoru refused to approve the TUP risk assessment.

    c.  Ms. Lee is now the Continuous Improvement ("CI") lead, reporting directly to Ms. Miles.

    d.  Ms. Schnitzer was slated for promotion to Manager and would take over Mr. Pachikoru's oversight of Hovione.

    e.  Scott Ibrahim, a new QA Director, has been hired as a technical resource for QA to lead process validation.

    f.  These changes will be effective in Vertex's Workday on March 3, 2025, aligning with HR requirements.

119.    On February 12, 2025, Mr. Pachikoru met Mr. Fasano for a one-on-one meeting in which Mr. Fasano, most notably stated "I don't want you telling me that I am wrong in front of Geny".

120.    On February 13, 2025, in a one-on-one meeting, Ms. Lee delivered Mr. Pachikoru's annual performance review, downgrading his rating from "strong" to "building." This downgrade reduced his bonus and annual compensation. It also immediately disqualified him from Green Card sponsorship under VUSIP and prevented his internal mobility.

**Emergence of PIP**

121.    On the evening of February 20, 2025, Mr. Pachikoru's annual performance review was altered in Vertex's Workday system. This review had originally been submitted by Ms. Lee on October 29, 2024, manually advanced on January 5, 2025, and marked completed on January 6, 2025. On February 20, 2025 the rating was again altered —the same date Mr. Pachikoru discovered that contaminated Journavx API bags had been released without his knowledge or awareness, after his refusal to approve the release.

122. Following the downgraded performance rating, Mr. Pachikoru explored and inquired regarding the possibility of transfer into the drug product process engineering group. A counterpart in process engineering discussed the matter with their manager. Before any transfer could be effectuated, Ms. Lee issued the PIP on March 7, 2025. Under Vertex's practices and/ or policies, the "Building" performance rating and active PIP status rendered Mr. Pachikoru ineligible for internal transfer.

123. On February 19, 2025, in a one-on-one meeting Mr. Pachikoru inquired QA Senior Manager, Margaret Bernstein ("Ms. Bernstein") about a change control query related to Kalydeco where OPM failed to retrieve QE-018579 as "impacted changed control". Ms. Bernstein acknowledged the system failure but stated that since the product was already released, no GMP compliance investigation was required. When Mr. Pachikoru shared this with Mr. Fasano in his one-on-one meeting on February 20, 2025; Mr. Fasano concurred with Ms. Bernstein's assessment, since such failures are known, and do not warrant a GMP compliance investigation. Ms. Lee later, labeled OPM's systemic implementation failures and GMP non-compliant training as Mr. Pachikoru's intellectual incompetency, in the PIP.

124.    In the early hours of February 20, 2025, through Hovione's email and responses to the multiple comments and questions made by Mr. Pachikoru in Hovione's Report 159272 in a live sharepoint (part of Vertex's QE-023896), Mr. Pachikoru discovered that the contaminated Journavx API batches had been accepted and released for further SDD manufacturing. This release was authorized based on the January 27, 2025, meeting, the contents of which were never revealed to Mr. Pachikoru, and the TUP risk assessment, which Mr. Pachikoru had refused to approve. Within hours of this email from Hovione, Mr. Shapally privately replied to Mr. Pachikoru; and that Mr. Pachikoru cannot challenge what Vertex's management had already decided.

125.    The black particles in Journavx API were found in more than 23 individual bags of 20 kilograms each amounting to approximately 500 kilograms from 9 unique Journavx drug substance/ API batches constituting approximately 3,200 kilograms, of Journavx API.

126.    On the same day, February 20, 2025, Mr. Pachikoru was pressured on a decision regarding yellow particle contamination, QE-025131 for Journavx API, a decision that was between Ms. Lee, Ms. Bond and Ms. Miles; and Mr. Pachikoru followed up with Ms. Lee for the third time seeking an update. Ms. Lee did not respond. Subsequently this was inferred as Mr. Pachikoru's incompetence in the PIP.

127. Later that afternoon on February 20, 2025, Mr. Pachikoru met with Ms. Schnitzer in a one-on-one meeting he scheduled for project transition and shared a detailed list (via SharePoint and email) of projects and concerns, inclusive of QE-023896 and QE-025453 (equipment/ software failures causing temperature excursions at Hovione). On February 27, 2025, Ms. Schnitzer emailed him regarding these issues but focused on internal ways of working rather than the underlying GMP product quality and compliance violations at Hovione. Ms. Schnitzer directed Mr. Pachikoru to work with process engineering leadership for quick resolution as it was holding a product release. Later Ms. Lee characterized these systematic GMP problems as coordination issues and attributed them to Mr. Pachikoru's incompetence.

128. On February 24, 2025, Mr. Pachikoru requested OPM training in a one-on-one meeting with QA Senior Manager Katerina Flater ("Ms. Flater"). Ms. Flater stated that the OPM "Sandbox" (training environment) no longer exists and was inadvertently lost in the beginning of 2023 and could not be retrieved anymore.

   a. She further stated that Ms. Lee had developed procedures to bypass the GMP training requirements by granting approvals directly to the GMP "PROD" environment. Ms. Flater directed him to train with Ms. Bernstein and two other drug product QA team members, as soon as possible.

41

b. During this same meeting, Ms. Flater stated that because Mr. Pachikoru had been trained by Ms. Lee but and that Ms. Lee had not signed off to authorize his access; Ms. Flater's approval to authorize his OPM access will look bad on Ms. Lee; Ms. Flater directed Mr. Pachikoru to document additional evidence of OPM training to avoid any questions on how and why she approved Mr. Pachikoru's access.

129. On February 28, 2025, Mr. Pachikoru had a one-on-one meeting with Mr. Fasano during which:

a. Mr. Pachikoru shared details about the problems and conversations he had regarding OPM with Ms. Flater.

b. Mr. Pachikoru shared a PowerPoint presentation with Mr. Fasano about the Journavx SDD development manufacturing batch's stability QE-026003, which was impacted due to uncontrolled equipment heating issues. Subsequently, the PIP cited that the QE-026003 was discovered by the QA management; attributing QE-026003 related issues to Mr. Pachikoru's incompetence.

c. Mr. Fasano is scheduled to follow up with QA management on March 4, 2025, regarding the escalation for QE-026003. Additionally, Mr. Fasano confirmed he will discuss QE-026003 and the transfer of its workload with both Ms. Lee and Ms. Miles. He will then update Mr. Pachikoru.

d. Mr. Fasano advised Mr. Pachikoru to transfer all the projects by March 15, 2025.

e. Mr. Fasano later inquired with additional questions from Ms. Miles about QE-026003, which was ongoing at Hovione.

f.  Furthermore, in that same one-on-one meeting on February 28, 2025, Mr. Pachikoru informed Mr. Fasano of his need to travel to India in April 2025 due to his grandmother's passing and its severe impact on his father's health. Mr. Pachikoru's request was consistent with Vertex's "Paid Medical, Bonding, and Family Caregiver Leave" policy. Seven days after this notification, Ms. Lee issued the PIP.

130.  On February 28, 2025, at approximately 2:00 PM, Mr. Pachikoru met with Mr. McDonagh, Mr. Reynolds, and Ms. Bond. During this meeting, Mr. McDonagh stated that neither Ms. Lee nor Ms. Bond had ever informed them that the black particles memo had been signed off. Ms. Bond, who had co-signed the Journavx product complaint, remained silent and did not correct this misrepresentation. This incident was subsequently cited in the PIP as evidence of Mr. Pachikoru's performance deficiencies, despite the fact that it demonstrated management's own failure to communicate and Ms. Bond's unwillingness to take responsibility for a decision she had co-authorized.

**QA Competency Model**

131. On January 17, 2025, Mr. Pachikoru attended and participated in a QA competency model meeting at the directive of Ms. Lee and subsequently drafted the assigned QA competency model at Ms. Miles' behest.

132. Ms. DiPierro, during her one-on-one meeting with Mr. Pachikoru on January 23, 2025, and Senior Director of HR Andrew Rigoglioso ("Mr. Rigoglioso"), during his one-on-one meeting with Mr. Pachikoru on February 5, 2025 — both of whom served as Mr. Pachikoru's assigned guides — provided no direct or indirect feedback regarding his competency model. No feedback was provided by either individual, whether during group meetings, through MS Teams chat, via email, or following the completion of the internal QA competency survey by Mr. Pachikoru as had been directed.

133. Ms. Miles requested a one-on-one meeting; which occurred on January 31, 2025 and she explicitly stated that Mr. Pachikoru "was not capable of leadership" and dismissed his competency model draft, saying she did not have to follow something modeled by him.

    a. Following the meeting with Ms. Miles, Mr. Pachikoru shared the competency model and "respectful meeting ideation" details, as instructed by Ms. Miles, via email to both Ms. Lee and Ms. Miles, and received no response.

    b. Ms. Lee referenced Mr. Pachikoru was a "QA Competency Revision Lead," and that he had wasted time and resources delivering a chart that was not useful to the management, in the PIP.

**Inception of Termination**

134.    On March 3, 2025 over a series of email exchanges inclusive of Mr. Fasano, Ms. Lee approved Mr. Pachikoru's goals in Workday and Ms. Lee further instructed him to work with Mr. Fasano.

135.    On March 3, 2025 Ms. Bond approved the Journavx API manufacturing investigation report and didn't share it with Mr. Pachikoru. Between March 3 and March 6, 2025, Ms. Bond and Ms. Schnitzer utilized a DTE service ticket to remove Mr. Pachikoru from the QE-023896 product quality investigation. This circumvented the standard VeeQMS process, which allows the current assignee to reassign. Mr. Pachikoru followed up with Ms. Bond and Ms. Schnitzer, to see if there were any additional concerns he might not be aware of that could warrant escalation, but he received no response.

136.    On March 4, 2025, between 3:00 PM and 4:00 PM EST, Ms. Lee accessed Veeva Quality Management System (Veeva QMS) for VV-QUAL-40360 and also downloaded product quality investigation reports QE-021898, QE-024595, and QE-020252. Neither Ms. Lee nor Mr. Fasano accessed QE-026003 on that date. However, Ms. Lee stated in the PIP that these issues were "discovered by QA Management". Mr. Pachikoru had shared information regarding QE-026003 with Mr. Fasano on February 28, 2025.

45

137. On March 6, 2025, at approximately 2:20 PM, immediately prior to the Journavx project transfer meeting, Mr. Pachikoru expressed his interest in the Povitacept planned product launch to Steven White ("Mr. White"), QA Vice President for Vertex's Biologics and Medical Devices; Mr. White responded positively and instructed Mr. Pachikoru to schedule a meeting within the next two weeks to further discuss the opportunity. Less than 24 hours later, Ms. Lee issued the PIP, which — combined with the "Building" performance rating — foreclosed all internal mobility, including this opportunity.

