**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

**(WORCESTER DISTRICT)**

| | |
|---|---|
| KRANTHI SAGAR PACHIKORU,<br>Plaintiff,<br><br>v.<br><br>VERTEX PHARMACEUTICALS INC.,<br>Defendant. | Civil Action No.: 4:25-CV-40184-MRG<br><br>**ORAL ARGUMENT**<br>**REQUESTED** |

**Leave To File Granted On April 9, 2026**

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT**

## INTRODUCTION

Plaintiff Kranthi Sagar Pachikoru ("Plaintiff" or "Mr. Pachikoru"), *pro se*, opposes Defendant Vertex Pharmaceuticals Inc., ("Defendant" or "Vertex") Renewed Motion to Dismiss ("MTD") the First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6).

This case is, at its core, a federal forced-labor case under the William Wilberforce Act's TVPRA, 2008 Amendment (18 U.S.C. § 1589,) brought by a skilled H-1B chemist. Vertex knowingly recruited Mr. Pachikoru — nearing his six-year statutory cap — with the promise of immediate green-card sponsorship, then exploited his immigration dependency through concealed internal sponsorship policies (FAC ¶¶ 20, 21, 33, 42).

When Mr. Pachikoru refused to approve release of Journavx drug product batches containing uncharacterized contamination across nine API batches (~3,200 kg), Vertex terminated him within weeks — timed to make lawful re-employment impossible. The TVPRA supplies the unifying framework; the § 1981, WTPP, fraud, IIED, § 52C, promissory estoppel, and Wage Act counts each plead a discrete legal wrong that, taken together, evidence the integrated coercive scheme Congress enacted in the 2008 Wilberforce Amendments, Pub. L. 110-457, 122 Stat. 5044, See *infra* Count V.

Vertex's Renewed MTD does not engage the FAC as pleaded. It excerpts isolated fragments, asks the Court to weigh evidence at the 12(b)(6) stage in violation of *Cardigan Mountain Sch. v. New Hampshire Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015), and treats each count in isolation to obscure the integrated scheme. Under the proper Rule 12(b)(6) standard, every count states a plausible claim.

## LEGAL STANDARD

Under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and draw all reasonable inferences in Mr. Pachikoru's favor. *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84. The complaint must state a "plausible"—not merely possible—claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A *pro se* litigant's pleadings are held to "less stringent standards" and must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## ARGUMENT

### THE PRELIMINARY ISSUE: MARCH 20, 2025 INVOLUNTARY SEPARATION

Because the voluntary/involuntary characterization of Mr. Pachikoru's separation controls elements of Counts VI, VII, and IX, the Court should resolve this threshold issue first.

Vertex's reliance on *Torrech-Hernandez* is misplaced. The employee there definitively stated "I resign"; Mr. Pachikoru's words were explicitly conditional and prospective: "I will submit my resignation mostly, today; if not tomorrow." Vertex's unilateral acceleration of that conditional email constitutes involuntary termination under both federal and state law.

The First Circuit has expressly held that an employer's unilateral "acceptance" of a non-resignation constitutes involuntary termination. *Forsythe v. Wayfair Inc.*, 27 F.4th 67, 81 (1st Cir. 2022). Massachusetts law compels the same result: an employee who leaves under the reasonable belief of imminent discharge — such as facing an unauthorized, pretextual PIP and an HR framing of "comply or resign" — is involuntarily discharged. *Malone-Campagna v. Director of the Div. of Employment Sec.*, 391 Mass. 399, 401–02 (1984). At the 12(b)(6) stage, these facts must be construed in Mr. Pachikoru's favor.

The FAC pleads an unbroken cascade of adverse actions across the narrow window between Mr. Pachikoru's protected GMP refusal and his termination on March 20, 2025 —including a 24-hour gap between his notice of intent to file a § 52C rebuttal and Vertex's unilateral separation decision[1]. That temporal proximity, standing alone, satisfies the causation element of every retaliation-adjacent count at the pleading stage.

Even absent involuntary termination, the totality supports constructive discharge. *GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 34 (1995); *Pennsylvania State Police v. Suders*, 542 U.S. 129, 140–41 (2004) (employer strictly liable where constructive discharge is effectuated through an official supervisory act). Vertex stripped Mr. Pachikoru of at least six active projects (FAC ¶118) — enforced idleness that constitutes constructive discharge[2]. *Rubin v. Household*

---

[1] Vertex's reliance on *Aulisio* and *Luciano* is misplaced because both involved standard PIPs offering a genuine opportunity to improve, unaccompanied by any official supervisory act or constructive discharge. (FAC ¶¶ 88, 91, 102, 117, 127, 129, 140–143, 149, 151–153).

[2] See *Green v. Brennan*, 578 U.S. 547 (2016).

*Commercial Fin. Servs.*, 51 Mass. App. Ct. 432, 441 (2001); *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir. 1984). The constructive discharge standard must be calibrated to the reasonable person in Mr. Pachikoru's position—an H-1B worker with fewer than eight months remaining on his six-year statutory maximum, whose family's collective immigration status depended entirely on continued employment and the ability to secure an approved I-140. No U.S. citizen would face Mr. Pachikoru's choice: secure an H-1B transfer  in less than 60 days and EB-2 NIW approval within a few months. Vertex's constructive-discharge authorities — *Stratton, Serrano-Cruz, Ara, Marrero,* and *Landrau-Romero* — each involved a U.S. worker for whom separation meant looking for another job. None involved an H-1B or nonimmigrant worker for whom separation meant loss of lawful presence for himself and removal of his dependent family. *Suders* itself directs that the objective standard be applied to "the plaintiff's position," 542 U.S. at 141, and Mr. Pachikoru's position is categorically distinct from every worker in Vertex's cited cases.

Vertex's contemporaneous payroll records — to be produced in discovery — will further confirm that Vertex, not Mr. Pachikoru, was the moving party in the separation and will corroborate the timing discrepancies pleaded in Counts VI, VII, and IX.

### COUNT I: FRAUDULENT MISREPRESENTATION — PRE-EMPLOYMENT

To state a claim for fraudulent misrepresentation under Massachusetts law, a plaintiff must allege: (1) a false representation of material fact with knowledge of its falsity; (2) intent to induce reliance; (3) justifiable reliance; and (4) resulting damage. *Balles v. Babcock Power Inc.*, 476 Mass. 565, 573 (2017). Under Rule 9(b), fraud must be pleaded with particularity. *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 190–91 (1st Cir. 2006). The FAC satisfies both standards.[3]

---

[3]The FAC identifies the who, what, when, where, and how of the alleged misrepresentations — five specific occasions with names, dates, times, and communication medium — satisfying Rule 9(b). (FAC ¶¶ 9, 14–19, 20(a)–(c), 21, 42.)

*Scienter:* Can be established by circumstantial evidence at the pleading stage. *Rodi v. Southern New England School of Law*, 389 F.3d 5, 15 (1st Cir. 2004). *Scienter* is supported by four independent indicators pleaded at FAC ¶¶ 20–21, 33, 41–42, and 10–23: (i) Vertex's immigration directives to conceal the nature of the green-card promise; (ii) concealment of the financial recoupment, subjective performance criteria, time commitment and discretionary layered management approvals until eight months post-hire (FAC ¶¶ 11, 33); (iii) materially false LCA and H-1B petition filings (FAC ¶¶ 10, 15, 17, 19); and (iv) non-initiation of any EB-2 PERM or EB-2 NIW (FAC ¶¶ 20, 33, 52, 57, 67, 70, 101, 147). See *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 709–10 (1990) (internal directive as paradigmatic indicator of promissory fraud).