138. On March 6, 2025, Mr. Pachikoru met with Ms. Schnitzer in person to discuss Journavx SDD product quality investigation QE-023896 and understand Ms. Schnitzer's rationale for preferring a CAPA and escalation.

   a. Mr. Pachikoru had previously discussed that TUP assessment was signed off by Ms. Lee at the behest of Ms. Miles authorization; and that he was neither aware nor had any knowledge until later —with Ms. Schnitzer; however, Ms. Schnitzer followed-up with questions whether to escalate to management on March 5, 2025.

   b. This discussion further continued again in the early hours of March 7, 2025, via Zoom meeting and MS Teams, at Ms. Schnitzer's request.

   c. Ms. Schnitzer accessed Veeva QMS, VV-QUAL-40360 in the early hours of March 3, 2025, and VV-QUAL-39754 around 4 PM on March 6, 2025.

139. Mr. Fasano sent a group email regarding the inconsistent practices within QA, on March 19, 2025. However, Ms. Lee characterized such inconsistent practices exclusive to Mr. Pachikoru in the PIP and stated that he failed to follow the escalation pathway (WI VV-QUAL-44070).

140. Per Ms. Miles directive, Ms. Lee was no longer Mr. Pachikoru's authorized manager, since 11:57 AM, February 5, 2025; and according to Vertex's official Workday records Ms. Lee was no longer Mr. Pachikoru's manager, since 5:50 PM, March 6, 2025.

141. On March 7, 2025, at 12 PM, in a sudden and unannounced manner, Ms. Lee and Ms. Kayla Burke ("Ms. Burke"), Employee Relations ("ER") Manager, joined a regular one-on-one scheduled by Mr. Pachikoru with Mr. Fasano, and Ms. Lee issued Mr. Pachikoru a 60-day PIP, in the presence of Mr. Fasano, despite the fact that Ms. Lee wasn't Mr. Pachikoru's manager.

   a. Ms. Lee continued reading the PIP for about 10 to 15 minutes and concluded by stating that Mr. Pachikoru's philosophical questions can derail the current GMP procedures and processes (manufacturing, testing, product quality control and release).

   b. The PIP cited that Mr. Pachikoru failed in OPM training; failed to coordinate disposition, referencing VV-QUAL-40360; and failed to follow escalation procedures, referencing VV-QUAL-44070.

   c. Ms. Lee stated that Mr. Pachikoru should complete the OPM training and prepare a presentation on successful completion to Ms. Miles and after completion of reading the PIP Ms. Lee stated "Kranthi, do you, now understand, why you are put in PIP" and after a brief pause stated "I am also here to help, if you need any help with OPM".

d.  Mr. Pachikoru then responded "So, the decision is made about the PIP and it is time to part ways, correct" to which Ms. Lee interrupted Ms. Burke's response and stated "Kranthi is philosophical, he will reflect and come back" followed by Ms. Burke "if you disagree, we can discuss further steps".

e.  Throughout the conversation Mr. Fasano kept his head down while seated in a huddle room from the office.

**Retaliation Report to HR , "Comply or Resign"  and Permanent Loss of Immigration Status**

142.  Later that afternoon on March 7, 2025, Mr. Pachikoru requested a meeting with Employee Relations Manager Ms. Burke, pursuant to Vertex's Code of Conduct. On March 10, 2025, while on sick leave, Mr. Pachikoru met with Ms. Burke. During this meeting, while Ms. Burke was taking notes:

a.  Mr. Pachikoru stated that Ms. Miles and Ms. Lee had wilfully and intentionally targeted him due to his mistreatment complaints to them, thereby exploiting his immigration vulnerability to silence him;

b.  Mr. Pachikoru asked if the PIP guidance was followed since it required consultation with "legal" if the employee had any prior complaints of managerial harassment and intimidation; and immigration concerns.

c.  He stated that the PIP was fabricated and was instituted suddenly as a surprise without any prior warnings or progressive discipline; and

48

d. The terms of VUSIP, the downgraded performance rating with PIP, immediately disqualifies him from green card sponsorship, causing permanent loss of lawful immigration status, work authorization, and also mandates recoupment of immigration and sponsorship costs of up to $30,000.

143. Furthermore, he also reported that the PIP fabrication was because of:

a. The GMP non-compliance reports he raised on Journavx SDD and OPM.

b. The concerns he had previously raised in the glint pulse survey; on the same note the PIP contradicts the VOCAP Bronze and Silver awards he received in September and October 2024 for the same projects mentioned in the PIP.

144. Ms. Burke approved Mr. Pachikoru's leave from March 11 to March 14, 2025. She committed to escalating his concerns regarding the potential permanent loss of his immigration status and promised to respond to his request for an internal legal portal to upload evidence supporting his retaliation claim.

145. This matter was escalated by Ms. Burke, leading to an ER investigation by Alisa Stedt ("Ms. Stedt") on March 11, 2025. Simultaneously, Mr. Fasano, scheduled daily 30 minute PIP meetings on March 13, 2025.

146. On March 17, 2025, during the ER investigation meeting with Ms. Stedt, Mr. Pachikoru shared all the concerns he previously raised with Ms. Burke, including the permanent loss of immigration status, per "Vertex's Code of Conduct". Ms. Stedt, who initially scheduled from 9:30 AM to 10:15 AM, continued the meeting until 11:15 AM. Ms. Stedt, was simultaneously taking notes; and:

a. Ms. Stedt questioned why Mr. Pachikoru was challenging OPM.

b. When Ms. Stedt questioned why Mr. Pachikoru hadn't come to HR earlier, in which he stated "I am raised to work with the person where the problem is originating instead of going to HR".

c. When Mr. Pachikoru stated "Claudia and Sue crossed a line, and they are doing what they did with Matt". Ms. Stedt dismissed him and concluded the meeting encouraging Mr. Pachikoru to resign.

d. Despite Mr. Pachikoru's iterative requests via meetings and emails to HR, no details were provided on his request for the legal portal or details of the HR investigation or case number.

147. On the same day, March 17, 2025, Ms. McGill stated that the NIW strategy will be led by BAL's Attorney Jennifer Schaaf ("Ms. Schaaf") and they could no longer guarantee Mr. Pachikoru's H-1B extension. However, they are expediting efforts to submit the EB-2 NIW case.

148. On March 18, 2025, Mr. Pachikoru accessed Vertex's VertexAlertLine system ("App.Convercent") as directed by Vertex's Code of Conduct.

149. On March 19, 2025, Mr. Pachikoru explicitly and unequivocally confirmed with Ms. Stedt, copying Ms. Burke via email that he will submit his formal legal complaint regarding the PIP through Vertex's Ethics & Compliance Alert Line, App.Convercent. However, Ms. Stedt repeated her ultimatum: comply with the PIP or resign.

150. Mr. Pachikoru emailed Ms. Doss on the evening of March 19, 2025, for a one-on-one meeting request to convey the truth but received no response.

151.    On March 20, 2025, at 11:20 A.M., Mr. Pachikoru emailed Mr. Fasano to cancel the daily PIP meetings. In this email — sent less than 24 hours after notifying Ms. Stedt and Ms. Burke that Mr. Pachikoru will submit a legal complaint — Mr. Pachikoru stated, "I will submit my resignation mostly, today; if not tomorrow," and "I will let you know once I submit." Mr. Pachikoru's language was conditional and exploratory: he had not submitted a resignation letter, had not specified a departure date, and expressly stated he would notify Mr. Fasano once a submission occurred. Mr. Fasano responded at 11:25 A.M., "canceling the daily PIP meetings per your email".

152.    At 12:18 P.M. on March 20, 2025 — less than one hour after Mr. Pachikoru's conditional email and before any formal resignation was submitted — Mr. Fasano sent an unprompted email to Mr. Pachikoru's personal email stating, "Vertex will accept this notice as your resignation, effective immediately." At the time of Mr. Fasano's email, Mr. Pachikoru had not submitted a formal resignation letter, had not finalized or communicated a departure date, and was actively preparing a formal internal legal complaint for submission through Vertex's App.Convercent portal, as he had formally notified HR on March 19, 2025.

153.    Vertex immediately severed Mr. Pachikoru's access to all company systems — including the App.Convercent portal, which he had notified HR that he was drafting to file his formal retaliation complaint. By terminating him within minutes, Vertex prevented Mr. Pachikoru from exercising his right to submit the written rebuttal and formal legal complaint he was actively preparing.

154.    Mr. Pachikoru was involuntarily terminated on March 20, 2025. At the time of his termination, he had approximately eight months of H-1B status remaining toward the six-year maximum period due to expire on December 6, 2025.

**Post-Termination Actions and Characterization of Separation**

155.    Vertex provided Mr. Pachikoru with his final paycheck on March 21, 2025.

156.    Mr. Pachikoru documented his concerns on March 23, 2025, in the exit form issued by Vertex's Office of Business Integrity and Ethics ("OBIE").

157.    Vertex never shared the recommendation letters for the EB-2 NIW, despite assurances in the follow-up emails in February 2025. Vertex canceled Mr. Pachikoru's EB-2 NIW case on March 25, 2025.

158.    Ms. Stedt emailed Mr. Pachikoru on March 27, 2025, March 31, 2025 and April 1, 2025 to schedule a meeting that occurred on April 1, 2025.

159.    Based on the VUSIP repayment obligations Mr. Pachikoru had signed on July 3, 2024, and the reiteration in Vertex's Exit Packet received at 9:10 AM, on March 21, 2025, Mr. Pachikoru understood that Ms. Stedt's meeting requests concern the mandatory immigration repayment costs of $15,000 to $30,000 and liquidated his 401(k) retirement savings in preparation.

160.    However, during the April 1, 2025 meeting, Ms. Stedt, while taking notes, did not discuss anything regarding the VUSIP recoupment obligations. Instead, she questioned Mr. Pachikoru about his prior complaints regarding Ms. Miles and Ms. Lee, and the statements he made in the OBIE exit form and during the March 17, 2025 meeting.

a. After Ms. Stedt stated that they couldn't rehire him, she asked Mr. Pachikoru to identify how management's actions violated Vertex's Code of Conduct, to confirm whether the "PIP Guidance" he referenced was the guidance she had provided by email, and to specify the five claims he had raised.

b. Ms. Stedt asked him to identify by name the other employees he mentioned had been placed on PIPs. Ms. Stedt then stated that Mr. Pachikoru's termination was within Vertex's guidelines, that he had not given HR more time to investigate, and that he had not applied for or taken additional vacation.

c. To Ms. Stedt's statement of "Good luck on whatever future plans you have" Mr. Pachikoru responded that, as a H-1B worker without an I-140, he cannot lawfully work in the US and it impacts his lawful ability to reside in the US; and Ms. Stedt concluded the meeting.