The totality supports the inference that Vertex never intended to honor its promise when made. *See Barrett Associates, Inc. v. Aronson*, 346 Mass. 150, 152 (1963); *Chellen v. John Pickle Co.*, 446 F. Supp. 2d 1247, 1270 (N.D. Okla. 2006) (finding fraud by clear and convincing evidence where employer made false immigration promises to induce Indian-ancestry workers).

Vertex's reliance on *Robert Reiser & Co. v. Scriven and Iron Mountain v. Carr* is misplaced; those cases involved unfulfilled future predictions, whereas Vertex concealed material information about its immigration enforcement practice and policies (FAC ¶¶ 20, 33) at the exact moment the promises were made — the hallmark of present-intent fraud. Vertex's argument that it took steps to sponsor Mr. Pachikoru's green card (ECF No. 23 at 7) is unfounded[4].

---

[4]Filing a Labor Condition Application ("LCA"), Form ETA-9035, with the U.S. Department of Labor is a prerequisite to petitioning Form I-129 under the H-1B program — a short-term work authorization. The Employment-Based Second Preference ("EB-2") permanent residence pathway is separate: it requires the employer to initiate a Prevailing Wage Determination (Form ETA-9141), followed by PERM Labor Certification (Form ETA-9089) with DOL, followed by an I-140 petition with USCIS. Vertex initiated none of these steps. The EB-2 National Interest Waiver ("NIW") bypasses PERM but requires a Form I-140 satisfying Matter of Dhanasar, 26 I&N Dec. 884 (AAO 2016); Vertex never filed an I-140 under either pathway.

*Justifiable Reliance:* Mr. Pachikoru's reliance was justifiable. The VUSIP's recoupment and performance preconditions were deliberately concealed during recruitment and remained undisclosed until eight months into employment (FAC ¶¶ 20(c), 42). Under Massachusetts law, "half-truths may be as actionable as whole lies," and a party who intentionally prevents another from acquiring material information commits fraud. *Kannavos v. Annino*, 356 Mass. 42, 48 (1969); see also *Yorke v. Taylor*, 332 Mass. 368, 374 (1955) (reliance justified on a positive statement of fact where investigation would be required to ascertain its falsity). Mr. Pachikoru accepted employment only after Vertex's express promise of immediate green-card sponsorship (FAC ¶¶ 9, 20(a)); no reasonable H-1B worker with 29 months of remaining authorization would surrender an active PERM queue position on lesser assurances. Vertex's at-will defense, citing *Kuwaiti Danish* and *French*, is foreclosed: "an employer may not fraudulently induce an employee to enter into an employment relationship and then use the at-will doctrine as a shield against liability." *Starr v. Fordham*, 420 Mass. 178, 188 (1995).[5] The at-will doctrine addresses whether an employer needs cause to terminate; it does not immunize employers from pre-employment fraud.

*Causation and Damages:* In reliance on Vertex's promise of express green card sponsorship, Mr. Pachikoru withdrew his PWD from previous employer, permanently forfeiting his PERM process, a first step to secure a priority date[6] in a 15-20 year (for people of Indian-Ancestry) long employer-sponsored permanent residence pathway.

---

[5] Also see, *Masso v. United Parcel Serv. of Am., Inc.*, 884 F. Supp. 610, 615 (D. Mass. 1995); *Rodi*, 389 F.3d at 15.

[6] Petitioning an I-140 by the employer allows the beneficiary to secure a "priority date" under the EB-2 immigration process to further obtain an I-485 Adjustment of Status application; a process in obtaining permanent residence, alternatively referred to as green card.

## COUNT II: FRAUDULENT MISREPRESENTATION — IMMIGRATION FILING

Count II addresses a distinct fraud: Vertex's knowing use of false occupational classifications in Form ETA-9035/ 9035E (LCA) and Form I-129 (H-1B petition) (FAC ¶¶ 8, 10, 12, 14–17, 19, 23, 178, and 182). Vertex filed an LCA using SOC Code 13-1082.00 for a position requiring pharmaceutical sciences expertise corresponding to SOC 11-3051.01, and classified Mr. Pachikoru, a chemist under OCC "030" for computer occupations contradictory to his degrees in Pharmaceutical Sciences and Drug Regulatory Affairs, skills and experience (FAC ¶¶ 8, 10, 14, 15, 192). The Ninth Circuit confirmed that such misrepresentations are material as a matter of law. *United States v. Patnaik*, No. 23-10043, 125 F.4th 1223 (9th Cir. 2025).

Notably, Vertex does not challenge the falsity of the filings or its scienter for purposes of this motion in footnote (ECF No. 23 at 8 n.3). The EB-2 NIW pathway was foreclosed before it began. The three-prong framework under *Matter of Dhanasar*, 26 I&N Dec. 884 (AAO 2016), requires, inter alia, demonstrated merit and national importance, a well-positioned beneficiary, and a balance of factors favoring waiver. Vertex's own H-1B filings — misclassifying Mr. Pachikoru as project manager and computer engineer and removing his pharmaceutical sciences duties — permanently contradicted the record any NIW petition would require (FAC ¶¶ 15, 17, 67, 101, 147). Vertex's contrary representations to USCIS were knowingly false when made; the EB-2 NIW petition was never filed; and, even if filed, could not have succeeded (FAC ¶¶ 12, 14–17, 19, 23, 147, 178).[7]

---

[7] Materiality in immigration filings is governed by the "natural tendency to influence" standard. *Kungys v. United States*, 485 U.S. 759, 770–72 (1988). Vertex's SOC code misclassification suppressed the Prevailing Wage (PW) and the fabricated duties in the RFE response submitted to the USCIS was expressly for the express purpose of influencing USCIS's approval to meet the "specialty" criteria — both plainly satisfy *Kungys*. *See United States v. Prasad*, 18 F.4th 313, 320–22 (9th Cir. 2021) (affirming visa fraud convictions where employer falsely represented H-1B position duties).

*Scienter:* When USCIS issued an RFE, Berry Appleman Leiden LLP ("BAL"), Vertex's agent instructed Mr. Pachikoru to conceal his qualifications and, in collaboration with Vertex, submitted a materially altered RFE response which constituted fabricated job responsibilities without his knowledge; concurrently, Vertex altered internal employment records (FAC ¶¶ 17, 19, 23).

*Reliance:* Vertex's argument on reliance is misplaced (ECF No. 23 at 8—9). That argument ignores a fact Vertex itself concedes in footnote 4 (ECF No. 23 at 9 n.4) regarding the H-1B regulatory framework and its exclusive control in the employer. Mr. Pachikoru does not practice immigration law and had no legal authority to amend or correct the H-1B petition; he was entirely dependent on Vertex and its agent BAL. Under 20 C.F.R. § 655.734(a)(3), the employer is legally required to provide a copy of the certified LCA to the H-1B worker, making Mr. Pachikoru a legally intended recipient of those representations. The H-1B beneficiary's inability to control filing contents does not negate reliance — it perfects it. Damages include wage suppression, a permanent Alien File inconsistency negating any future EB-2 NIW petition, and loss of lawful work authorization (FAC ¶¶ 196(a)–(c)).

Mr. Pachikoru's inquiry was about the context of the application, not whether he relied on it. As pled, when Mr. Pachikoru questioned the filing, Vertex's specialized immigration counsel, BAL[8] explicitly assured him the classification was a "natural fit" and instructed him on how to proceed (FAC ¶17). Mr. Pachikoru justifiably relied on the immigration counsel's professional legal assurances relying on their knowledge that the filing strategy was lawful. Furthermore, one cannot "doubt" fabricated duties in an RFE response that the employer actively conceals until after submission (FAC ¶19).

---

[8]Massachusetts recognizes indirect reliance where a defendant makes a false statement to a third person intending it to reach and influence the plaintiff. *See Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 462 n.7 (1997).