161. When Mr. Pachikoru inquired about unpaid Employee Stock Purchase Plan ("ESPP"), accrued PTO, and any outstanding wages, Ms. Stedt directed him to employee services. Between April 1 and April 14, 2025, Ms. Kathryn Arigo ("Ms. Arigo") from Vertex's Employee Services responded through a series of emails confirming that:

a. Vertex never filed a green card application;

b. Vertex revoked Mr. Pachikoru's H-1B petition to USCIS; and

c. Vertex refused to provide an employer notice of termination to Mr. Pachikoru as a non-immigrant employee, stating that "Vertex does not provide this document in the case of voluntary terminations".

162. Vertex did not effectuate a bona fide termination as required for H-1B non-immigrant workers.

163.    Vertex paid Mr. Pachikoru's accrued PTO and ESPP deductions on April 4, 2025.

**Pattern of Discriminatory Treatment Against Employees of Indian Ancestry**

164.    Throughout his tenure, Mr. Pachikoru shared the hostile treatment he experienced from Ms. Miles and Ms. Lee with a few select trusted colleagues in QA and TechOps, including senior directors, directors, senior managers and managers. Some of them empathized with him and others who shared the same ancestry acknowledged that they experienced similar hostile treatment from specific management chain and that there was nothing Mr. Pachikoru could do.

165.    Upon information and belief, Vertex applied its performance management policies in a discriminatory manner against employees of Indian ancestry. One non-immigrant employee, who does not share Mr. Pachikoru's Indian ancestry ("Employee A") received a "Building" performance rating from Ms. Miles's management chain at the same time as Mr. Pachikoru. Rather than placing Employee A on a PIP — the consequence was imposed on Mr. Pachikoru and another employee of Indian ancestry ("Employee B") under substantially similar circumstances — while Ms. Miles waived the PIP and transferred Employee A.

166.    Upon information and belief, a former QA employee of Indian ancestry ("Employee C") who served under Ms. Miles's management between approximately April 2021 and September 2022 experienced similar hostile treatment, including public confrontations with Ms. Miles. Employee C subsequently transferred to a different QA group, where they continued to face similar treatment, and ultimately departed Vertex in or around March 2023. Mr. Pachikoru learned of Employee C's experience through unprompted statements from a technical colleague who had direct knowledge of the events.

54

167. During his tenure, within Ms. Miles's QA organization of more than 60 employees, individuals of Indian ancestry were predominantly in working-level positions or as contractors, while career progression and growth and/ or leadership positions were exclusively reserved for and/ or held by white American employees.

168. On April 8, 2024 and June 4, 2024 one-on-one with Mr. Pachikoru, Ms. Miles made disparaging remarks to Mr. Pachikoru about two senior members of Indian ancestry, investigating why they did not defer to her directives. She did not make comparable remarks about white American employees who similarly challenged her.

169. Upon information and belief, an equally qualified employee of Indian ancestry ("Employee D") was ignored for promotions despite accomplishing a higher workload than white American counterparts, subsequently leading to their abrupt departure. Shortly after Employee D's departure, the role was converted to a QA Manager and offered to a white American contractor converting their position into full-time.

170. Upon information and belief, within Ms. Miles's QA organization, at least four other employees of Indian ancestry stayed in the same role without any opportunity for progression or development despite their advanced qualifications and tenure, while white American employees with comparable or lesser qualifications and/ or tenure were granted better treatment or provided with better opportunities and manageable workloads.

171. Upon information and belief, multiple employees of Indian ancestry independently advised Mr. Pachikoru that Ms. Miles expected employees of their background to remain silent and deferential.

172. Upon information and belief, multiple current and former employees who personally witnessed or experienced the discriminatory treatment described herein declined to be identified, stating that Vertex retaliates against employees who speak out.

**Good Faith Approach Seeking Personnel File & Immigration Documentation**

173. On May 8, 2025, Mr. Pachikoru's legal counsel approached Vertex requesting his personnel file and immigration records from Vertex in good faith.

174. On May 15, 2025, Vertex's counsel produced select personnel records which revealed that Mr. Pachikoru had earned a Gold VOCAP, a one-time bonus worth $750.00 award that was processed for payment on March 20, 2025 but Vertex never paid Mr. Pachikoru, which was marked as processed for payment.

175. Between May 22 and May 23, 2025, Vertex's counsel refused to provide further details regarding the investigation into Mr. Pachikoru's matter.

176. After multiple email correspondence with BAL, BAL's General Counsel transmitted the EB-2 NIW documentation required for Form I-140 petition to the USCIS. Upon review, these documents were prepared and ready for signatures as of February 5, 2025 — the same date Ms. Miles and Ms. Lee removed Mr. Pachikoru from Journavx and other SDD projects. The EB-2 NIW documentation was never shared with Mr. Pachikoru while he was still employed at Vertex.

**Impairment of Lawful Immigration Record To Work And Reside In The United States**

177.   Vertex never filed an EB-2 PERM or an EB-2 NIW.

178.   Furthermore, Vertex's H-1B petition created a permanent inconsistency in Mr. Pachikoru's I-94 and Alien File maintained by USCIS; Mr. Pachikoru's pharmaceutical chemical sciences qualification — directly contradicts the "Project Management and Computer Related Occupation" classification.

**Nature of Internal Reports and Immigration-Dependent Constraints**

179.   Throughout his employment, Mr. Pachikoru reported to Ms. Lee, Ms. Tyskwicz, Ms. Miles, Ms. Burke, Ms. Stedt, and through six internal anonymous pulse surveys, the hostile treatment, disparate workload, denial of professional development and travel opportunities extended to white American counterparts, management's demands that he remain silent and deferential, and management's explicit invocation of his visa status as leverage to enforce compliance. Mr. Pachikoru did not use the specific words "race", "ancestry" or "discrimination" in these internal reports.

180.   Mr. Pachikoru's immigration-dependent status — controlled entirely by the same managers he was reporting to — created a reasonable fear that explicit accusations of racial bias would accelerate the very retaliation he was experiencing. At the time of each report, Mr. Pachikoru had no independent path to lawful immigration status; his green card eligibility, H-1B maintenance, and continued ability to reside and work in the United States depended on the approval and cooperation of Ms. Lee, Ms. Miles, and VGMI team. Under these circumstances, Mr. Pachikoru reported the substance of the discriminatory conduct — the behavioral expectations, the disparate treatment, the visa threats — without labeling it as ancestry-based discrimination.

**Lawsuit And Current Immigration Status of Mr. Pachikoru**

181. After Vertex's counsel declined to share any further investigation details on August 19, 2025, Mr. Pachikoru terminated his counsel and proceeded to file a complaint in the federal district court of Massachusetts.

182. As of March 3, 2026, Mr. Pachikoru has remained without work authorization since the day of his termination by Vertex on March 20, 2025 — a period of approximately twelve months. As a direct and proximate result of Vertex's actions, Mr. Pachikoru has been unable to maintain lawful immigration status independent of his pending application for immigration relief, which remains under adjudication by USCIS.

**In the Alternative**

183. Even if the Court does not find that Mr. Pachikoru was involuntarily terminated —the totality of Vertex's conduct —including the retaliatory PIP, the ER investigator's ultimatum to "comply with the PIP or resign", the downgraded performance rating that disqualified Mr. Pachikoru from green card sponsorship, the systematic dismantling of his role, and the imminent permanent loss of his lawful immigration status — created working conditions so intolerable that a reasonable person in Mr. Pachikoru's position would have felt compelled to resign.

## V. STATEMENT OF CLAIMS

### COUNT I

### Fraudulent Misrepresentation — Pre-Employment

### (Massachusetts Common Law)

184. Mr. Pachikoru re-alleges and incorporates by reference Paragraphs 1 through 182 of this Complaint as if fully set forth herein.

185. During recruitment in March–April 2023, Vertex, through its agents, made false representations of material fact to Mr. Pachikoru that Vertex would "immediately" sponsor his Green Card. These representations were made by Ms. Greenfield on March 1, 2023, March 29, 2023 and April 3, 2023 via phone call; by Ms. Lee on March 16, 2023, via Zoom meeting; and by Ms. Miles on March 21, 2023, via Zoom meeting. (¶ 9).

186. Vertex knew these representations were false when made:

   a. Vertex maintains an internal directive which instructs HR and managers to only offer verbal support on green card sponsorship and never to promise it in writing or in the offer letter (¶ 21);

   b. Vertex had an established VUSIP, imposing performance rating requirements, layered management approvals, and recoupment obligations of $15,000 to $30,000—none of which were disclosed to Mr. Pachikoru before his acceptance of employment (¶¶ 33, 42(a)–(e));

   c. VGMI team acknowledged Mr. Pachikoru's H-1B time limitation yet delayed the process multiple times despite the acknowledged urgency of Mr. Pachikoru's H-1B timeline (¶ 20(a)–(b)); and

    d.   Vertex's immigration counsel BAL shifted the burden to Mr. Pachikoru whether he would prefer EB-2 PERM or EB-2 NIW and that it must be filed by December 7, 2024 (¶¶ 57, 101).

    e.   Vertex never had any intention to file either EB-2 PERM or EB-2 NIW (¶¶ 46, 52(a)–(b), 142(d), 147, 177). The EB-2 NIW documents were prepared and ready for signatures as of February 5, 2025, but were never shared with Mr. Pachikoru during his employment (¶¶ 101, 176).

187.    Vertex made these representations with the intent to induce Mr. Pachikoru to accept employment. Immediate green card sponsorship was the critical and determinative factor in Mr. Pachikoru's decision, given that he had approximately 29 months remaining on his H-1B six-year period. (¶¶ 9, 11, 13).

188.    Mr. Pachikoru justifiably relied on Vertex's representations as true. In direct reliance, he accepted Vertex's offer on April 4, 2023, and withdrew from Prevailing Wage Determination P-100-22306-564519, a critical step in the PERM Labor Certification process with his previous employer. (¶ 11). Mr. Pachikoru's reliance was reasonable because: (a) the VUSIP conditions and eligibility requirements were not communicated to him—verbally, in writing, or electronically—at any time during recruitment or before his acceptance of employment (¶ 42); and (b) Vertex's internal directive (¶ 21) was specifically designed to prevent the creation of any written record that would have alerted him to the falsity of the oral representations.

189.    As a direct and proximate result of Vertex's fraudulent misrepresentations, Mr. Pachikoru suffered the following damages:

    a.   Loss of the PERM process and priority date with his previous employer (¶ 11);

b.  Termination without a filed I-140, depriving him of the statutory ability to extend his H-1B beyond December 6, 2025, or port to a new employer under AC21 § 106(b) (¶¶ 161(a), 177);

c.  Permanent loss of lawful work authorization and immigration status in the United States (¶ 182);

## COUNT II

### Fraudulent Misrepresentation — Immigration Filing

### (Massachusetts Common Law)

190.  Mr. Pachikoru re-alleges and incorporates by reference Paragraphs 1 through 182 of this Complaint as if fully set forth herein.