Vertex's attack on Count II rests on the premise that an H-1B beneficiary cannot justifiably rely on filings the employer controls. That premise is legally foreclosed, and analytically incoherent because Vertex concedes exclusive control over the filings (ECF No. 23 at 9 n.4); Count II cannot be evaluated in isolation —Taken together, Counts I and II establish that Vertex's sponsorship promise was not merely unfulfilled — it was structurally impossible from the moment Vertex filed the misclassified LCA and H-1B petition. See supra Count I (scienter; *McEvoy* internal-directive indicator). A promise the promisor has already rendered impossible to perform is the paradigm of fraudulent inducement; no subsequent conduct could have cured it.

**COUNT III: DISCRIMINATION BASED ON RACE AND ANCESTRY, 42 U.S.C. § 1981**

Section 1981 and Title VII claims are analyzed under the same framework. *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011) (cited by Vertex at ECF No. 23 at 12); *Ayala-Gerena v. Bristol-Myers Squibb Co.*, 95 F.3d 86, 95 (1st Cir. 1996). Section 1981 protects against intentional discrimination based on ancestry. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987)[9]. Vertex's attempt in footnote (ECF No. 23 at 9 n.5) to recharacterize Mr. Pachikoru's claim as "national origin" discrimination is foreclosed by *Saint Francis College*, which explicitly holds that § 1981 protects ancestry or ethnic characteristics—a category encompassing Mr. Pachikoru's Indian ancestry. *Id.* at 613. Multiple courts have permitted individuals of Indian descent to proceed with § 1981 claims. *Chellen*, 446 F. Supp. 2d at 1283–84. Vertex's footnote (ECF No. 23 at 9 n.5), § 1981 has absolutely no EEOC administrative exhaustion requirement. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975). Vertex's argument framing "attempts to recast Title VII claims" mischaracterizes the

---

[9] 42 U.S.C. § 1981(a): guarantees all persons the same right to make and enforce contracts; *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327 (2020).

statutory framework. Section 1981 and Title VII are independent remedies; Title VII's exhaustion requirement is irrelevant to a *§ 1981* claim.

**A. Disparate Treatment:** The FAC pleads specific comparators. Ms. Bond, Ms. Schnitzer, and Mr. Braudis received development, travel, and credit denied to Mr. Pachikoru. Employee A — non-Indian, same "Building" rating — received a PIP waiver and transfer while Mr. Pachikoru and another Indian-ancestry employee were placed on PIPs and terminated (FAC ¶¶ 27–30, 34, 59, 69, 77, 85, 165).

Vertex's argument that the immigration policy "applied to all employees seeking immigration sponsorship, regardless of race or nationality" (ECF No. 23 at 13) misapprehends the § 1981 claim. Mr. Pachikoru does not challenge the VUSIP as facially discriminatory; he challenges Ms. Lee's and Ms. Miles's intentional use of that policy as the instrument through which ancestry-based animus was executed. Section 1981 reaches intentional discrimination, including the selective application of facially neutral policies as instruments of ancestry-based animus. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982). Mr. Pachikoru does not bring a disparate-impact claim under Title VII § 703(a)(2); he alleges selective application of the VUSIP against Indian-ancestry employees while white American peers and at least one non-Indian comparator were treated more favorably under comparable circumstances (FAC ¶¶ 27–30, 34, 59, 69, 77, 85, 165). Vertex's "recasting" argument conflates two doctrinally distinct theories and attacks one Mr. Pachikoru has not asserted.

Section 1981 reaches the discriminatory application of facially neutral rules no less than facially classificatory ones. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989); *Ferrill v. Parker Group*, Inc., 168 F.3d 468, 473 n.7 (11th Cir. 1999). That Employee A — non-Indian, same management, same "Building" rating — received a PIP waiver while Mr. Pachikoru, an

employee of Indian ancestry, was terminated is direct evidence of the selective enforcement *§ 1981* was enacted to reach. *See Vélez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 451 (1st Cir. 2009) (similarly situated analysis is flexible and fact-specific).[10]

Vertex's comparator footnote (ECF No. 23 at 25 n.10) invokes *Straughn* in its WTPP section to attack a similarly-situated-supervisor theory Mr. Pachikoru has never pleaded. To the extent Vertex repurposes that argument against Count III in reply, it still misses: the disparate-treatment comparators pleaded in the FAC are Ms. Bond, Ms. Schnitzer, Mr. Braudis, and Employee A — all peers, not supervisors. Ms. Lee appears in the FAC not as a *Straughn* comparator but as the biased subordinate whose fabricated performance inputs drove the adverse decision under *Staub's* cat's-paw framework. See *supra* Count III.A. To the extent (FAC ¶77) recounts Ms. Miles's differential allocation of travel and development opportunities, that allegation goes to Ms. Miles's ancestry-correlated pattern of favoritism — not to any claim that Ms. Lee is herself a "similarly situated" comparator.

Where biased subordinates manipulate the inputs underlying an adverse employment decision, courts recognize direct evidence of discrimination under the cat's paw theory. *Cariglia v. Hertz Equipment Rental Corp.*, 363 F.3d 77, 85 (1st Cir. 2004); *Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011). Here, Ms. Lee fabricated the PIP by recharacterizing Mr. Pachikoru's protected whistleblowing and his refusal to release uncharacterized-contamination of cGMP API batches as "performance deficiencies", (FAC ¶¶ 88, 90, 102, 123, 127). That is the paradigmatic cat's-paw mechanism *Staub* reaches.[11]

---

[10]Vertex's suggestion in footnote (ECF No. 23 at 12 n.8) that Mr. Pachikoru "changed the character" of this allegation by substituting "exemplary" for "highly respected" is a refinement of language, not substance. The core allegation — FAC ¶¶ 45, 55 —remain unchanged and actionable. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989). Also, see *Ash v. Tyson Foods*, Inc., 546 U.S. 454, 456–57 (2006). Selective favoritism toward compliant members of a protected class is consistent with, not exculpatory of, stereotyping animus against those who decline to conform.

[11] A 42 U.S.C § 1981 plaintiff is not limited to any single type of pretext evidence. *Patterson*, 491 U.S. at 187–88 (holding the district court erred by restricting the plaintiff to proving she was more qualified than the person

**Same-Actor Inference:** Vertex's same-actor argument fails. The same-actor inference is permissive, not a presumption, and is readily overcome by changed circumstances. *Vélez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 451 (1st Cir. 2009). Intervening events — the GMP escalations (FAC ¶¶ 39, 44, 49, 94–100), the approaching AC21 deadline (FAC ¶¶ 46, 52), and the Journavx launch (FAC ¶116) — fundamentally changed the relationship, and the twenty-two-month gap exceeds the "relatively short time span" the doctrine contemplates[12].

**B. Hostile Work Environment:**  The FAC pleads a twenty-two-month pattern of ancestry-correlated adverse treatment — denial of development and travel opportunities extended to white peers, reassignment of credit, stripping of substantive projects, bonus reduction, foreclosure of internal-mobility pathways, an unauthorized and facially unlawful PIP requiring wilful violation of FDA mandated GxP regulations under the 21 C.F.R. Part 11, and preemptive interference with Mr. Pachikoru's § 52C rebuttal (FAC ¶¶ 27–34, 55(b), 64, 69, 72, 77, 85, 137, 141–143, 165). Overlaid on all of this was the VUSIP recoupment provision — itself unenforceable under INA § 212(n)(2)(C)(vi)(I) — which operated as a cost-shifting mechanism extracting subservience from a visa-dependent worker (FAC ¶¶ 42, 159).