191.  Vertex recruited Mr. Pachikoru for the position of Manager, GMP Operational Quality, REQ-17609, requiring specialized expertise in pharmaceutical sciences and federal drug manufacturing and safety regulations, corresponding to SOC Code 11-3051.01 (¶¶ 8, 10). On April 18, 2023, Vertex filed LCA I-200-23101-920831 with the U.S DOL using SOC Code 13-1082.00 ("Project Management Specialists") at Level III—a materially different classification corresponding to a lower prevailing wage (¶ 14).

192. Vertex further misrepresented the Form I-129 of the H-1B petition (IOE8429937781) filed on April 20, 2023, by classifying Mr. Pachikoru under OCC "030" for computer-related occupations (¶ 15). Mr. Pachikoru holds degrees in Pharmaceutical Sciences, Drug Regulatory Affairs, and Project Management. He possesses no qualifications in computer programming or computational sciences (¶ 8). The occupational classification was material to both the wage determination and the specialty occupation analysis.

193. Vertex knew these classifications were false:

    a. Vertex recruited, interviewed, and hired Mr. Pachikoru specifically for his pharmaceutical sciences expertise for a quality assurance and managerial role (¶¶ 8, 10), yet filed immigration documents under entirely different occupational classifications;

    b. When USCIS issued an RFE on May 4, 2023, challenging the specialty occupation classification (¶ 15), Vertex furthered the misrepresentation rather than correcting the record. On May 9, 2023, Ms. McGill from BAL instructed Mr. Pachikoru to emphasize his Project Management degree and conceal his MS in Regulatory Affairs in the RFE worksheet (¶ 17);

    c. The RFE response materially altered Mr. Pachikoru's actual job duties without his knowledge or awareness, fabricating responsibilities including OPM System upgrades and product disposition—duties not part of REQ-17609, the interview discussions, the certified LCA, or the I-129 petition (¶ 19). Vertex submitted this altered RFE response to USCIS on or about July 5, 2023 (¶ 19); and

    d.  On July 21, 2023, Vertex concurrently altered Mr. Pachikoru's job description via DocuSign and uploaded a materially different Job Description into Vertex's Workday system, aligning his employment records with the fabricated duties submitted to USCIS (¶ 23).

194.    Vertex intended for the U.S DOL and USCIS to rely on these misrepresentations to approve the LCA and H-1B petition, and further intended for Mr. Pachikoru to rely on its representations that his immigration status was being secured lawfully, inducing his continued employment under a fraudulently obtained visa.

195.    Mr. Pachikoru relied on BAL's professional representation—and the joint representation agreement signed on April 6, 2023 (¶ 12)—that the filing approach was appropriate and lawful. As the H-1B beneficiary, Mr. Pachikoru was dependent on Vertex and its immigration counsel BAL for the accuracy of filings made on his behalf and had no independent ability to verify or rectify the occupational classifications. BAL refused to share the RFE with Mr. Pachikoru despite his requests on May 4, 2023 (¶ 16), and the altered RFE response was submitted without his knowledge or awareness (¶ 19).

196.    As a direct and proximate result of Vertex's fraudulent misrepresentations in its immigration filings, Mr. Pachikoru suffered the following damages:

    a.  Wage suppression resulting from the lower prevailing wage associated with SOC Code 13-1082.00 rather than SOC Code 11-3051.01 (¶ 14);

    b.  Permanent inconsistency in his Alien File maintained by USCIS, nullifying the EB-2 NIW petition's possibility for lawful permanent residence based on his true qualifications and expertise (¶ 178); and

c. Permanent and irreparable loss of lawful work authorization and immigration status in the United States (¶ 182).

## COUNT III

### Discrimination Based on Indian Ancestry

### 42 U.S.C. § 1981

197. Mr. Pachikoru re-alleges and incorporates Paragraphs 1 through 182 as if fully set forth herein.

**Ancestry as a Protected Classification**

198. Mr. Pachikoru is of Indian ancestry, lineage, and ethnicity. Vertex subjected Mr. Pachikoru to stereotypical behavioral expectations and materially inferior employment conditions that white American employees did not face.

199. Vertex maintained institutional policies—including VUSIP (¶¶ 33, 42), an internal immigration directive instructing talent acquisition and managers to offer only verbal sponsorship promises (¶ 21), and exclusively oral green card assurances during recruitment (¶ 9)—that created a parallel, inferior track of employment terms for nonimmigrant workers; Vertex exploited this infrastructure specifically against Mr. Pachikoru, a person of Indian ancestry, through conditions that do not apply to similarly situated white American employees (¶¶ 165, 167, 170).

**But-For Causation**

200. But for Mr. Pachikoru's Indian ancestry, he would not have been subjected to the disparate treatment, hostile work environment, and retaliation described herein. The but-for causal nexus is established by:

64

a. Stereotypical behavioral expectations imposed exclusively on employees sharing Mr. Pachikoru's Indian ancestry, including the directive to emulate specific Indian colleagues (¶ 55(b)), the expectation of silence and deference confirmed independently by multiple employees of Indian ancestry (¶ 171), and disparaging remarks about senior Indian-ancestry employees who did not defer (¶ 168);

b. Comparator evidence showing that a similarly situated non-Indian-ancestry employee (Employee A) received a waiver of PIP and transfer under the same "Building" performance rating, while Mr. Pachikoru and another Indian-ancestry employee (Employee B) were placed on PIPs and terminated under substantially identical circumstances (¶ 165);

c. A pattern of Indian-ancestry employees being denied promotions, development, and career progression while white American employees with comparable or lesser qualifications advanced (¶¶ 167, 169–170); and

d. The concentration of adverse actions against Indian-ancestry employees within Ms. Miles's management chain, including the targeted October 25, 2024 email from Ms. Doss sent exclusively to employees of Indian ancestry two of whom were subsequently placed on PIPs and terminated (¶¶ 82–83).

**Disparate Treatment in Terms and Conditions**

201. Vertex subjected Mr. Pachikoru to materially inferior terms and conditions compared to similarly situated white American counterparts, including Ms. Bond, Ms. Schnitzer, Mr. Braudis, and Employee A (¶¶ 28–30, 34, 59, 69, 85, 165). This disparate treatment included:

a. Systematic denial of professional development and travel opportunities that were regularly extended to white American counterparts (¶¶ 27–28, 58, 77, 85);

b. Disproportionate workload requiring work during holidays and PTO, cross-timezone assignments between IST and EST, and expanded project responsibilities without corresponding support (¶¶ 26, 31, 39, 43);

c. Removal of projects after Mr. Pachikoru prioritized GMP product quality and patient safety over management's stereotypical expectations (¶¶ 30, 34, 118);

d. Withholding of recognition and credit for his work, including crediting white American counterparts for his contributions (¶¶ 59, 69, 73); and

e. Selective enforcement of PIP where Employee A, a non-Indian-ancestry employee, received a waiver and transfer under the same performance rating while Mr. Pachikoru was placed on PIP and terminated (¶ 165).

**Hostile Work Environment Through Stereotyping**

202. Over twenty-two months, Ms. Miles and Ms. Lee imposed behavioral expectations on Mr. Pachikoru that they did not impose on white American employees — specifically, expectations of silence, deference, and compliance — and penalized Mr. Pachikoru when he did not conform to those expectations.

a. Ms. Miles directed Mr. Pachikoru to emulate specific Indian-ancestry colleagues whom she identified by name as behavioral models (¶ 55(b));

b. Ms. Miles made disparaging remarks about senior Indian-ancestry employees who did not defer to her directives, while making no comparable remarks about white American employees who similarly challenged her (¶ 168);

c. Ms. Miles advised Mr. Pachikoru to accept that "bad bosses are everywhere" and to mimic Ms. Lee's behaviors to succeed (¶ 63(b));

d. Ms. Miles explicitly stated that Mr. Pachikoru's visa was at risk if he did not meet management's expectations (¶ 55(a)); and

e. Multiple employees of Indian ancestry independently confirmed that Ms. Miles expected employees of their background to remain silent and deferential (¶ 171).

203. When Mr. Pachikoru deviated from these ancestry-based expectations by exercising independent professional judgment, prioritizing GMP product quality and patient safety over stereotypical expectations, and asserting his right to equal treatment, he was labeled as "not conforming", "emotional", "not capable of leadership" and told that his "philosophical questions" could "derail" commercial GMP procedures (¶¶ 79, 133, 141(a)). This conduct—demonstrated across more than 58 one-on-one meetings with Ms. Lee, 6 one-on-one meetings with Ms. Miles (¶ 95), and six internal anonymous pulse surveys (¶ 50)—was pervasive, continuous, objectively abusive, and caused Mr. Pachikoru panic attacks, anxiety, and sleeplessness (¶ 64).

**Retaliation for Opposing Discriminatory Treatment**

204. Mr. Pachikoru engaged in protected activity under 42 U.S.C. § 1981 by opposing conduct rooted in his Indian ancestry.

   a. Through reports to Ms. Tyskwicz (¶ 49), Ms. Miles in multiple one-on-one meetings (including at Ms. Miles's own request for continued feedback about Ms. Lee's conduct (¶¶ 39, 44, 48, 95)), six internal anonymous pulse surveys (¶¶ 22, 50), Ms. Burke (¶ 142), and Ms. Stedt (¶¶ 145–146), Mr. Pachikoru challenged the behavioral expectations imposed on him, objected to the disparate denial of opportunities extended to white American counterparts, reported management's invocation of his visa status as leverage, and notified HR on March 19, 2025, of his intent to submit a formal legal complaint (¶ 149).

   b. Although Mr. Pachikoru did not use the specific words "race," "ancestry," or "discrimination" in these reports, the substance of each complaint described and opposed the conduct alleged herein, under the immigration-dependent constraints described in (¶¶ 179–180).

205. In direct and temporally proximate response to this protected activity, Vertex escalated adverse actions:

   a. Ms. Lee directly questioned Mr. Pachikoru about his anonymous pulse survey comments (¶ 22);

   b. Ms. Miles invoked a former employee's PIP and termination as an implicit threat after Mr. Pachikoru raised workload and compliance concerns (¶ 72);

68

c. Ms. Lee downgraded Mr. Pachikoru's performance rating from "strong" to "building," which immediately disqualified him from green card sponsorship under VUSIP and blocked internal mobility (¶ 120);

d. Ms. Lee issued the PIP without any official authority, specifically  seven days after Mr. Pachikoru notified Mr. Fasano of his intent for family caregiver leave and while Mr. Pachikoru was simultaneously exploring internal transfers (¶¶ 122, 129(f), 137); and

e. Within 58 minutes of Mr. Pachikoru's conditional email—and less than 24 hours after he notified HR of his intent to file a formal legal complaint—Vertex terminated Mr. Pachikoru based on his conditional statement of his future intent to resign and severed all access including the App.Convercent legal portal (¶¶ 149, 151–153).