Vertex's attempt (ECF No. 23 at 11 n.6) to recharacterize Ms. Miles's "visa at risk" statement as a permissible warning tied to the Immigration fails on Count III and Count V. The facts pleaded in the FAC satisfy the severity-or-pervasiveness standard under *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001), particularly when assessed against the reasonable-person under Mr. Pachikoru's circumstances, see *infra* Count V; an H-1B worker

---

promoted, because "there are a variety of types of evidence that an employee can introduce to show that an employer's stated reasons are pretextual"). The cat's paw evidence, comparator disparities, and VOCAP awards collectively satisfy this standard.

[12] The Supreme Court has recognized that subjective evaluation systems are particularly susceptible to masking discriminatory intent precisely because they resist objective scrutiny. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988). Here, Vertex's discretionary performance ratings — administered by the same managers alleged to have imposed ancestry-based behavioral expectations — are exactly the type of opaque criteria *Watson* warns about.

dependent on Vertex's immigration authorization continued ability to lawfully work and reside in the US.

Taken together, these allegations plead conditions "sufficiently severe or pervasive to alter the conditions of employment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). The cumulative-totality standard governs. *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 48 (1st Cir. 1999).

The ancestry-based behavioral expectations pleaded (FAC ¶¶ 55(b), 165–168) are analogous to the stereotyping from *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250–51 (1989), where an employer's directive that a female employee "walk more femininely" and "wear make-up" constituted direct evidence of conformity-based stereotyping. The First Circuit has squarely applied this principle. *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 58–59 (1st Cir. 1999).[13] The hostile environment cannot be evaluated in isolation from the coercive framework pleaded in **Count V**. See *Chellen*, 446 F. Supp. 2d at 1283–84. Because the hostile environment culminated in a tangible employment action — Mr. Pachikoru's termination — Vertex is strictly liable and no affirmative defense is available. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 140–41 (2004); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998).

**C. Retaliation:** Section 1981 encompasses retaliation claims, *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008), and Mr. Pachikoru engaged in protected activity by opposing discriminatory conduct (FAC ¶¶ 204(a)–(b)). Plaintiff need not have used the formal words

---

[13]*Flowers* and *Salomon*, cited by Vertex, dismissed hostile-environment claims lacking any racial nexus. Here, FAC (¶¶ 55(b), 165, 166, 168) supplies that nexus directly.

"race," "ancestry," or "discrimination" for his opposition to qualify as protected activity, *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009).[14]

The First Circuit has held that complaints about a manager's hostility constitute protected activity when that manager has created a discriminatory environment. *See Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 42 (1st Cir. 2011) (holding that a physician of Indian descent's complaints about managerial hostility constituted protected activity). Mr. Pachikoru's internal reports opposed Ms. Miles's ancestry-based behavioral expectations — her demands for subservience and her directives to emulate specific Indian-ancestry colleagues (FAC ¶¶ 55(b), 79, 84(b), 133) — conduct *Tuli* squarely reaches. The causal chain is pleaded with granularity (FAC ¶¶ 22, 46, 72, 120, 129(f), 137, 140, 149, 151–153): anonymous survey-inquiry pretext, invocation of a former employee's PIP as implicit threat, the unauthorized performance-rating downgrade, the PIP issued seven days after *caregiver-leave* notice, the preemptive termination within minutes of a conditional email of intent, and interference with the § 52C rebuttal process.

That Mr. Pachikoru's safety escalations triggered the termination does not negate *§ 1981* liability. Under *Bostock v. Clayton County*, 590 U.S. 644 (2020), there can be multiple but-for causes. His Indian ancestry—and the resulting immigration dependency—was the necessary but-for condition that allowed Vertex to weaponize his visa status. Ms. Miles's explicit statements targeting Mr. Pachikoru's defiance of ancestry-based behavioral expectations constitute direct evidence of discriminatory animus. *Simas*, 170 F.3d at 49.

---

[14]Vertex's cited cases do not advance its position. *Cabi* itself recognized that complaints opposing race-based conduct constitute protected activity, 161 F. Supp. 3d at 157. *Pina* and *Frith* were summary-judgment rulings on records bare of temporal or substantive linkage; the FAC pleads the opposite — a 24-hour gap between Mr. Pachikoru's notice of intent to file a § 52C rebuttal and Vertex's unilateral termination (FAC ¶¶ 149, 151–153), and a seven-day gap between his caregiver-leave notice and Ms. Lee's unauthorized PIP (FAC ¶¶ 129(f), 137, 140). *James v. Cox* dismissed claims devoid of any causal facts; the FAC pleads the opposite.

14

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

IIED requires extreme and outrageous conduct, intent or reckless disregard, severe emotional distress, and causation. *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–45 (1976).

***Workers' Compensation Act:*** WCA exclusivity applies only to "personal injuries" "arising out of and in the course of employment." M.G.L. c. 152, § 24. Massachusetts courts hold that the WCA does not preempt claims intertwined with bona fide civil rights violations. *Green v. Wyman-Gordon Co.*, 422 Mass. 551, 558 (1996); *Ruffino v. State Street Bank and Trust Co.*, 908 F. Supp. 1019, 1051 (D. Mass. 1995).[15] Mr. Pachikoru's IIED claim is inextricably intertwined with his § 1981 and TVPRA claims. The emotional distress arises from immigration-based coercion and ancestry-based stereotypical discrimination—conduct categorically distinct from workplace injuries the WCA was designed to address.

Vertex cites *Cavicchi v. Raytheon Co.*, but *Cavicchi* involved a post-separation defamation claim repackaged as a workplace grievance. Here, Vertex's post-termination conduct involved immediate termination of sponsorship before H-1B revocation, false characterization of the separation as 'voluntary,' and a threat to enforce VUSIP recoupment (FAC ¶¶ 155–161).

***Extreme and Outrageous Conduct:*** Vertex cites *Burns v. City of Worcester*, 772 F. Supp. 3d 109, 145–46 (D. Mass. 2025) (Guzman, J.). *Burns* is distinguishable: In *Burns*, the employer merely knew about a personal vulnerability; here, Vertex was the sole architect, wielder, and exploiter of the vulnerability itself. Under the INA, Vertex controlled every lawful immigration pathway — a point Vertex itself concedes in footnote (ECF No. 23 at 9 n.4) — governing Mr. Pachikoru's ability to obtain work authorization, reside, and seek future permanent residence—the H-1B petition, the EB-2 PERM process or the EB-2 NIW, and the performance

---

[15]Vertex may also cite *Rogers v. Nstar*, *Doe v. Purity Supreme*, and *Tennaro v. Ryder* for WCA exclusivity. Those cases are governed by the same exception established in *Green,* 422 Mass. 551, 558, and *Ruffino,* 908 F. Supp. 1019, 1051: the WCA does not preempt claims intertwined with bona fide civil rights violations.

ratings determining sponsorship eligibility (FAC ¶¶ 42, 46, 120). The distinction between an employer who knows about a vulnerability and one who created and wielded it as a tool of coercion is the difference between *Burns* and this case.[16]

## COUNT V: TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT

The TVPRA, 18 U.S.C. § 1589, prohibits obtaining labor through (a)(2) serious harm or threats thereof; (a)(3) abuse or threatened abuse of law or legal process; and (a)(4) any scheme, plan, or pattern intended to cause belief of serious harm. The statute contains no sophistication exception, and courts have repeatedly applied § 1589 to skilled and credentialed visa-dependent workers. *Adia v. Grandeur Mgmt., Inc., 933 F.3d 89, 93 (2d Cir. 2019)*; see also *United States v. Papantoniadis*, No. 25-1126 (1st Cir. Jan. 21, 2026) (affirming forced-labor convictions where employer exploited immigration vulnerability; rejecting divide-and-conquer); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430 (E.D.N.Y. 2017) (denying motion to dismiss § 1589 claims brought by Filipino nurses on employer-sponsored visas); *Chellen v. John Pickle Co.*, 446 F. Supp. 2d 1247 (N.D. Okla. 2006) (Indian-ancestry plaintiffs succeeding on convergent § 1981 and TVPA-adjacent claims under the pre-2008 statute).[17]

**A. The Integrated Coercive Scheme and Reasonable-Person Standard:** Congress enacted the 2008 William Wilberforce Amendments, Pub. L. 110-457, § 222(b)(3), to reach precisely the psychological, non-physical coercion alleged here.