**Immigration Status as a Mechanism of Ancestry-Based Discrimination**

206. The discriminatory treatment, hostile environment, and retaliation were inextricably linked to Mr. Pachikoru's immigration-dependent status—a condition arising from his Indian ancestry. The same managers who controlled his performance ratings controlled his green card eligibility, internal mobility, and capacity to maintain lawful immigration status (¶¶ 42, 45, 55(a), 120). By exploiting the immigration sponsorship framework as a tool to enforce compliance and silence dissent, Vertex rendered its immigration policies a mechanism to effectuate ancestry-based discrimination.

**Impairment of Contractual Rights and Damages**

207.    Vertex's conduct impaired Mr. Pachikoru's rights under 42 U.S.C. § 1981(b) with respect to:

   a. The **making** of the employment contract, through fraudulent verbal immigration sponsorship promises that induced his acceptance of employment and withdrawal from his prior employer's PERM process (¶¶ 9, 11);

   b. The **terms and conditions** of the contractual relationship, through VUSIP's undisclosed conditions that created materially inferior employment terms applicable exclusively to immigration-dependent employees (¶¶ 33, 42);

   c. The **performance** of the contract, through systematic denial of professional development, travel, recognition, and resources afforded to similarly situated white American counterparts (¶¶ 27, 28, 59, 69, 77);

   d. The **modification** of the contract, through unilateral alteration of job duties (¶ 23) and the downgraded performance rating that immediately disqualified Mr. Pachikoru from green card sponsorship (¶ 120); and

   e. The **termination** of the contract, through the pretextual PIP and Vertex's treatment of a conditional intent of future resignation to effectuate immediate termination (¶¶ 141, 151–153).

208.    As a direct and proximate result of Vertex's conduct, Mr. Pachikoru suffered loss of employment (¶ 154); permanent and irreparable loss of immigration status including Vertex's revocation of his H-1B petition and cancellation of the EB-2 NIW case (¶¶ 157, 161); approximately twelve months and continuing without work authorization (¶ 182); liquidation of retirement savings (¶ 159); Vertex's nonpayment of a processed Gold VOCAP award (¶ 174); and severe emotional distress (¶ 64). Mr. Pachikoru is entitled to compensatory damages, punitive damages, equitable relief, and such other relief as this Court deems just and proper.

## COUNT IV

### Intentional Infliction of Emotional Distress (IIED)

### (Massachusetts Common Law)

209.    Mr. Pachikoru re-alleges and incorporates by reference Paragraphs 1 through 182 of this Complaint as if fully set forth herein.

210.    Vertex, through the actions of its management and agents, including Ms. Lee, Ms. Miles, and Ms. Stedt, engaged in a sustained course of conduct that was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

211.    Vertex management acted with the intent to cause Mr. Pachikoru severe emotional distress, or acted with reckless disregard of the high probability that such distress would result. Vertex was aware of Mr. Pachikoru's vulnerability — his H-1B visa status with a six-year maximum expiring December 6, 2025, and his total dependence on Vertex for continued lawful presence in the United States for himself and his family.

71

212. Vertex intentionally exploited Mr. Pachikoru's known vulnerability and abused its position of power over him in an extreme and outrageous manner, characterized by a sustained campaign of coercion, retaliation, and humiliation, including but not limited to:

    a. Vertex used the Green Card sponsorship process as a deliberate instrument of coercion, whereby Ms. Lee and Ms. Miles conditioned Mr. Pachikoru's path to lawful permanent residence on his silent acquiescence to their demands, knowing that non-compliance would result in loss of his lawful immigration status and his right to remain in the United States with his family (¶¶ 42, 46, 55(a), 120, 142(d));

    b. Vertex subjected Mr. Pachikoru to repeated denigration and humiliation calculated to undermine him professionally while exploiting his inability to seek alternative employment due to his H-1B visa dependency, including Ms. Miles asserting her hierarchy (¶ 84(b)), labeling him as "emotional" and "not conforming" (¶ 79), explicitly telling him he "was not capable of leadership" (¶ 133), and his being publicly reprimanded by senior leadership for performing his QA duties (¶¶ 32, 97);

    c. Vertex actively blocked Mr. Pachikoru's internal transfer away from the very managers who were subjecting him to these coercive conditions (¶¶ 62, 111, 122), with knowledge that his H-1B status precluded external mobility;

    d. Vertex manufactured a pretextual and fabricated PIP (¶ 141) that maliciously recharacterized Mr. Pachikoru's conscientious efforts to identify and resolve systemic GMP compliance failures as his personal performance deficiencies (¶¶ 88, 90, 102, 117(b), 123, 127); the PIP disqualified Mr. Pachikoru from green card sponsorship under VUSIP (¶ 120), blocked all internal mobility (¶ 122), and was

issued without any prior progressive discipline or written warnings, seven days after Mr. Pachikoru notified Mr. Fasano of his need for family caregiver leave (¶ 129(f)); and caused him severe psychological distress by threatening his immigration status;

e. When Mr. Pachikoru reported retaliation and explicitly communicated his fear of the "permanent loss of his immigration status," (¶ 142) Vertex escalated the outrageous conduct rather than ameliorating it. Specifically, ER investigator Ms. Stedt (¶¶ 145, 146) repeatedly encouraged him to resign (¶¶ 146(c), 149) , despite knowing that resignation would result in the loss of Mr. Pachikoru's H-1B status. The culmination of this campaign was the involuntary termination or constructive discharge of Mr. Pachikoru (¶¶ 149, 151–153); and

f. Vertex's outrageous conduct continued after Mr. Pachikoru's separation from employment. Vertex deliberately mischaracterized (¶¶ 152, 161(c)) the nature of his termination to evade its legal obligations, canceling EB-2 NIW case promptly and later revoked Mr. Pachikoru's H-1B petition (¶¶ 157, 161(b)).

213. Vertex is vicariously liable for the conduct of its managers and agents under respondeat superior. Vertex ratified this conduct by adopting the fabricated PIP— delivered by Ms. Lee despite her no longer being Mr. Pachikoru's authorized manager (¶ 140) — as the basis for termination, by permitting the exploitation of immigration sponsorship as a coercive tool despite Mr. Pachikoru's reports to Employee Relations (¶¶ 142, 145, 146), and by pursuing the post-termination mischaracterization of his separation.

214. As a direct and proximate result of Vertex's extreme and outrageous conduct, Mr. Pachikoru suffered and continues to suffer damages, including but not limited to:

73

a. Severe emotional and psychological distress, including anxiety, panic attacks, sleeplessness, and ongoing trauma (¶ 64);

b. The loss of his Green Card sponsorship and PERM priority date, resulting in the loss of years of immigration processing;

c. Reputational harm within his professional field; and

d. The loss of his employment, wages, benefits, future earning capacity; and loss of his lawful immigration status and right to remain in the United States (¶ 182);

e. Such other damages may be proven at trial.

215. WHEREFORE, Mr. Pachikoru demands judgment against Defendant Vertex Pharmaceuticals Incorporated for compensatory damages, consequential damages, and such other relief as this Court deems just and proper.

## COUNT V

## Violation of the Trafficking Victims Protection Reauthorization Act of 2008, TVPRA

## 18 U.S.C. §§ 1589, 1595

216.   Mr. Pachikoru re-alleges and incorporates by reference Paragraphs 1 through 182 of this Complaint as if fully set forth herein.

### Obtaining Labor or Services

217.   Vertex obtained Mr. Pachikoru's specialized and skilled labor related to pharmaceutical sciences, GMP and health regulatory compliance. Mr. Pachikoru led external manufacturing quality oversight for API and SDD products and directly contributed to the Journavx product launch (¶¶ 8, 18, 25, 43, 51, 86, 116).

### Vertex Acted Knowingly

218.   Vertex acted knowingly throughout the conduct described herein, as demonstrated by:

a.  Vertex maintained an internal directive instructing talent acquisition personnel and managers to offer only verbal green card support and never to promise it in writing (¶ 21);

b.  Vertex imposed previously undisclosed VUSIP conditions—performance rating requirements, layered management approvals, and recoupment obligations of $15,000 to $30,000—after Mr. Pachikoru accepted employment (¶¶ 33, 42);

c.  VGMI team acknowledged Mr. Pachikoru's H-1B's time duration's limitation, yet deferred the process (¶ 20(a)–(b));

d.  Ms. Lee was personally aware that another Indian employee who had experienced similar immigration-related difficulties with Vertex (¶ 45); and

e. Vertex knew that Indian professionals face an EB-2 Green Card backlog of approximately 10–15 years, and deliberately leveraged this knowledge to make the coercive effect of immigration sponsorship control on Mr. Pachikoru, particularly acute.

**Serious Harm or Threats of Serious Harm**

219. Vertex obtained Mr. Pachikoru's labor through serious harm and threats of serious harm through psychological coercion:

a. Ms. Miles threatened Mr. Pachikoru's visa vulnerability to enforce compliance of management's stereotypical expectations and silence GMP issues and his proposed resolutions (¶ 55(a));

b. Ms. Miles referenced the fate of a former employee who had raised GMP and workload concerns (¶ 72);

c. Ms. Miles stated that Mr. Pachikoru was "emotional" and "not conforming," in order to psychologically condition his continued employment ensuring his silence (¶ 79);

d. Ms. Lee despite no officially authority downgraded Mr. Pachikoru's performance rating and removed the green card sponsorship benefit per VUSIP and prevented internal mobility (¶ 120); and

e. Issued a fabricated PIP on March 7, 2025—eliminated every pathway to lawful permanent immigration status while Mr. Pachikoru had eight months remaining on his H-1B visa, no filed I-140, and no job portability (¶¶ 141, 142(d), 154).

220.    The threats and harm in the above paragraph were made by the same managers who controlled Mr. Pachikoru's immigration status, had been the subject of his complaints, and cited systemic GMP failures he had reported as individual performance deficiencies in the PIP (¶¶ 88, 90, 102, 117(b), 123, 126, 127, 129(b)).

**Abuse of Law and Legal Process**

221.    Vertex obtained Mr. Pachikoru's labor through abuse and threatened abuse of law and legal process. Under 18 U.S.C. § 1589(c)(1), "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process for purposes for which the law was not designed:

   a.    Vertex filed LCA I-200-23101-920831 using SOC Code 13-1082.00 at Level III—a materially different and lower-paying classification than the position for which Mr. Pachikoru was recruited (¶ 14);

   b.    Vertex filed the H-1B petition classifying Mr. Pachikoru under OCC "030" for computer-related occupations, a classification that directly contradicts  Mr. Pachikoru's GMP QA in pharmaceutical sciences background, skills, and the bona fide job offered (¶ 15);

   c.    When USCIS challenged the classification through an RFE, BAL instructed Mr. Pachikoru to emphasize his Project Management degree and conceal his MS in Regulatory Affairs (¶ 17);

   d.    Vertex submitted a materially altered RFE response fabricating responsibilities without Mr. Pachikoru's knowledge, and concurrently altered his job description in Workday (¶¶ 19, 23); Vertex as the employer had exclusive authority and control over immigration matters (¶¶ 16, 19); and

    e.   These misrepresentations created a permanent inaccurate record in Mr. Pachikoru's Alien File, impairing EB-2 PERM and EB-2 NIW pathway for lawful permanent residence based on his true qualifications (¶ 178).