---

[16]*Mercurio, Bazinet, Fountain,* and *McConney*, cited by Vertex for the proposition that the alleged conduct is not extreme and outrageous, all involved rude or insulting workplace conduct — not an employer that engineered the victim's legal vulnerability and then weaponized it. Those cases are distinguishable because the employers merely knew about a preexisting vulnerability; Vertex created and wielded the vulnerability as a tool of coercion.

[17]The 2008 Wilberforce Amendments expressly expanded § 1589 to reach psychological, financial, and reputational coercion that the pre-2008 statute did not explicitly address. *See* Pub. L. 110-457, § 222(b)(3). Cases like *Chellen*, decided under the narrower pre-amendment framework, demonstrate that § 1589 liability attaches to immigrant-worker exploitation even without reaching the psychological and financial coercion Congress later brought within the statute's sweep. Mr. Pachikoru's claim arises under the post-2008 statute Congress enacted precisely to reach the conduct alleged here.

Section 1589(c)(2) defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational," sufficient under all surrounding circumstances to compel a reasonable person "of the same background and in the same circumstances of the victim" to continue performing labor. The baseline is not an unencumbered U.S. worker but an H-1B chemist within months of his six-year cap, dependent on employer-controlled EB-2 sponsorship, unable to port, and whose lawful presence terminates with his employment. Within that framework, deliberate manipulation of immigration timelines, concealment of sponsorship preconditions, and termination engineered to coincide with H-1B expiration satisfy § 1589(a)(2) and (a)(3) as a matter of statutory text.

Vertex's reliance on *Claros v. Marvin's Refrigeration Corp.*, 800 F. Supp. 3d 391 (N.D.N.Y. 2025), for a "hallmarks" gatekeeping test is directly contrary to the statutory text. Vertex's MTD does not cite § 1589(c)(2), does not address the reasonable-person in the circumstances of the "victim" standard, and does not engage with the 2008 William Wilberforce Act's amendments at all. Its "hallmarks" framework implicitly requires the *indicia* of physical bondage and confinement that Congress expressly rejected when it amended § 1589 to reach psychological, financial, and reputational coercion. To apply Vertex's framework would be to read the 2008 amendments out of the statute. See *United States v. Dann*, 652 F.3d 1160, 1170–71 (9th Cir. 2011); *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008). Conscious design is properly inferred from a pattern of facially neutral acts. *Pollock v. Williams*, 322 U.S. 4, 18 (1944).[18]

---

[18] Vertex cites *Taylor v. Salvation Army Nat'l Corp*; *Taylor* involved a voluntary participant in a domestic religious program who could leave at any time without legal or immigration consequences — structurally incomparable to an H-1B worker whose departure triggers deportation. This is not a routine employment dispute; it involves systematic manipulation of federal immigration filings and exploitation of statutory dependency, precisely the conduct the 2008 amendments were designed to reach. Vertex also cites *Khalid v. Microsoft* for the unremarkable proposition that the TVPRA targets modern-day human trafficking underscores, rather than undermines, *Mr. Pachikoru's* claim. The plaintiff, *Khalid* was a former employee litigating a patent-assignment clause after voluntarily leaving Microsoft; he had no immigration dependency, no employer-controlled lawful presence, and no ongoing coercive relationship —

**B. Vertex's Own Briefing Establishes the Coercive Power Structure:** Vertex's footnote concession of exclusive petition control (ECF No. 23 at 9 n.4) is the predicate for Count V, not its defeat. See *supra* Count II. Vertex's assertion that Mr. Pachikoru "voluntarily agreed" to the VUSIP (ECF No. 23 at 19) fails for the same reasons Count I survives: the VUSIP's preconditions, recoupment obligations, and approval layers were concealed until eight months after Mr. Pachikoru's employment at Vertex. See *supra* Count I. Section 1589(c)(2) measures the reasonable-person inquiry when the coercive methods are applied — not at hiring, before the victim has been shown the trap's terms. As a matter of basic contract and coercion doctrine, one cannot voluntarily agree to terms that were concealed or never disclosed; Vertex's "voluntary agreement" theory (ECF No. 23 at 19) fails at the threshold.

The same misclassifications that establish fraud under Count II independently constitute "abuse or threatened abuse of law or legal process" under § 1589(a)(3): Vertex weaponized the LCA, Form I-129, and the RFE response as instruments of coercion. See *supra* Count II. Vertex may lawfully seek Mr. Pachikoru's skilled labor, but it may not treat him as a commodity — subject to a performance standard not applied to similarly situated U.S. peers, see *supra* Count III, and burdened with $15,000–$30,000 in sponsorship costs under the VUSIP in direct violation of 20 C.F.R. § 656.12(b).

The VUSIP's $15,000–$30,000 recoupment exposure against Mr. Pachikoru's approximately $136,000 annual salary falls squarely within the ratio range courts have found sufficient to state a § 1589(a)(2) claim at the pleading stage. See *Lyu v. Alfa Chemistry Inc.* et al, 23-CV-7951 (EK)(ST), 2025 WL 1093134 (E.D.N.Y. April 13, 2025) (one-third ratio); *Javier v.*

---

which is why the court found he "ha[d] not been coerced" at all. 409 F. Supp. 3d at 1034. The FAC here alleges the precise coercive architecture *Khalid* lacked: an H-1B worker at the six-year cap, undisclosed recoupment obligations, and a termination engineered to remove a GMP obstacle while the visa clock ran. *Khalid* marks the outer boundary Defendant says Plaintiff must clear; the FAC's allegations are on the opposite side of that line.

*Beck*, No. 13-CV-2926, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014) (six months' gross wages), particularly where, as here, the recoupment obligation is intertwined with subjective performance requirements the employer alone controls. See *United States v. Kalu,* 791 F.3d 1194, 1212–14 (10th Cir. 2015) (H-1B job-duty misrepresentations as mechanism of forced labor).[19]

**C. Labor Extraction-Then-Discard Cements TVPRA Liability:** Mr. Pachikoru's H-1B status made departure itself the harm — loss of lawful presence and removal of his family — that sustained the forced labor. Vertex extracted his specialized labor through immigration-calibrated coercion until it secured FDA approval of Journavx on January 30, 2025, and then discarded him. See *supra* Section I. Retaliatory termination does not retroactively exonerate prior coercion; it cements *§ 1589* liability.

**D. Vertex's Own Cited Authority Supports Mr. Pachikoru.** *Yassin v. AR Enterprises, LLC*, 2017 WL 6625027 (D. Mass. Dec. 28, 2017), denied summary judgment — a higher standard than Rule 12(b)(6) — and expressly recognized that immigration-dependent workers face constraints the reasonable-person standard must account for. Id. at *7–8. The First Circuit has held that deportation threats are a classic form of nonviolent coercion under the TVPRA. *United States v. Rivera*, 799 F.3d 180, 186 (1st Cir. 2015). Vertex's "labels and conclusions" footnote (ECF No. 23 at 17 n.9) ignores the FAC's granular six-phase timeline with exact dates, actors, and communications.[20]

---

[19] The INA and its implementing regulations treat PERM and sponsorship costs as the employer's non-delegable obligation. Vertex's VUSIP not only imposed those costs on Mr. Pachikoru but conditioned their forgiveness on continued employment — converting an unlawful cost-shift into an instrument of retention leverage. See *Lyu v. Alfa Chemistry Inc.* which is directly on point. Each *Lyu* factor maps onto Vertex's VUSIP: the $15,000–$30,000 exposure against approximately $136,000 in annual salary, the absence of any tie to actual employer cost as INA § 212(n)(2)(C)(vi)(I) requires, and Mr. Pachikoru's status as an H-1B worker facing removal on separation. Id. at *30–*33. The statutory framework under 8 U.S.C. § 1182(n)(2)(C)(vi)(I) can be found at 20 C.F.R. § 656.12(b).
[20] Vertex cites *Calimlim*'s "difficult burden" language describes the evidentiary standard at trial, not the pleading stage. At 12(b)(6), the question is whether scienter is plausibly alleged, and the FAC's granular allegations of institutional knowledge, oral-only directives, and systematic delay satisfy that threshold.