222.   Vertex used the H-1B process, EB-2 PERM and EB-2 NIW process, and VUSIP repayment framework not for their intended purpose of facilitating lawful employment-based immigration, but to extract and coerce Mr. Pachikoru to continue performing labor and to refrain from reporting GMP violations and the hostile treatment.

**Scheme, Plan, and Pattern**

223.   Vertex procured and maintained Mr. Pachikoru's labor through a scheme, plan, and pattern intended to cause him to believe that, if he did not continue performing labor under the conditions Vertex imposed, he would suffer serious harm. The scheme operated through:

    a.   **Recruitment through false promises:** Vertex recruited Mr. Pachikoru with explicit verbal promises of "immediate Green Card sponsorship," the critical factor in his decision to accept the position, in reliance on which he withdrew from an active PERM process with his previous employer (¶¶ 9, 11, 13);

    b.   **Concealment of conditions:** After Mr. Pachikoru commenced employment, Vertex imposed previously undisclosed VUSIP conditions that were not communicated during recruitment (¶¶ 21, 33, 42);

c. **Systematic delay of immigration process:** Vertex intentionally and repeatedly delayed the green card process despite knowledge of Mr. Pachikoru's H-1B expiration: deferring initiation from July 2023 to January 2024 (¶ 20(b)); Ms. Lee's and Ms. Miles's refusal to initiate for over a year (¶ 41); Ms. Lee demanding a minimum 10-year service commitment on May 8, 2024 (¶ 46); abandoning the PERM pathway without informing Mr. Pachikoru (¶ 67); and pivoting to EB-2 NIW and not completing the filing (¶¶ 101, 147, 176–177);

d. **Stripping professional autonomy:** Vertex systematically removed projects after Mr. Pachikoru raised GMP concerns, altered his job duties, and denied professional development and travel opportunities (¶¶ 19, 23, 27, 28, 30, 34, 58, 77, 85, 118);

e. **Enforcing silence through immigration leverage:** Ms. Miles's threat of Mr. Pachikoru's visa status (¶ 55(a)), combined with Vertex's exclusive control over every pathway to his lawful permanent immigration status, created conditions under which a reasonable person would have been compelled to continue working rather than risk the loss of lawful presence in the United States; and

f. **Extraction and disposal:** After obtaining the regulatory and commercial value of Mr. Pachikoru's labor through the Journavx product launch on January 30, 2025 (¶ 116), Vertex removed him from all Journavx and SDD projects within six days (¶ 118(a)), issued the PIP on March 7, 2025 (¶ 141), and terminated him on March 20, 2025 while preventing him to file an internal legal complaint (¶¶ 152, 153).

224.   The VUSIP Repayment Agreement functioned as a contract of adhesion that deterred mobility and reinforced the coercive scheme (¶¶ 33, 42). The coercive effect was so severe that Mr. Pachikoru liquidated his 401(k) retirement savings in reasonable anticipation of the $15,000–$30,000 repayment obligation (¶ 159).

**Actualization of Coercive Threats**

225.   When Mr. Pachikoru refused to cease his efforts to ensure GMP product quality and patient safety—including refusing to approve the TUP risk assessment (¶ 112), challenging the absence of analytical characterization (¶¶ 91, 97), and escalating GMP operational failures (¶¶ 54, 100, 116)—Vertex actualized the threatened harm:

   a.   Ms. Lee, who was not the official manager downgraded his performance rating, disqualifying him from green card sponsorship (¶ 120);

   b.   Ms. Lee, who was not the official manager issued a PIP citing the same systemic GMP failures which Mr. Pachikoru had reported to the management, as his performance deficiencies (¶¶ 140, 141);

   c.   Within 58 minutes of Mr. Pachikoru's conditional email, and less than 24 hours after he notified HR of his intent to file a formal legal complaint, Vertex terminated Mr. Pachikoru and severed his access to the App.Convercent complaint portal (¶¶ 149, 151–153); and

   d.   The PIP and downgraded rating contradicted the VOCAP awards Mr. Pachikoru received in September and October 2024 for the same projects cited as deficiencies, as well as a Gold VOCAP processed for payment on the date of his termination (¶¶ 73, 143(c), 174).

**Venture Liability**

226.    Vertex, through its officers, managers, and agents, knowingly benefited financially from participation in a venture that obtained Mr. Pachikoru's labor through the means described herein. The labor obtained under coercive conditions directly supported the Journavx launch on January 30, 2025. Vertex knew or was in reckless disregard of the fact that the means described in 18 U.S.C. § 1589(a) were being used to obtain Mr. Pachikoru's labor.

**Post-Termination Abuse of Legal Process**

227.    Vertex's abuse of legal process continued after termination:

   a. On March 20, 2025, Vertex characterized Mr. Pachikoru's separation as "voluntary" to evade its obligation to effectuate a bona fide termination of a H-1B worker, including the requirement to offer return transportation, and to trigger VUSIP immigration costs recoupment obligations (¶¶ 152, 153, 161(c));

   b. Mr. Pachikoru, relying on the VUSIP recoupment obligations reiterated in the Exit Packet, liquidated his 401(k) (¶ 159). Ms. Stedt did not discuss recoupment; instead she questioned Mr. Pachikoru about his prior complaints (¶ 160(a), 160(b));

   c. Only after Ms. Stedt's meeting, Vertex revoked Mr. Pachikoru's H-1B petition (¶ 161(b)); but Vertex canceled Mr. Pachikoru's EB-2 NIW soon after termination (¶¶ 157, 176), prioritizing business over law; and

   d. Vertex withheld payment of the Gold VOCAP award processed for payment on the date of termination (¶ 174).

**Serious Harm**

228.  As defined in 18 U.S.C. § 1589(c)(2), the serious harm Mr. Pachikoru suffered:

   a.  Financial harm, loss of the PERM process and priority date with his previous employer, wage suppression from the misclassified SOC code, VUSIP repayment obligations, liquidation of 401(k) savings, and nonpayment of the Gold VOCAP award (¶¶ 11, 14, 42, 159, 174);

   b.  Psychological harm, including panic attacks, anxiety, and sleeplessness (¶ 64);

   c.  Reputational harm, due to PIP and inaccurate Alien file (¶¶ 120, 141, 178); and

   d.  Immigration harm, including permanent and irreparable loss of lawful work authorization, Vertex's failure to file either EB-2 PERM or EB-2 NIW and the resulting loss of job portability (¶¶ 161(b), 177, 182).

229.  A reasonable person in Mr. Pachikoru's circumstances—whose family's collective immigration status depended on his continued employment—would have been compelled to continue performing labor to avoid the serious harm described herein.

**Damages**

230.  As a direct and proximate result of Vertex's violations of 18 U.S.C. § 1589(a)(2), (a)(3), and (a)(4), and Vertex's liability under 18 U.S.C. § 1589(b), actionable under 18 U.S.C. § 1595(a), Mr. Pachikoru has suffered, and continues to suffer: severe emotional distress and psychological harm; loss of income and loss of future earning capacity; permanent and irreparable loss of lawful immigration status; and approximately twelve months without work authorization as of March 3, 2026 (¶ 182). Mr. Pachikoru is entitled to compensatory damages, punitive damages, and such other relief as this Court deems just and proper under 18 U.S.C. § 1595.

**COUNT VI**

**Wrongful Termination in Violation of Public Policy**

**(Massachusetts Common Law)**

231.    Mr. Pachikoru re-alleges and incorporates by reference Paragraphs 1 through 182 of this Complaint as if fully set forth herein.

**Public Policy**

232.    Vertex terminated Mr. Pachikoru in retaliation for his internal reporting of violations of 21 C.F.R. Part 211 (Current Good Manufacturing Practices) and 21 C.F.R. Part 11 (Electronic Records; Electronic Signatures). Mr. Pachikoru reported, escalated, and proposed solutions regarding the recurring black particle contaminants that are uninvestigated and uncharacterized in the Journavx commercial API's use in SDD; and reported systemic data integrity and traceability failures in Vertex's OPM GMP inventory and supply chain management system.

   a.  Compliance with these federal regulations constitutes a public policy interest of the Commonwealth of Massachusetts, as violations of 21 U.S.C. § 331 carry criminal penalties under 21 U.S.C. § 333.

   b.  Mr. Pachikoru was terminated for refusing to approve the release of non-conforming pharmaceutical product, an act that would have violated 21 C.F.R. § 211.165(f). The Quality Control Unit ("QCU") bears the regulatory responsibility to approve or reject drug products, components, and intermediates per 21 C.F.R. § 211.22.

**QCU Role and Authority**

233. Mr. Pachikoru was employed by Vertex as Manager, GMP Operational Quality, a position within Vertex's QCU. (¶¶ 8, 10). In this capacity, Mr. Pachikoru held the regulatory authority and responsibility to approve or reject drug product components, in-process materials, and intermediates pursuant to 21 C.F.R. § 211.22.

**Contamination of Journavx API**

234. Between May 2024 and February 2025, Mr. Pachikoru identified, documented, and escalated recurring black particles contaminants in Journavx API with uncharacterized black particles of unknown physio-chemical character alongside proposals of resolution (¶¶ 81, 108, 125).

235. The black particles were found in more than 23 individual bags totaling approximately 500 kilograms from 9 unique Journavx API batches constituting approximately 3,200 kilograms of API. (¶ 125). The Journavx API bags failed the GMP inspection and analytical QC testing specifications (¶ 81). The failure of API components to conform to established GMP standards required rejection under 21 C.F.R. § 211.84(d)(2).

236. Vertex did not perform comprehensive analytical characterization—including LC-MS, NMR, or XRPD—to determine the mechanism of formation related to the altered physio-chemical nature, the source of contamination, or whether the contaminants included genotoxic species, as required by 21 C.F.R. § 211.160. As of Mr. Pachikoru's termination, the source and physio-chemical nature of the black particles remained uninvestigated and uncharacterized (¶¶ 81, 91).

237. The U.S. FDA approved Journavx for commercial distribution on January 30, 2025. (¶ 116). The contaminated API was the same supply feeding commercial Journavx SDD manufacturing for direct patient consumption.

**Refusal To Approve**

238. Mr. Pachikoru refused to approve risk assessment VV-QUAL-166876 that would have authorized the release of contaminated Journavx API batches without exhaustive product quality investigation and comprehensive chemical characterization. (¶ 112). Had Mr. Pachikoru approved the release, he would have participated in the delivery of a drug product that deviated from its established quality standards in violation of 21 U.S.C. §§ 331, 351 and 21 C.F.R. § 211.165(f).