19

**E. All Four Statutory Means Are Alleged:** The FAC pleads each means with paragraph-specific support: § 1589(a)(2) serious harm (FAC ¶¶ 55(a), 72, 228); § 1589(a)(3) abuse of legal process (¶¶ 221(a)–(e)); § 1589(a)(4) scheme, plan, or pattern (¶¶ 223(a)–(f)); and scienter (¶¶ 17, 21, 42, 55(a), 101, 147, 176–177). Termination of an H-1B worker at the six-year cap is not an ordinary adverse action — it is the permanent and irreconcilable damage i.e., the removal of the sole lawful basis for immigration status, a consequence Vertex knew, foresaw, and weaponized[21]. Under *Nuñag-Tanedo* and *Lagasan*, a threat calibrated to a vulnerable worker's immigration-dependent circumstances satisfies § 1589(a)(2) at the pleading stage.[22]

## COUNT VI: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

Massachusetts recognizes an exception to at-will employment where termination violates a "well-defined" public policy. *King v. Driscoll*, 418 Mass. 576, 582 (1994). The SJC has identified three categories: (1) asserting a legally guaranteed right; (2) doing what the law requires; and (3) refusing to do what the law forbids. *Smith-Pfeffer v. Superintendent*, 404 Mass. 145, 149–50 (1989). The termination was involuntary, as established *supra* Section I.

**A. M.G.L. c. 94, §§ 186 and 190 Establish Clear Massachusetts Public Policy.** Mr. Pachikoru's WTPP claim falls within the third *Smith-Pfeffer* category: he was terminated for refusing to do what the law forbids. M.G.L. c. 94, § 186 defines a drug as "adulterated" on multiple independent grounds applicable here — below-standard purity, uncharacterized

---

[21] Federal courts have repeatedly allowed TVPRA claims brought by H-1B and similarly situated visa-dependent workers, recognizing that the immigration framework controlled by employers creates the coercive predicate. *See*, *Saraswat v. Business Integra, Inc.*, No. 15-CV-4680 (E.D.N.Y. Sept. 28, 2016) (denying motion to dismiss H-1B worker's TVPA claims); *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619 (S.D. Ind.) (H-1B physical therapists).

[22] *United States v. Bradley*, 390 F.3d 145, 153 (1st Cir. 2004) (exploiting precarious immigration status satisfies § 1589). *Walia v. Veritas* and *Headley v. Church of Scientology*, on which Vertex relies, are distinguishable: when the employer controls both the threat and its execution through immigration filings, the 'warning' is not a recitation of external consequences — it is a statement of intended action.

substances, and preparation under conditions permitting contamination. Section 190 criminalizes the manufacture or delivery of any such drug.

The contamination alleged—uncharacterized black particles across 23 bags, 9 batches, and approximately 3,200 kg of API whose composition remained uninvestigated at Mr. Pachikoru's termination (FAC ¶¶ 81, 108, 125)—satisfies multiple independent grounds under § 186.[23] Mr. Pachikoru refused to approve risk assessment VV-QUAL-166876, which would have authorized release of those batches for commercial drug product manufacturing for direct patient consumption (FAC ¶¶ 81, 112, 116).

Had he approved the release, he would have participated in conduct that M.G.L. c. 94, § 187 prohibits and § 190 criminalizes — conduct that is also prohibited by the materially identical federal provision, 21 U.S.C. § 331(a). His role as a QCU member carried specific regulatory responsibilities under 21 C.F.R. § 211.22 (FAC ¶¶8,10). This places his conduct within the *Hobson* framework: an employee terminated for enforcing safety laws he was responsible to enforce. *Hobson v. McLean Hosp. Corp.*, 402 Mass. 413, 416 (1988); *Falcon v. Leger*, 62 Mass. App. Ct. 352 (2004).

### B. Murray Is Inapplicable and Federal Preemption Fails:

Vertex's reliance on *Murray v. Warren Pumps, LLC.*, is misplaced. Mr. Pachikoru's claim is categorically different on both dimensions. Mr. Pachikoru's claim does not rest solely on federal authority —it is also independently anchored in M.G.L. c. 94, §§ 186 and 190, Massachusetts statutes that define adulterated drugs and penalize their manufacture and delivery.

---

[23]The seriousness of CGMP violations is confirmed by federal enforcement in this District. In *United States v. Pharmasol Corp.*, No. 1:23-CV-12801-AK (D. Mass. Dec. 13, 2023), the United States obtained a consent decree imposing a permanent injunction, mandatory drug destruction, independent CGMP expert oversight, and liquidated damages of $5,000 per day per violation—without any requirement of proof of actual patient harm.

The federal cGMP framework supplies factual context; the state criminal statutes supply the public-policy source Murray requires.

**First,** Massachusetts authority, cited with approval by this District in Terani, recognizes that internal whistleblowing regarding alleged violations of federal drug safety laws constitutes a protected public policy. See *Riley v. Green*, 2002 Mass. Super. LEXIS 448, at *3 (Mass. Super. Nov. 5, 2002) (approving WTPP claim where pharmaceutical employee internally reported alleged violations of federal drug safety laws), cited with approval in *Terani*, 2025 U.S. Dist. LEXIS 108777, at *16 (characterizing Riley as "basing exceptions on alleged violations of controlling federal codes"); *Shea v. Emmanuel College*, 425 Mass. 761, 762–63 (1997) (holding that an employee who internally reports criminal wrongdoing or safety violations to superiors, rather than outside authorities, is fully protected under the WTPP public policy exception).

**Second**, Independent of any federal-regulation theory, Mr. Pachikoru's claim rests on a Massachusetts criminal statute that by itself satisfies *Murray's* "state source" requirement; Mr. Pachikoru's conduct falls within a different *Smith-Pfeffer* category altogether. Murray involved an employee who complained about alleged regulatory violations — the first *Smith-Pfeffer* category (asserting a legally guaranteed right). Mr. Pachikoru refused to affix his signature to risk assessment "*VV-QUAL-166876,*" the very act that would have authorized commercial release of uncharacterized, potentially adulterated drug in violation of M.G.L. c. 94, § 190. That places him squarely within the **third** *Smith-Pfeffer* category — refusing to do what the law forbids — which *Murray* never addressed. An employee cannot be terminated for declining to become the signatory to a criminal act, and *Smith-Pfeffer's* "simply disagrees with policy decisions" language does not reach a refusal to participate in conduct a state criminal statute prohibits.

22

This is precisely what *Mello v. Stop & Shop Cos.*, 402 Mass. 555, 557 (1988), identifies as the strongest WTPP foundation. In *Terani v. Allen Med. Sys., Inc.*, No. 23-12510-BEM, 2025 U.S. Dist. LEXIS 108777, at *15–16 (D. Mass. June 9, 2025), this District held that complaints about "violations of federal regulations governing the manufacturing of medical devices" implicate the Massachusetts public policy exception[24].