**Escalations**

239. Mr. Pachikoru escalated the following GMP violations that impact product quality and patient safety to QA Management:

   a. Recurring black particle contamination and the failure to conduct an exhaustive investigation and remediations (¶¶ 81, 89, 91, 93, 96–98, 102, 105), in violation of 21 C.F.R. § 211.84(d)(2).

   b. The need for comprehensive analytical investigation of the contaminants to assess product quality and patient safety risk (¶¶ 91, 93, 97, 99), as required by 21 C.F.R. § 211.192 and 21 C.F.R. § 211.160.

c. The inaccurate evaluation of contaminants classified as "TUP" without exhaustive product quality investigation, statistical analysis, and exhaustive chemical analysis required under cGMP commercial manufacturing standards (¶¶ 108, 109, 112). Mr. Pachikoru objected to and refused to approve the TUP classification, asserting the application of such classification caused to bypass the obligation to conduct a thorough GMP product quality investigation and implement GMP controls as required by 21 C.F.R. § 211.100 and § 211.160.

d. Management's decision to overrule Mr. Pachikoru's reasoned refusal to approve the TUP assessment not only undermined the QCU's responsibilities under 21 C.F.R. § 211.22 but also the product quality and patient safety resulting in the improper acceptance and use of non-conforming material, in violation of 21 C.F.R. § 211.165(f), § 211.101, and § 211.25 (¶ 109).

e. Systemic data integrity and product traceability failures in Vertex's OPM system, including the system's inability to retrieve quality events, the absence of a validated training environment, and management's directive to bypass system failures to release products (¶¶ 36, 47, 75, 88, 92, 123, 128). Specifically:

i. A lack of proper, learner-based training and qualified trainers for the OPM system, which led to inconsistent and non-compliant practices such as trainers applying signatures in the "PROD" environment without a valid audit trail of the trainee's logical decisions, in violation of 21 C.F.R. §§ 11.10(e), 11.10(i), 211.22, 211.25, and 211.192.

ii. The lack of a validated OPM system capable of demonstrating traceability, data integrity, and management's directive to use non-compliant mechanisms to circumvent OPM failures in order to release products, in violation of 21 C.F.R. §§ 11.10(f) and 211.68(b).

iii. Pervasive system failures, including OPM's instability, data loss, and synchronization errors, and the subsequent use of "DTE tickets" as an improper, non-compliant mechanism to release drug products, in violation of 21 C.F.R. §§ 11.10(b), 11.10(c), 11.10(k), and 211.68(b).

f. The lack of microbial method validation for Journavx wet-state SDD material, after product complaints of human and animal hair contamination in process validation and commercial batches (¶¶ 86, 87), in violation of 21 C.F.R. § 211.113.

**Adverse Actions**

240. In response to Mr. Pachikoru's refusal and escalations, Vertex took the following actions:

a. On December 10, 2024, Ms. Miles instructed Mr. Pachikoru, not to use the terms "safety" or "patient safety," prohibited him from taking notes, and directed him not to provide guidance to technical partners (¶ 94).

b. Between January 17 and January 22, 2025, Ms. Lee and Mr. Medendorp deleted "Patient Safety" language from the draft API risk assessment (¶ 102).

c. On January 23, 2025, Ms. Lee ordered Mr. Pachikoru to cease all communication about the contamination issue (¶ 106).

87

d. On January 27, 2025, Ms. Lee excluded Mr. Pachikoru from the senior leadership meeting at which the TUP classification was adopted, altering his QCU determination (¶ 109).

e. On February 5, 2025, Ms. Miles stripped Mr. Pachikoru of all SDD projects and reassigned him to a slower-moving project (¶ 118).

f. On February 13, 2025, Ms. Lee—who was no longer Mr. Pachikoru's authorized manager (¶ 140)—downgraded Mr. Pachikoru's performance rating thereby disqualifying him from green card sponsorship under VUSIP (¶ 120).

g. On March 7, 2025, Ms. Lee—who was no longer Mr. Pachikoru's authorized manager (¶ 140)—issued a 60-day PIP that characterized Mr. Pachikoru's GMP escalations and refusal to approve contaminated products as his performance deficiencies (¶¶ 102, 127, 141).

h. On March 20, 2025, Vertex terminated Mr. Pachikoru. (¶¶ 151–154).

**Pretext**

241. The PIP cited as performance deficiencies the same GMP violations and product quality failures that Mr. Pachikoru had escalated (¶¶ 102, 123, 127, 129(b), 141). Mr. Pachikoru received VOCAP Bronze, Silver, and Gold awards for his work on the same Journavx projects criticized in the PIP (¶¶ 73, 143(c), 174). Ms. Miles had previously stated that Mr. Pachikoru's GMP draft was exemplary (¶ 38). The PIP was issued without any prior progressive discipline or written warnings. Mr. Fasano, on March 19, 2025, sent a group email acknowledging the same inconsistent QA practices. However, the PIP attributed them exclusively to Mr. Pachikoru (¶ 139).

**Termination**

242.    Mr. Pachikoru had been preemptively terminated preventing him to file a formal legal complaint through Vertex's App.Convercent (¶¶ 149, 153); as Mr. Pachikoru had not submitted a resignation letter and had not specified a departure date (¶¶ 151, 152).

**Causal Connection**

243.    Mr. Pachikoru's refusal to approve the TUP risk assessment was followed by reassignment of his projects (February 5, 2025); downgrading the performance rating (February 13, 2025); issuance of the PIP (March 7, 2025); and termination (March 20, 2025).

**Damages**

244.    As a direct and proximate result of Vertex's conduct in violation of Massachusetts public policy, Mr. Pachikoru has suffered lost wages and benefits; permanent loss of lawful immigration status and work authorization; severe emotional distress including panic attacks, anxiety, and sleeplessness; and reputational harm.

## COUNT VII

### Wrongful Termination in Violation of Public Policy

### (M.G.L. c. 149, § 52C)

245. Mr. Pachikoru re-alleges and incorporates by reference Paragraphs 1 through 182 of this Complaint as if fully set forth herein.

### Statutory Right and Public Policy

246. An employee has the statutory right to submit a written statement rebutting any information contained in the employee's personnel record that the employee believes to be inaccurate. Section 52C(e) provides that no employer shall discharge an employee for exercising any right guaranteed under § 52C.

247. On March 7, 2025, Ms. Lee issued a 60-day PIP to Mr. Pachikoru (¶ 141). The PIP was placed in Mr. Pachikoru's personnel record maintained by Vertex. Mr. Pachikoru disputed the accuracy of the PIP's characterizations (¶¶ 88, 90, 102, 117(b), 123, 126, 127, 129(b), 139).

### Exercise of the Statutory Right

248. Following receipt of the PIP, Mr. Pachikoru took affirmative steps to exercise his § 52C right to submit a written rebuttal for inclusion in his personnel record:

   a. On March 10, 2025, Mr. Pachikoru met with Ms. Burke and formally reported that Ms. Lee and Ms. Miles had fabricated the PIP in retaliation for his product quality and patient safety advocacy. He identified specific contradictions between the PIP and the VOCAP awards he received in September and October 2024 for the same projects cited as deficiencies (¶¶ 143, 143(c)).

   b. Mr. Pachikoru further stated that the PIP was fabricated and was instituted

without any prior warnings or progressive discipline (¶ 142(c)); and if legal was consulted regarding the PIP(¶ 142(b)); and requested a legal portal link to upload evidence of the fabrication(¶ 144).

c. On March 18, 2025, Mr. Pachikoru accessed Vertex's VertexAlertLine system ("App.Convercent") as directed by Vertex's Code of Conduct, to prepare a written rebuttal and formal legal complaint rebutting the PIP on his record along with explanation of the fraudulent fabrication mechanism by Ms. Lee and Ms. Miles (¶ 148).

d. On March 19, 2025, Mr. Pachikoru explicitly and unequivocally confirmed with Ms. Stedt, copying Ms. Burke via email, that he would submit his formal written complaint regarding the PIP through Vertex's App.Convercent portal (¶ 149). This notification placed Vertex on direct notice that Mr. Pachikoru was actively preparing to submit a written rebuttal to disputed information in his personnel record.

**Vertex's Knowledge**

249.    At the time of Mr. Pachikoru's termination, Vertex had actual knowledge that Mr. Pachikoru was exercising his right to rebut disputed personnel record information:

a. Ms. Burke met with Mr. Pachikoru on March 10, 2025, during which he disputed the PIP and identified it as fabricated. Ms. Burke committed to escalating his concerns regarding the potential permanent loss of his immigration status (¶ 144).

b. Ms. Stedt conducted an investigative meeting on March 17, 2025, during which Mr. Pachikoru reiterated his objections to the PIP and shared the concerns he had previously raised with Ms. Burke (¶ 146).

91

c.  On March 19, 2025, Mr. Pachikoru formally notified both Ms. Stedt and Ms. Burke via email of his intent to submit the written complaint through App.Convercent (¶ 149). In response, Ms. Stedt repeated the ultimatum: comply with the PIP or resign (¶ 149).

d.  Despite Mr. Pachikoru's iterative requests via meetings and emails to HR, Vertex provided him with no access to the legal portal's link and no details of the HR investigation or case number (¶ 146(d)).

**Sequence and Timing of Termination**

250.  On March 20, 2025, at 11:20 A.M., Mr. Pachikoru emailed Mr. Fasano stating conditionally, "I will submit my resignation mostly, today; if not tomorrow," and "I will let you know once I submit" (¶ 151). At the time of this email, Mr. Pachikoru had not submitted a resignation letter and had not specified a departure date.

251.  At 12:18 P.M. on March 20, 2025—less than one hour after Mr. Pachikoru's conditional email, and less than 24 hours after he formally notified HR of his intent to file his written complaint—Vertex, through Mr. Fasano, sent an email to Mr. Pachikoru's personal email stating, "Vertex will accept this notice as your resignation, effective immediately" (¶ 152).

252.  Vertex immediately severed Mr. Pachikoru's access to all company systems, including the App.Convercent portal through which he was preparing to submit his written rebuttal (¶ 153). At the time of termination, Mr. Pachikoru had not submitted a formal resignation letter, had not finalized or communicated a departure date, and was actively preparing the written rebuttal he had notified HR that he intended to submit (¶¶ 151–153).

253.  Mr. Pachikoru's notification to HR of his intent to submit a written complaint regarding

92

the PIP occurred on March 19, 2025 (¶ 149). Vertex terminated his employment on March 20, 2025 (¶¶ 152–153). The termination occurred within 24 hours of Mr. Pachikoru's formal notification of his intent to exercise his § 52C right.

**Causal Connection**

254.    The causal connection is further supported by the following:

    a.  Ms. Stedt's response to Mr. Pachikoru's March 19, 2025 notification was: comply with the PIP or resign (¶ 149);

    b.  Vertex treated Mr. Pachikoru's conditional, non-final statement as an immediate resignation before any formal resignation was submitted (¶¶ 151–152);

    c.  Vertex's immediate severance of system access, including the App.Convercent portal, prevented Mr. Pachikoru from completing and submitting the written rebuttal he had been preparing (¶ 153); and

    d.  Management questioned Mr. Pachikoru about the anonymous pulse survey comments (¶ 22) and Ms. Miles referencing a former employee's PIP and termination after Mr. Pachikoru raised workload and compliance concerns (¶ 72).