Terani itself cataloged a line of D. Mass. and Massachusetts decisions doing precisely that, including *Norris v. Lumbermen's Mut. Cas. Co.*, 881 F.2d 1144, 1152–53 (1st Cir. 1989); *Hutson v. Analytic Scis. Corp.*, 860 F. Supp. 6 (D. Mass. 1994); *Tighe v. Career Sys. Dev. Corp.*, 915 F. Supp. 476 (D. Mass. 1996); and *Simas v. First Citizens' Fed. Credit Union,* 63 F. Supp. 2d 110 (D. Mass. 1999). Under federal notice pleading standards, Mr. Pachikoru is required to plead facts, not specific legal theories or state statutes, to survive a motion to dismiss. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014). The FAC's factual allegations regarding the manufacturing of contaminated, uncharacterized drugs fall squarely within the conduct recognized under M.G.L. c. 94.

**C. Mr. Pachikoru's Concerns Were Not "Generalized":** They were explicit, specific, documented, and quantified;[25] recurring contaminants of unknown character across 23 bags, 9 batches, and approximately 3,200 kg of API (FAC ¶¶ 81, 125). Mr. Pachikoru not only identified uncharacterized contaminants in API destined for commercial release but also advocated the need for comprehensive analytical characterization—including LC-MS, NMR, and XRPD (FAC ¶¶ 81, 91). Vertex's own management acknowledged that thorough analysis could "create regulatory issues" (FAC ¶¶ 91, 93). The contaminated API was the same supply feeding

---

[24] Id. at *13–15. Drug manufacturing under 21 C.F.R. Parts 210–211 implicates the identical Commonwealth interest in healthcare-product safety that *Terani* found sufficient. Notably, *Terani* reached this conclusion at summary judgment on a fully developed record; at the Rule 12(b)(6) stage, where well-pleaded facts must be accepted as true, the case for denying dismissal is a *fortiori* stronger.

[25] *Provuncher v. Angioscore* and *Nelson v. Anika Therapeutics*, on which Vertex relies, involved internal business disputes or unsubstantiated speculation about possible future harm.

commercial Journavx SDD manufacturing for direct patient consumption (FAC ¶116). *See Hobson*, 402 Mass. at 416–17; *Surprise v. Innovation Grp., Inc.*, 925 F. Supp. 2d 134, 148 (D. Mass. 2013).

Vertex mischaracterizes the FAC to argue Mr. Pachikoru "conceded" there was no safety risk. Vertex quotes only the first half (FAC ¶81) to claim the particles merely "resembled the API," while omitting the second half of the very same sentence, which explicitly states Vertex's rudimentary tests "could not identify the mechanism of formation, the source of contamination, or whether the contaminants included genotoxic species." Deliberate ignorance of a contaminant's nature through inadequate testing is not proof of safety; an uncharacterized, potentially genotoxic physical transformation of a small molecule is precisely the cGMP violation Mr. Pachikoru escalated, and it is actionable under both federal and state statutes.

**D. FDA Approval Does Not Negate the Claim:** Vertex's argument conflates two independent regulatory tracks. FDA's approval of Journavx's NDA[26] was a drug-level determination of safety and efficacy under PDUFA. Batch-level cGMP compliance is a separate, continuing obligation governed by 21 C.F.R. Part 211, including the GMP product quality investigations of unexplained discrepancies and contamination as required by § 211.192 and the post-approval reporting framework of §§ 314.70 and 314.81. PDUFA approval of the drug does not retroactively validate any particular batch, and nothing in the NDA record speaks to the specific lots Mr. Pachikoru refused regarding the release and risk assessment (FAC ¶¶ 81, 91, 108, 116, 125).

---

[26] NDA 219209 (Journavx) is a matter of public record before FDA's Center for Drug Evaluation and Research. Batch-level CMC documentation, deviation and out-of-specification investigations maintained under 21 C.F.R. § 211.192, Field Alert Reports under 21 C.F.R. § 314.81(b)(1)(ii), adverse drug experience reports submitted under 21 C.F.R. § 314.80, and any post-approval supplements filed under 21 C.F.R. § 314.70 are held by the Agency and obtainable through ordinary regulatory channels, including 21 C.F.R. Part 20. To the extent the Court would find supplementation of the record useful at any stage of these proceedings, Mr. Pachikoru is prepared to obtain and submit such materials.

**E. Pretext:** Pretext is pleaded with specificity in the FAC (deficiencies and escalations cited by the PIP; VOCAP awards; PIP issued by an unauthorized manager; absence of progressive discipline; absent HR investigation) (FAC ¶¶ 73, 139, 140, 143(c), 174, 241). *See Forsythe*, 27 F.4th at 79; *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003).

### COUNT VII: WRONGFUL TERMINATION UNDER MGL. c. 149, § 52C

Section 52C guarantees employees the right to submit a written rebuttal to disputed personnel record information. *Meehan v. Medical Information Technology, Inc.*, 488 Mass. 730 (2021). The FAC alleges affirmative steps: Mr. Pachikoru met with HR to dispute the PIP (FAC ¶248(a)); accessed App.Convercent to prepare the rebuttal (FAC ¶248(c)); explicitly notified HR again of his intent to file a formal complaint (FAC ¶248(d)). Vertex terminated him the next day and severed portal access (FAC ¶¶ 251–252). The termination was involuntary, as established *supra* Section I.

An interpretation requiring completion would create a perverse incentive: employers could avoid § 52C liability by terminating employees before the rebuttal is filed. *Meehan* protects the exercise of the right, not merely its completion. 488 Mass. at 740. The SJC has held that terminating an employee in anticipation of statutory right exercise violates public policy. *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 811 (1991). The 24-hour proximity between notification and termination creates a powerful inference of causal connection (FAC ¶¶ 249–253). Vertex's reading produces perverse incentive: an employer that terminates an employee the day after a rebuttal is filed would be liable, but one that preemptively terminates to prevent the filing would escape liability altogether. That defeats the purpose of the law and *Meehan's* precedent.

25

## COUNT VIII: PROMISSORY ESTOPPEL

The FAC pleads each element with specificity: an unambiguous oral promise of immediate sponsorship (FAC ¶¶ 9, 20(a), 257, 260); Vertex's foreseeable intent to induce acceptance and PWD withdrawal (FAC ¶¶ 13, 259); reasonable reliance in light of concealed and facially unlawful VUSIP conditions (FAC ¶¶ 21, 33, 42, 261–262); and the irreversible detriment (FAC ¶¶ 11, 263, 267). *Loranger Constr. Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 761 (1978); *Graphic Arts Finishers, Inc. v. Bos. Redev. Auth.*, 357 Mass. 40, 42 (1970).

Vertex's concealment of the VUSIP preconditions until eight months post-acceptance is *explicitly* and *specifically* pleaded see *supra* Count I (scienter and justifiable reliance as a matter of law on a Rule 12(b)(6) record) and Count V (coercive framework), and is incorporated here[27]. The VUSIP preconditions Vertex now invokes are themselves unenforceable[28]; an unlawful condition cannot defeat estoppel. See *supra* (Counts III.B & Count V.B).

Mr. Pachikoru's April 4, 2023 withdrawal of PWD (P-100-22306-564519) permanently forfeited his queued position in the multi-year DOL/USCIS PERM process — a position that, under *AC21 § 106(a)*, could not be reconstituted with a new employer within his remaining H-1B authorization. That is an irreversible forbearance of an existing right and satisfies the detriment element as a matter of law.[29] *Loranger*, 376 Mass. at 761; *Graphic Arts Finishers*, 357 Mass. at 42–43. Mr. Pachikoru does not claim forfeiture of a vested federal property right; he never

---

[27]Reasonableness of reliance is ordinarily a question of fact unsuitable for resolution on a motion to dismiss. *Rooney v. Paul D. Osborne Desk Co.*, 38 Mass. App. Ct. 82, 85 (1995).