**Damages**

255.    As a direct and proximate result of Vertex's termination of Mr. Pachikoru in violation of the public policy established by M.G.L. c. 149, § 52C, Mr. Pachikoru has suffered lost wages and benefits; permanent loss of lawful immigration status and work authorization; severe emotional distress including panic attacks, anxiety, and sleeplessness (¶ 64); reputational harm from the disputed PIP remaining uncorrected in his personnel record; and liquidation of retirement savings in anticipation of VUSIP recoupment obligations (¶ 159).

## COUNT VIII

### Promissory Estoppel — Massachusetts Common Law

256.   Mr. Pachikoru re-alleges and incorporates by reference Paragraphs 1 through 182 of this Complaint as if fully set forth herein.

**Clear and Unambiguous Promise**

257.   During the recruitment process in March and April 2023, and in direct response to Mr. Pachikoru's specific inquiries about green card sponsorship, Vertex's authorized agents made explicit, clear, and unambiguous promises that Vertex would *immediately* sponsor Mr. Pachikoru's Green Card upon commencement of employment (¶ 9).

258.   At the time these promises were made,Vertex did not communicate any performance rating requirements, immigration costs recoupment  obligations, management approval layers, or waiting periods as prerequisites to Green Card sponsorship at any time before Mr. Pachikoru's acceptance of the offer on April 4, 2023 (¶ 42).

**Vertex's Intent to Induce Reliance**

259.   Vertex knew or should have known that its promise would induce Mr. Pachikoru's reliance and act upon it — namely, Mr. Pachikoru's withdrawal from an existing PERM process. Vertex knew that immediate Green Card sponsorship was the critical and determinative factor in Mr. Pachikoru's decision. Mr. Pachikoru had approximately 29 months remaining on his H-1B six-year maximum period, creating a narrow window within which the multi-step, multi-year Green Card process must be processed (¶¶ 9, 11, 13).

260.   On July 18, 2023, Ms. Jacobs from VGMI team acknowledged in an email that Vertex had discussed green card sponsorship as a pre-requisite prior to hiring Mr. Pachikoru, and

that "Kranthi's green card support would likely need to start in advance of meeting the eligibility requirements due to the remaining time, which is on his H-1B" (¶ 20(a)).

**Reasonable and Foreseeable Reliance**

261.    Mr. Pachikoru reasonably and foreseeably relied on Vertex's unconditional promise of immediate Green Card sponsorship. In direct reliance on these promises, Mr. Pachikoru:

    a.    Accepted Vertex's offer of employment on April 4, 2023 (¶ 11);

    b.    Withdrew from the active PWD, P-100-22306-564519, a critical and irreversible step in the Labor Certification ("PERM") process with his previous employer (¶ 11); and

    c.    Commenced employment with Vertex on May 22, 2023, forgoing other employment opportunities that could have preserved his pathway to permanent residence (¶ 11).

262.    Mr. Pachikoru's reliance was reasonable because the conditions that Vertex later imposed—including the VUSIP performance rating requirements, recoupment obligations of $15,000 to $30,000, and layered management approvals—were not disclosed to him until January 8, 2024, approximately eight months after he had already accepted employment, abandoned his prior PERM process, and commenced work at Vertex (¶¶ 33, 42).

**Phase I - Breach of Reliance and Detriment**

263.    Mr. Pachikoru's detriment due to his reliance was complete and irreversible at the moment he accepted Vertex's offer and withdrew from his previous employer's PERM process. The withdrawal from PWD P-100-22306-564519 permanently forfeited his position in the PERM queue, his accrued priority date, and his pathway to

95

employer-sponsored permanent residence through his previous employer. This detriment occurred on or about April 4, 2023—before Vertex disclosed any conditions on sponsorship (¶ 11).

264. After Mr. Pachikoru detrimentally relied on the promise and commenced employment, Vertex breached its commitment. Instead of initiating immediate Green Card sponsorship, Vertex:

   a. Unilaterally deferred initiation of the Green Card process to January 2024—eight months after Mr. Pachikoru's start date—despite Vertex's own acknowledgment of the urgency of his H-1B timeline (¶ 20(a), 20(b));

   b. Imposed previously undisclosed conditions through the VUSIP, including subjective performance rating requirements, recoupment obligations of $15,000 to $30,000, and layered management approvals (¶¶ 33, 42);

   c. Through Ms. Lee, explicitly refused to initiate sponsorship for one year and demanded a minimum commitment of ten years of labor services in exchange for the promised sponsorship (¶ 46);

**Phase II - Further Detriment and Continued Breach of Reliance**

265. Between July 3, 2024 and Mr. Pachikoru's separation, Vertex shifted the immigration pathway from EB-2 PERM to EB-2 NIW, resulting in the missed December 7, 2024 PERM filing deadline acknowledged by Vertex's own immigration counsel (¶¶ 67, 101).

266. Vertex never filed an EB-2 PERM application or an EB-2 NIW petition (Form I-140), despite EB-2 NIW documents having been prepared and ready for signatures as of February 5, 2025 (¶¶ 176, 177).

267. Mr. Pachikoru did not voluntarily terminate his employment (¶¶ 151–153). The

irreversible detriment of abandoning his prior PERM process occurred in April 2023, nearly two years before his separation from Vertex.

**Injustice Can Be Avoided Only by Enforcement of the Promise**

268. Vertex's promises of immediate Green Card sponsorship were made orally during recruitment (¶ 9), and Vertex imposed previously undisclosed conditions only after Mr. Pachikoru had withdrawn his existing immigration pathway (¶¶ 33, 42).

269. Vertex received the benefit of Mr. Pachikoru's specialized labor for nearly two years while failing to honor the promised Green Card sponsorship. Between January 8, 2024 and August 23, 2024, Vertex delayed the sponsorship process while Mr. Pachikoru continued working for Vertex in reliance on the promise until termination (¶¶ 20(b), 33, 46, 52, 67(a)–(c), 68, 70).

**Damages**

270. As a direct and proximate result of his detrimental reliance on Vertex's broken promise, Mr. Pachikoru suffered substantial and irreparable harm, including:

   a. The permanent loss of his PERM process and priority date with his previous employer, which constituted his existing pathway to lawful permanent residence (¶ 11);

   b. The permanent and irreparable loss of his lawful immigration status and ability to work and reside in the United States. Without an I-140, Mr. Pachikoru was deprived of the statutory ability to extend his H-1B beyond December 6, 2025, or to port to a new employer under AC21 § 106(b) (¶¶ 147, 161(a), 176, 182);

c. The loss of his employment, wages, benefits, and future earning capacity, including the inability to lawfully work in any capacity in the United States (¶¶ 147, 154, 182);

d. Approximately twelve months and continuing without work authorization as of March 3, 2026 (¶ 182); and

e. Continued severe psychological distress, including panic attacks, anxiety, and sleeplessness (¶ 64).

## COUNT IX

### Violation of the Massachusetts Wage Act (M.G.L. c. 149, §§ 148, 150)

271. Mr. Pachikoru re-alleges and incorporates Paragraphs 1 through 182 as if fully set forth herein.

272. The Massachusetts Wage Act, M.G.L. c. 149, § 148, requires employers to pay a discharged employee all wages earned, including accrued vacation pay, in full on the date of discharge.

273. Vertex terminated Mr. Pachikoru on March 20, 2025 (¶ 154). Vertex was required to pay all wages due on that date.

274. Vertex failed to pay Mr. Pachikoru in full on the date of his discharge. Specifically:

a. **Failure to Return Withheld ESPP Wages:** As of March 20, 2025, Vertex held $7,906.65 of Mr. Pachikoru's post-tax earnings, which had been deducted from his paychecks for the ESPP. Upon termination, Vertex did not return these funds on March 20, 2025. Vertex paid them on April 4, 2025, fifteen days after discharge (¶ 163).

98

b. **Late Payment of Accrued PTO:** Vertex did not pay Mr. Pachikoru, his accrued and unused PTO on the date of discharge. Vertex paid the accrued PTO on April 4, 2025, fifteen days after discharge (¶ 163).

c. **Late Payment of Regular Wages:** Vertex did not pay Mr. Pachikoru his final regular wages on March 20, 2025. Vertex paid the final regular wages on March 21, 2025, one day after discharge.

d. **Non-Payment of VOCAP Bonus:** Vertex's internal compensation records list a $750.00 Gold VOCAP award as "Successfully Completed" with a "Scheduled Payment Date" of March 20, 2025 and a status of "Send to Payroll: Yes." Vertex has not paid this amount.

275. Vertex's failure to pay Mr. Pachikoru in full on the date of discharge violated M.G.L. c. 149, § 148.

276. Mr. Pachikoru has filed a Private Right of Action with the Massachusetts Attorney General's Office and has received authorization to sue ("Exhibit A").

277. As a direct result of Vertex's violations, Mr. Pachikoru is entitled to treble damages, reasonable attorneys' fees, and costs pursuant to M.G.L. c. 149, § 150.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kranthi Sagar Pachikoru respectfully requests that this Court:

A. Enter judgment in favor of Mr. Pachikoru and against Vertex on all Counts;

B. Award compensatory damages, including but not limited to back pay, front pay, lost wages, lost benefits, and other economic losses in an amount to be determined at trial;

C. Award damages for emotional distress, humiliation, and reputational harm in an amount to be determined at trial;

D. Award damages for the permanent loss of Mr. Pachikoru's lawful immigration pathway, including impairment of his lawful permanent residence through EB-2 NIW, caused by the inconsistencies introduced into his Alien File;

E. Award punitive damages as permitted by law under 42 U.S.C. § 1981 and 18 U.S.C. § 1595;

F. Award pre-judgment and post-judgment interest as permitted by law;

G. Award the costs of this action, including reasonable attorneys' fees where authorized by statute;

H. Grant injunctive and equitable relief ordering Vertex to:

 a. Correct Mr. Pachikoru's employment records, including the performance rating and the circumstances of his separation;

 b. Take all steps necessary to correct misrepresentations made to the USCIS regarding Mr. Pachikoru's H-1B petition and employment;

I. Issue a declaratory judgment that Mr. Pachikoru's termination was unlawful;

J. Grant such other and further relief as this Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

Mr. Pachikoru demands a trial by jury on all issues so triable.

Dated: March 3, 2026


Respectfully submitted,


/s/ Kranthi Sagar Pachikoru

_____

Kranthi Sagar Pachikoru

Plaintiff, Pro Se


2 Congress St, Ste 18

Milford, MA 01757

Phone: 571-570-3607

Email: kranthi@tuta.io