[28]Vertex's reliance on *Daniels v. Alvaria, Inc.*, and *Gould v. Bank of N.Y. Mellon.,* is inapposite on two independent grounds. First, *Daniels* turned on open repudiation — the plaintiff kept working after Alvaria told her it would not pay the disputed commissions — whereas Vertex concealed the VUSIP preconditions (FAC ¶¶ 33, 42) and repeatedly assured Mr. Pachikoru that sponsorship was on track (FAC ¶¶ 20(a)–(b), 45, 46, 52(a)–(c), 67) until after the *AC21 § 106(a)* window had lapsed (FAC ¶101). Second, the relevant reliance here is not continued labor but the pre-employment surrender of a portable PERM priority date — a detriment that crystallized before Vertex issued its first paycheck and cannot be unwound by resignation.

[29] Vertex's reliance on 8 C.F.R. § 204.5(d) conflates federal immigration vesting with common-law detrimental reliance. The detriment is not the loss of a vested priority date — it is the irreversible forfeiture of a queued position in the multi-year PERM process, a forbearance of an existing right that *Loranger* squarely protects. 376 Mass. at 761.

possessed one. He accepted employment at Vertex precisely because Vertex expressly promised the I-140 sponsorship benefit it now invokes its own non-performance to defeat.

Vertex's *at-will* defense fails here for the reasons explained in Count I, see *supra* (*Starr v. Fordham*). The promise at issue was collateral to employment tenure: it induced Mr. Pachikoru to surrender an active PERM queue held with his prior employer. That is collateral forbearance, not a disguised contract-of-employment claim. See *Treadwell v. John Hancock Mut. Life Ins. Co.*, 666 F. Supp. 278, 286 (D. Mass. 1987).

Vertex's assertion that it "honored" the promise (ECF No. 23 at 27) is unfounded. Vertex never petitioned EB-2 PERM or NIW for Mr. Pachikoru under receipt number IOE8429937781. See (FAC ¶¶ 101, 147); see *supra* Count II. To the extent Vertex argues the 2025 separation extinguished the claim, the detriment was complete in April 2023 and is measured as of the moment of forbearance.[30]

### COUNT IX: MASSACHUSETTS WAGE ACT

The Wage Act, M.G.L. c. 149, § 148, requires employers to pay a discharged employee all wages on the date of discharge. *Reuter v. City of Methuen*, 489 Mass. 465, 474 (2022). Violations entitle the employee to treble damages under § 150. The termination was involuntary, as established *supra* Section I.

The FAC pleads four distinct violations: (1) $7,906.65 in ESPP deductions returned fifteen days late (FAC ¶274(a)); (2) accrued PTO paid fifteen days late (FAC ¶274(b)); (3) final regular wages paid one day late (FAC ¶274(c)); and (4) a Gold VOCAP award of $750.00 processed for payment with status "Send to Payroll: Yes" but never paid (FAC ¶¶ 154, 163)[31].

---

[30]The causal link between false immigration sponsorship promises and permanent loss of immigration pathways was recognized in *Reynaud v. Technicolor Creative Servs. USA, Inc.*, 46 Cal. App. 5th 1007, 1021 (2020) (persuasive authority).

[31] Mr. Pachikoru has received authorization from the Massachusetts Attorney General's Office to bring a private right of action under § 150 (FAC ¶276).

***ESPP Withholdings:*** The ESPP withholdings at issue are Mr. Pachikoru's own wages, deducted from each paycheck and held by Vertex pending the purchase date; upon termination they revert to wage status and are due on the date of discharge under § 148. *Reuter v. City of Methuen*, 489 Mass. 465 (2022), forecloses any defense based on subsequent payment: late payment of any portion of final wages triggers mandatory treble damages[32]. Vertex's fifteen-day delay is uncontested on the face of its own payroll records.  See *Awuah v. Coverall N. Am., Inc.*, 460 Mass. 484, 492 (2011). Section 8 is a transactional exemption, not a permanent reclassification, and Wage Act exemptions must be strictly construed. *Camara v. Attorney Gen.*, 458 Mass. 756, 767 (2011). Any ESPP plan term permitting delayed return is void under §148. *Electronic Data Systems Corp v. Attorney General*, 454 Mass. 63, 72 (2009).

Vertex's reliance on *Calixto v. Coughlin*, 481 Mass. 157, 161 (2018), is inapposite: *Calixto* addressed whether "extraordinary relief" under the Wage Act reaches situations beyond non-payment of earned wages; it did not address post-tax cash deductions returned after a stock purchase never occurred, nor the return of accrued PTO on discharge. *Calixto's* "egregious behavior" language describes the statute's purpose, not a threshold requirement a plaintiff must independently satisfy to invoke § 150's treble-damages remedy.

***VOCAP Bonus.*** The SJC has held that once an employer exercises its discretion and determines the amount of a bonus, it becomes a protected "wage." *EDS*, 454 Mass. at 67–68. Vertex fixed the Gold VOCAP amount and marked it "Send to Payroll: Yes" (FAC ¶274(d)) — meaning discretion was already exercised, bringing the bonus squarely within *EDS*.[33]

---

[32] Vertex argues ESPP payments are excluded under M.G.L. c. 154, § 8, citing Weems v. Citigroup Inc.. *Weems* is inapposite: it addressed deferred compensation forfeitures, not employee-funded payroll deductions held in trust.
[33] *Alfieri, Prozinski,* and *O'Connor,* cited by Vertex, involved bonuses where the employer had not yet exercised discretion or fixed an amount. Here, Vertex fixed the $750 Gold VOCAP and marked it "Send to Payroll: Yes" (FAC ¶274(d)), bringing it squarely within *EDS*.

Because the termination was involuntary, see *supra* Section I, all wages — including PTO and ESPP deductions — were due on March 20, 2025. Vertex's payments on *March 21* and A*pril 4, 2025,* were therefore late, triggering mandatory treble damages under *Reuter*.

## **CONCLUSION**

The FAC states plausible claims for relief on every count, supported by specific dates, names, times, communications, and internal Vertex documents exceeding the plausibility threshold under *Iqbal and Twombly*. The factual web is too tightly woven for any single count to be dismissed without doing violence to the plausibility of the whole. Vertex's motion to dismiss should be denied in its entirety.

Finally, given the complex and integrated nature of the nine counts and the application of the TVPRA, Mr. Pachikoru respectfully requests oral argument pursuant to Local Rule 7.1(d) to address any questions the Court may have. As a pro se litigant, Mr. Pachikoru is mindful of the Court's time and would welcome the opportunity to clarify any aspect of the briefing the Court finds unclear. Mr. Pachikoru stands ready to proceed to discovery upon the Court's resolution of the pending motion.

Respectfully submitted,

/s/ Kranthi Sagar Pachikoru

_____

Kranthi Sagar Pachikoru
Plaintiff, *Pro Se*

2 Congress St, Ste 18
Milford, MA 01757
Phone: 571-570-3607
Email: kranthi@tuta.io
Dated: April 14, 2026

**CERTIFICATE OF SERVICE**

I, Kranthi Sagar Pachikoru, hereby certify that on April 14, 2026, a true and correct copy of the foregoing was filed through the Court's CM/ECF system, which will send notification of such filing to all counsel of record.


Christopher W. Kelleher

Lynn A. Kappelman

Seyfarth Shaw LLP

*Counsel for Defendant Vertex Pharmaceuticals Inc.*



/s/ Kranthi Sagar Pachikoru

_____

Kranthi Sagar Pachikoru

Plaintiff, *Pro Se*

30