**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KRANTHI SAGAR PACHIKORU,<br><br>Plaintiff,<br><br>v.<br><br>VERTEX PHARMACEUTICALS INC.,<br><br>Defendant. | Civil Action No. 4:25-CV-40184-MRG<br><br>**LEAVE TO FILE GRANTED ON**<br>**APRIL 14, 2026** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Vertex Pharmaceuticals Incorporated ("Vertex" or "Defendant") submits this Memorandum of Law in Support of Its Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") in its entirety, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

**INTRODUCTION**

Vertex is a global biotechnology company that invests in scientific innovation to create transformative medicines for people with serious diseases. In April 2023, Vertex hired Plaintiff to work as a GMP Operational Quality Manager overseeing parts of the drug manufacturing process. Vertex committed to supporting Plaintiff's immigration status during his employment with the company, and after he accepted Vertex's employment offer, Vertex engaged and paid outside counsel to submit the necessary paperwork to sponsor his immigration status. Vertex's immigration support, however, was contingent on Plaintiff meeting performance expectations. By Plaintiff's own admission, beginning in 2024, Vertex made Plaintiff aware of its concerns regarding his performance. As a result of these concerns, on March 7, 2025, Plaintiff's manager placed him on a 60-day performance improvement plan ("PIP") to provide Plaintiff an opportunity to improve his performance. Vertex did not terminate Plaintiff's employment, and in fact, he

expressly pleads Vertex sought to work with him long-term. However, in response to receiving a PIP, Plaintiff voluntarily resigned from his employment on March 20, 2025.

On February 10, 2026, Defendant moved to dismiss the original Complaint for failure to state a claim. ECF 14-15. Instead of filing an opposition, Plaintiff responded by filing his FAC which, in many areas, deleted or revised previously pled factual allegations that undermined his claims. ECF 18. However, despite Plaintiff's attempts to reframe his claims, his allegations remain largely unchanged, and are subject to dismissal as a matter of law, for the reasons set forth below:

- Counts I and II – fraudulent misrepresentation: Plaintiff does not plausibly allege Vertex lacked the present intent to sponsor his green card nor does he plausibly allege reliance on Vertex's alleged misrepresentations to the U.S. Department of Labor ("DOL") and U.S. Citizenship and Immigration Services ("USCIS") as true. Plaintiff also fails to meet the heightened pleading standard in Count I.

- Count III – 42 U.S.C. § 1981: Plaintiff fails to plead facts showing Vertex made decisions because of his race, or that he was subject to severe or pervasive harassment. Likewise, Plaintiff alleges no protected activity under Section 1981 and no adverse action causally tied to such activity.

- Count IV – intentional infliction of emotional distress: This claim, among other defects, is barred by the Massachusetts Workers' Compensation Act.

- Count V – Trafficking Victims Protection Reauthorization Act ("TVPRA"): Plaintiff's factual allegations do not even begin to suggest that Plaintiff – a highly sophisticated professional – was subject to forced labor.

- Counts VI and VII – wrongful termination in violation of public policy ("WTPP"): Plaintiff does not, and cannot, identify a public policy to support a WTPP claim under Count VI, and Plaintiff admits he did not file a written rebuttal, as statutorily required, for Count VII. Counts VI and VII also fail from the outset because Vertex did not terminate Plaintiff's employment, constructively or otherwise.

- Count VIII – promissory estoppel claim: Plaintiff fails to adequately allege that Vertex promised to unconditionally sponsor his immigration status or show reasonable reliance on Vertex's commitment to his detriment because Vertex did in fact sponsor his green card; it was Plaintiff's resignation that ended that process.

- Count IX – Massachusetts Wage Act ("Wage Act"): Plaintiff does not plausibly allege that Vertex paid him any wages in an untimely manner.

Vertex respectfully requests an Order dismissing the FAC in its entirety, with prejudice.

2

<u>**PLAINTIFF'S ALLEGATIONS**</u>[1]

**I.    PLAINTIFF IS HIRED AS GMP OPERATIONAL QUALITY MANAGER**

In April 2023, Vertex hired Plaintiff for a GMP Operational Quality Manager role. ECF 18, FAC ¶¶ 10-11. During the hiring process, Quality Assurance Operations ("QA") Associate Director Claudia Lee ("Ms. Lee") and QA Executive Director Sue Miles ("Ms. Miles") informed Plaintiff that Vertex would sponsor his green card application as part of his employment. *Id.* ¶ 9. According to Vertex's Immigration Policy, Plaintiff was required to meet certain performance expectations as a condition of employment and green card sponsorship. *Id.* ¶ 42. Specifically, Plaintiff was expected to achieve a "leading" rating for at least one year, or alternatively, a "strong" rating for two years from his first day of employment with Vertex. *Id.* Plaintiff alleges that he first became aware of the Immigration Policy on January 8, 2024. *Id.* ¶¶ 33, 41, 42(c).

After he accepted Vertex's employment offer, Vertex filed a Labor Condition Application ("LCA") for Plaintiff with the DOL, which listed a Standard Occupational Classification ("SOC") code reflecting that he would be working for Vertex as a Project Management Specialist. *Id.* ¶ 14. On May 4, 2023, USCIS issued a Request for Evidence ("RFE") to Vertex inquiring as to whether Plaintiff's role qualified as a specialty role for purposes of his immigration status. *Id.* ¶ 15.

Plaintiff alleges that on June 23, 2023, in response to USCIS's inquiry, Ms. Lee "shared the finalized RFE response; which was significantly different from the job [he] applied for, and the RFE included" additional job duties and that Ms. Lee later submitted the form to USCIS without his knowledge or awareness. *Id.* ¶19. He further alleges that Ms. Lee subsequently changed his job description according to the alterations she made on the RFE worksheet and removed his

---

[1] For purposes of this Motion, Vertex assumes the factual allegations in the FAC are true. In doing so, Vertex does not agree that the allegations are indeed true, and Vertex expressly reserves the right to further respond to these allegations.

people management responsibilities. *Id.* ¶ 23. He nonetheless accepted his new job description and continued to work for Vertex for nearly two more years. *Id.* ¶¶ 23, 151. During his employment, Vertex continued to work with him to help him secure a green card. *Id.* ¶¶ 12, 57, 67, 70, 101, 147.

## II.     PLAINTIFF'S POOR PERFORMANCE AND VOLUNTARY RESIGNATION

In his role at Vertex, Plaintiff was responsible for overseeing product quality and assurance related to the manufacturing process for one of Vertex's medicines. *Id.* ¶¶ 18. He reported to Ms. Lee, who reported to Ms. Miles—the same individuals who hired him. *See id.* ¶¶ 9, 22-23, 26-27.

In mid-late 2024 and into 2025, Plaintiff received performance feedback from his manager relating to his poor communication skills, leadership abilities, and failure to meet his manager's expectations, among other concerns. *Id.* ¶¶ 60, 88, 123, 133, 126-127, 129(b). As a result of his underperformance, in February 2025, Vertex reduced Plaintiff's responsibilities by reassigning him to a slower-moving project. *Id.* ¶ 118(a). Plaintiff subsequently received a performance rating of "building" on his annual performance review, which he alleges was a reduction from his previous rating of "strong." *Id.* ¶ 120. His performance rating "disqualified him from Green Card sponsorship under [the] Immigration Policy and prevented his internal mobility." *Id.*

On March 7, 2025, Plaintiff was placed on a 60-day PIP. *Id.* ¶ 141. On March 10, 2025, Plaintiff met with a Vertex Employee Relations representative and verbally alleged that his PIP had been fabricated by Ms. Lee and Ms. Miles in retaliation for alleged internal reports he made regarding alleged non-compliance, product quality, and patient safety concerns, among other generalized concerns. *Id.* ¶¶ 142-143. Vertex initiated an investigation into his allegations. *Id.* ¶¶ 145-146.

On March 20, 2025, Plaintiff emailed his new manager to cancel a scheduled PIP meeting and instead submitted his resignation. *Id.* ¶ 151. He alleges he was "actively preparing" to file a

rebuttal to his PIP but acknowledges he never did so prior to his resignation. *Id.* ¶¶ 152-153, 248. Following Plaintiff's resignation, Vertex ceased its sponsorship of his green card. *Id.* ¶ 157.

## ARGUMENT

### I.     RELEVANT LEGAL STANDARDS

To survive a 12(b)(6) motion, a complaint must set forth sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[M]ere conclusory statements" are not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the Court can reasonably infer that the defendant is liable for the misconduct alleged. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). Dismissal is appropriate if the complaint "fails to set forth factual allegations . . . respecting each material element necessary to sustain recovery[.]" *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008).

### II.    PLAINTIFF FAILS TO STATE A CLAIM FOR FRAUD (COUNTS I & II)

#### A.     Legal Standards for Fraudulent Misrepresentation Claims.

To state a claim for fraudulent misrepresentation, Plaintiff must plausibly allege: (1) Vertex made a false representation of a material fact with knowledge of its falsity; (2) for the purpose of inducing action thereon; and (3) he relied upon the representation as true and acted upon it; (4) causing him damage. *Masingill v. EMC Corp.*, 449 Mass. 532, 540 (2007). Further, he must "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). This heightened pleading standard "precludes the use of a groundless fraud claim as a pretext to using discovery as a fishing expedition" and prevents "frivolous charges that might damage [Vertex's] reputation[]." *Robert Reiser & Co. v. Scriven*, 130 F. Supp. 3d 488, 494 (D. Mass. 2015) (citation modified).

Count I should be dismissed pursuant to Rule 12(b)(6) and Rule 9(b).[2] Count II should be dismissed pursuant to Rule 12(b)(6).

### 1. Plaintiff Has Not Sufficiently Alleged That Vertex Knowingly Misrepresented its Intention to Sponsor His Green Card (Count I).

Plaintiff has not sufficiently alleged that Vertex falsely represented its intention to sponsor his immigration status with knowledge of its falsity. Plaintiff alleges without factual support that during the hiring process, Vertex misrepresented its intention to sponsor his green card. FAC ¶¶ 185-186. He claims in conclusory fashion that Vertex "knew these representations were false when made" because a promise of green card support was not in writing, Vertex had an Immigration Policy that imposed performance requirements on employees in order to maintain its immigration support (which Plaintiff alleges was not disclosed to him before his acceptance of employment), and the timing of his green card application process took longer than he had anticipated. *Id.* ¶ 186.

None of these allegations, however, support his assertion that Vertex promised to act in early 2023 ***while knowing at that time that it would not act***. *See Robert Reiser & Co.*, 130 F. Supp. 3d at 494 (finding misrepresentation claim insufficiently pled because there were no allegations that the company's statement of future intention misrepresented the company's actual intention at the time it was made); *Iron Mountain Inc. v. Carr*, No. 05–10890–RCL, 2006 WL 6602266, at *9-10 (D. Mass. Mar. 13, 2006) (recommending dismissal of fraud claim because conclusory statement to the effect that "[i]n hindsight it is apparent that the plaintiffs knew their statements . . . were false when made" was insufficient to prove the statements were made falsely). Contrary to Plaintiff's conclusory assertions, the policy prohibiting express written promises of green card

---

[2] Motions to dismiss for failure to comply with Rule 9(b)'s heightened pleading requirement are properly characterized as a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *JRA Architects & Project Managers, P.S.C. v. First Fin. Grp., Inc.*, No. 08-1285 (FAB/MEL), 2008 WL 11381412, at *1 n.2 (D.P.R. Sept. 15, 2008), *report and recommendation adopted*, 2009 WL 10688978 (D.P.R. Apr. 13, 2009).

support (FAC ¶ 21) demonstrates that no such guarantee was made. Further, it would defy reason and would fail to satisfy the *Twombly* standard to suggest that Vertex's enforcement of its internal performance requirements demonstrated Vertex knew when it recruited and hired Plaintiff that it did not actually intend to sponsor his immigration status. *See Twombly*, 550 U.S. at 555 ("Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level.") (citation modified). Finally, Plaintiff concedes that as late as February 2025, the month prior to his resignation, Vertex had been actively engaged in supporting his immigration status. FAC ¶ 186(e).

Even if Vertex promised "immediate Green Card sponsorship," as Plaintiff alleges, he did not ***reasonably rely*** on any such promise as ***unconditional*** given the presumption of at-will employment in Massachusetts. *Kuwaiti Danish Comput. Co. v. Digit. Equip. Corp.*, 438 Mass. 459, 467-69 (2003) (fraudulent misrepresentation requires reasonable reliance); *see French v. United Parcel Serv., Inc.*, 2 F. Supp. 2d 128, 133 (D. Mass. 1998) ("In Massachusetts, employment is presumptively at-will, meaning that either the employee or employer may end the employment without notice for almost any reason or for no reason at all.") (citation modified). By Plaintiff's logic, the alleged promise provided him with immunity for ***any*** policy violation or performance failure, which is contrary to the strong presumption of at-will employment.

Moreover, the FAC allegations ***undermine*** Plaintiff's fraud claim, including his admission that Vertex took steps to support his immigration status. For example, Plaintiff alleges that Vertex engaged and paid for outside Immigration counsel on his behalf (FAC ¶ 12); filed an LCA for him (*id.* ¶ 14); responded to USCIS's RFE (*id.* ¶ 19); pursued EB-2-NIW for him (*id.* ¶ 67); and followed up with him about the completion of his EB-2-NIW questionnaire (*id.* ¶ 101). He even notes that Vertex ceased efforts to support Plaintiff's immigration status only ***after*** his resignation.

*Id.* ¶ 157. These allegations contradict any assertion that Vertex knowingly misrepresented at the time of his employment offer its intent to sponsor Plaintiff for a green card.

In addition to Count I being implausible, Plaintiff fails to state Count I with particularity, as required by Rule 9(b). Other than asserting in conclusory terms that Vertex verbally promised immediate green card sponsorship without intending to honor that commitment, he provides no specificity regarding what made the alleged statement fraudulent nor the details surrounding such statement. *Id.* ¶¶ 9, 185-186; *see CardiAQ Valve Techs., Inc. v. Neovasc, Inc.*, 57 F. Supp. 3d 118, 123 (D. Mass. 2014) (Rule 9(b) requires the pleader to (1) specify the fraudulent statement; (2) identify the speaker, (3) plead when and where the statement was made; and (4) to explain what made the statements fraudulent).

Count I and its mere conclusory assertions are insufficient to satisfy *Twombly's* plausibility standard, let alone the heightened pleading standard required for fraud claims. Therefore, this Court should dismiss Count I for failure to satisfy Rules 12(b)(6) and 9(b).

### 2.  Plaintiff Fails to Allege that He Relied on Vertex's Alleged Misrepresentations on His Immigration Forms as Truth (Count II).

Plaintiff fails to plausibly plead the reliance element of his fraud claim in Count II. While Plaintiff has alleged that Vertex made misrepresentations to the DOL and USCIS[3] regarding his employment classification, code, and duties on immigration forms Vertex submitted on his behalf to these agencies (not to Plaintiff), importantly, he fails to allege that *he* relied upon these supposed misrepresentations *as true* and then acted upon them to his detriment. FAC ¶¶ 191-195. Rather, he alleges that he explicitly disagreed with, or at a minimum doubted, Vertex's reasoning for including certain language in these immigration forms. For instance, Plaintiff alleges that he "inquired" about the employment classification code used in his LCA filed with the DOL (*id.* ¶

---

[3] Vertex denies any misrepresentation but is not moving on those allegations for purposes of its Motion to Dismiss.

17), presumably because he believed Vertex could use a different classification code to describe his role at Vertex (*id.* ¶ 14). He also alleges that Vertex altered responses submitted to USCIS "without [his] knowledge or awareness" (*id.* ¶ 19), implying that he was unaware (and/or did not approve) of such alleged misrepresentations.[4] Under the alleged facts, ***Plaintiff*** could not have relied upon Vertex's alleged misrepresentations on his immigration forms as true such that he then acted upon those misrepresentations to his detriment. Count II, accordingly, should be dismissed for failing to state a claim under Rule 12(b)(6).

### III.   PLAINTIFF FAILS TO STATE CLAIMS UNDER 42 U.S.C. § 1981 (COUNT III)

In Count III, Plaintiff purports to assert three distinct claims under 42 U.S.C. § 1981 based on his "Indian ancestry" including hostile work environment, disparate treatment, and retaliation.[5] FAC ¶¶ 198, 200. These claims fail for the reasons set forth below.

---

[4] Importantly, Vertex was not required to obtain Plaintiff's review or approval of its responses and Plaintiff did not otherwise have control over Vertex's immigration filings. Under the H-1B statutory and regulatory framework, the ***employer***, not the foreign national, controls the definition of the proffered position and the contents of the H-1B petition, including the selection of the appropriate Standard Occupational Classification ("SOC") code. The regulations make clear that an H-1B petition is employer-driven and must be filed by the employer offering the services, who bears the burden of describing the job duties, requirements, and terms of employment. *See* 8 C.F.R. § 214.2(h)(1)(i) (providing that an alien may be authorized to perform services in the United States only "if petitioned for by that employer"). Consistent with this framework, the DOL requires the employer to identify the occupational classification on the Labor Condition Application ("LCA") based on the job duties it has defined, for purposes of prevailing wage compliance. *See* 20 C.F.R. § 655.730(c)(1) (requiring the employer or its authorized representative to submit a completed LCA); *id.* § 655.730(c)(2) (providing that, by signing the LCA, the employer attests that the statements therein are true and agrees to comply with the labor condition attestations); *see generally id.* § 655.730(d). USCIS, in turn, adjudicates whether the employer's proffered position qualifies as a specialty occupation by evaluating the job duties and requirements as articulated by the petitioner, not by reference to the beneficiary's preferences or expectations. *See* USCIS Policy Manual, Vol. 2, Pt. H, Ch. 2(A). Both DOL and USCIS may review the employer's SOC code selection and job description for accuracy and regulatory compliance. Neither the statute nor the implementing regulations vest authority in the foreign national to determine the occupational classification or the contents of the H-1B petition.

[5] Plaintiff's allegations of discrimination sound in national origin discrimination. To the extent he purports to allege national origin discrimination, such claims are not actionable under Section 1981. *Hall v. FMR Corp.*, 559 F. Supp. 2d 120, 126 (D. Mass. 2008). Title VII of the Civil Rights Act provides the appropriate causes of action for Plaintiff's claims for national origin discrimination. Plaintiff failed to exhaust his administrative remedies by filing a charge of discrimination with the EEOC. As a result, he attempts to recast Title VII claims into claims under Section 1981.

### A.    Plaintiff Does Not State a Claim for Hostile Work Environment.

To establish a hostile work environment claim under 42 U.S.C. § 1981, Plaintiff must show that: (1) he is a member of a protected class; (2) he experienced uninvited harassment; (3) the harassment was racially-based; (4) the harassment was so severe or pervasive as to create an abusive work environment; and (5) the harassment was objectively and subjectively offensive. *Prescott v. Higgins*, 538 F.3d 32, 42 (1st Cir. 2008); *Hall v. FMR Corp.*, 667 F. Supp. 2d 185, 201 (D. Mass. 2009). At a minimum, Plaintiff has failed to plausibly allege that any alleged harassment was racially motivated, was severe and pervasive, or was objectively and subjectively offensive.

### 1.    Plaintiff Offers No Evidence of Race-Based Harassment.

As a preliminary matter, Plaintiff fails to provide any factual basis for his conclusory allegation that he suffered a hostile work environment based on his race. FAC ¶¶ 200, 202. Indeed, he has *removed* prior references to "race" in the FAC and does not allege a single instance of racially motivated harassment. As such, he cannot satisfy the third element of his hostile work environment claim and, on that basis alone, his claim should be dismissed. *Hall*, 667 F. Supp. 2d at 202 (finding "the absence of evidence that any of the perceived slights … had a connection to [plaintiff]'s race]" fatal to hostile work environment claim); *Salomon v. Mass. Housing Fin. Agency*, No. 22-cv-10181-ADB, 2023 WL 2588334 at *8 (D. Mass. Mar. 21, 2023) (dismissing hostile work environment claim where allegations "lack any indication of race-based motivation").

### 2.    The Alleged Conduct Was Not Sufficiently "Severe or Pervasive" to Create an Objectively or Subjectively Abusive Working Environment.

Nor can Plaintiff establish the fourth or fifth elements of his hostile work environment claim. To do so, he must show his "workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Quiles-Quiles v. Henderson*, 439 F.3d

10

1, 7 (1st Cir. 2006) (citation modified); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (analysis of whether work environment is "hostile" or "abusive" includes "the frequency of the discriminatory conduct; its severity; [and] whether it is physically threatening or humiliating"). Importantly, "any abuse must be both objectively offensive (as viewed from a reasonable person's perspective) and subjectively so (as perceived by the plaintiff)." *Alvarado v. Donahoe*, 687 F.3d 453, 461 (1st Cir. 2012).

Plaintiff bases his hostile work environment claim (FAC ¶ 202) on the following allegations: Ms. Miles instructed him to "emulate specific colleagues of Indian ancestry whom she identified as exemplary," (*id.* ¶ 55(b)); Ms. Miles made certain ***unspecified*** "disparaging remarks . . . about two senior members of Indian ancestry[,]" (*id.* ¶ 168); Ms. Miles told him that "bad bosses are everywhere" and to mimic Ms. Lee's professional behaviors (*id.* ¶ 63(b)); Ms. Miles told him his visa was at risk if he did not meet management's expectations[6] (*id.* ¶ 55(a)); and "upon information and belief, multiple employees of Indian ancestry independently advised [Plaintiff] that Ms. Miles expected employees of their background to remain silent and deferential" (*id.* ¶ 171). None of these allegations include discriminatory ridicule, repeated instances of severe discriminatory conduct, or anything else that even hints that Plaintiff was subject to "severe or pervasive" harassment or to an objectively (or subjectively) abusive working environment, and in fact, some of the alleged conduct is not even directed at Plaintiff. *See Flowers v. FLLAC Educ. Collaborative*, No. 18-1170, 2019 WL 10982432, at *2-3 (1st Cir. 2019) (dismissing hostile work environment claim where *pro se* plaintiff failed to adequately plead that he suffered harassment that was "explicitly racial in nature," and little of the alleged conduct "could be plausibly viewed as targeted toward [plaintiff]"); *Colon-Fontanez v. Mun. of San Juan*, 660 F.3d 17, 44 (1st Cir.

---

[6] As described above, Plaintiff expressly pleads that Vertex's Immigration Policy required him to meet certain performance standards for continued immigration status support. FAC ¶ 42(a).

11

2011) (no abusive work environment where supervisor allegedly regularly refused to meet with plaintiff, publicly yelled at her, failed to prevent or deter other employees from making derogatory comments about her, and limited plaintiff's movements around the workplace); *c.f. Wilson v. Moulison N. Corp.*, 691 F. Supp. 2d 232, 235-36 (D. Me. 2010) (subjection to multiple racially insensitive and derogatory comments using the "N" word sufficiently severe and pervasive), *aff'd,* 639 F.3d 1 (1st. Cir. 2011). Given these legal standards, a reasonable person in Plaintiff's position would not find his alleged working conditions "abusive". *See Hall*, 667 F. Supp. 2d at 201. Accordingly, the hostile work environment claim must be dismissed.

### B.    Plaintiff Does Not State a Claim for Disparate Treatment Based on Race.

Section 1981 disparate treatment claims are analyzed under the same framework as Title VII claims. *Prescott*, 538 F.3d at 40. Plaintiff must plausibly allege: (1) he was a member of a protected class;[7] (2) he was qualified for his position; (3) he was subjected to an adverse employment action; and (4) a causal connection between his membership in a protected class and the adverse employment action. *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011). In particular, to prevail on such a claim, "a plaintiff must initially plead and ultimately prove that, ***but for race***, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020) (emphasis added).

For the same reasons stated *supra*, Sec. III(A)(1), the disparate treatment claim is fatally flawed because he has not alleged facts demonstrating Vertex held racially discriminatory animus against Indian employees. To the contrary, Plaintiff alleges Ms. Miles viewed his Indian colleagues as "exemplary"[8] and that Ms. Lee described at least one Indian employee as a "good friend." FAC

---

[7] As noted above, Section 1981 is not a permissible avenue for raising a national origin discrimination claim.

[8] Notably, Plaintiff has changed the character of this allegation to fit his argument. In the original Complaint, he alleged that Ms. Miles told him to emulate certain Indian colleagues "whom she highly respected." ECF 1, ¶ 41.

¶¶ 45, 55(b). Plaintiff claims in conclusory fashion that immigrant workers were on a "parallel, inferior track of employment" because they were subject to the Immigration Policy, but there is no allegation that the Immigration Policy applied only to Indian employees; rather, it applied to all employees seeking immigration sponsorship, regardless of race or nationality. *Id.*¶ 199.

Plaintiff also offers no factual support for his assertion that "white American" employees were treated more favorably due to their race. *Id.* ¶ 167. For instance, he claims, "upon information and belief"—without any factual support—that "Employee A" was not placed on a PIP despite a "building" performance rating (*id.* ¶ 165), but he offers no allegations whatsoever establishing that "Employee A" was a similarly situated employee and thus a proper comparator to him. *See Waleyko v. Phelan*, 146 F.4th 89, 96-98 (1st Cir. 2025) (dismissing plaintiff's discrimination claims, which were grounded in comparisons of "unfounded suppositions or improper[] compar[isons of] apples and oranges"); *Giordano v. Pub. Serv. Co. of N.H.*, No. 19-cv-1231-PB, 2020 WL 2404885, at *5 (D.N.H. May 12, 2020) (dismissing plaintiff's discrimination claims because plaintiff compared her treatment to employees who either held a different title or worked at a different location); *McIntosh v. Mass. Bay Transp. Auth.*, No. 24-cv-10109-RGS, 2024 WL 2704997, at *5 (D. Mass. May 27, 2024) (dismissing claims of discrimination because plaintiff "fail[ed] to include any facts which indicate that he was treated less favorably than other similarly situated employees or that any of the comments or acts he describes were motivated by animus directed at him personally because of his race"). Further, while Plaintiff claims that he was denied opportunities that were given to other employees, he expressly pleads that his managers based these decisions on his performance deficiencies, including his poor communication skills, and not for any reason having to do with his race. FAC ¶¶ 27-28, 77, 85, 201(a).

13

Just as importantly (and dispositive of his claim), Plaintiff alleges that the same individuals who hired him, Ms. Lee and Ms. Miles, were responsible for discriminating against him. *Id.* ¶¶ 9, 183, 212. There can be no inference of discrimination under these circumstances. *See LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 847 (1st Cir. 1993) (noting plaintiff "points to nothing in the record to suggest" why his employer who approved his transfer "would develop an aversion" against his protected class less than two years later) (citing *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hire, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.")).

Because the FAC fails to plausibly allege that Vertex possessed or acted on racial animus against Plaintiff, the race discrimination claim must also be dismissed.

### C.       Plaintiff Fails to State a Claim for Retaliation.

To state a claim for retaliation under Section 1981, Plaintiff must plausibly allege that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) the protected conduct and adverse employment action were causally connected. *Pina v. Child.'s Place*, 740 F.3d 785, 800-01 (1st Cir. 2014). Protected activity consists of actions taken to oppose or report racial discrimination. *Cabi v. Bos. Child.'s Hosp.*, 161 F. Supp. 3d 136, 157 (D. Mass. 2016). As here, where Plaintiff fails to plausibly allege that an adverse employment action was caused by his oppositional, protected conduct, his asserted retaliation claim necessarily fails. *Frith v. Whole Foods Mkt., Inc.*, 38 F. 4th 263, 277-78 (1st Cir. 2022).

### 1.       Plaintiff Does Not Allege That He Engaged in Protected Activity.

Plaintiff's allegations that he reported concerns about product quality and safety and management's "hostile and disparate treatment" (FAC ¶¶ 39, 44, 49, 50, 60, 63, 95, 142) do not constitute protected activity under Section 1981 because they are unrelated to race discrimination.

14

*Cf. Cabi*, 161 F. Supp. 3d at 157 (finding that plaintiffs engaged in protected activity by reporting a series of explicit and derogatory race-based comments and conduct). Indeed, Plaintiff expressly pleads that he did ***not*** make any complaints of race or ancestry discrimination. FAC ¶¶ 179, 204. Absent such a complaint of racial discrimination, Plaintiff fails to establish that he engaged in protected activity under Section 1981.

> **2.      Plaintiff Does Not Sufficiently Allege a Causal Connection Between Any Alleged Protected Activity and Adverse Employment Action.**

Even if Plaintiff had sufficiently alleged that he engaged in protected activity—he did not—he does not plausibly allege that he suffered an adverse employment action due to any protected activity. There are no factual allegations establishing that any of Defendant's alleged adverse actions, such as Plaintiff's poor performance review, were causally related to any report of discrimination. *See James v. Cox*, No. 21-CV-12098-AK, 2022 WL 2905367, at *7 (D. Mass. July 22, 2022) (dismissing retaliation claim because plaintiffs failed to allege facts connecting protected activity to adverse action). Notably, Plaintiff attributes his allegedly "downgraded performance rating" and "fabricated PIP" to having raised concerns about alleged product quality and safety among other generalized concerns, rather than any report of race discrimination. *See* FAC ¶¶ 142-143, 212(d). Accordingly, Plaintiff's retaliation claim fails as well and the Section 1981 claims should be dismissed.

## IV.      THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM FAILS AS A MATTER OF LAW AND FOR FAILURE TO STATE A CLAIM (COUNT IV)

### A.      The IIED Claim Is Barred By the Massachusetts Workers' Compensation Act.

Plaintiff's claim for intentional infliction of emotional distress ("IIED") is barred by the exclusivity provision of the Massachusetts Workers Compensation Act. *Rogers v. Nstar Elec.*, 389 F. Supp. 2d 100, 110 (D. Mass. 2005) (citing M.G.L. c. 152, § 24); *Doe v. Purity Supreme, Inc.*, 422 Mass. 563, 565 (1996)); *Tennaro v. Ryder Sys., Inc.*, 832 F. Supp. 494, 500 (D. Mass. 1993).

To the extent Plaintiff alleges Vertex engaged in conduct giving rise to a claim for IIED after his employment ended, that alleged conduct is also preempted by the Workers' Compensation Act because it relates to Plaintiff's employment relationship with Vertex. *See Cavicchi v. Raytheon Co.*, 16 F. Supp. 3d 4, 7 (D. Mass. 2014). Accordingly, Plaintiff's IIED claim must be dismissed.

### B.       Plaintiff Further Fails to Sufficiently Allege Facts that Support an IIED Claim.

Even if the IIED claim was not barred—which it is as a matter of law—Plaintiff cannot show that Vertex's alleged conduct toward him meets the objective reasonable person standard of "extreme and outrageous" conduct to sufficiently ground an IIED claim. *Mercurio v. Town of Sherborn*, 287 F. Supp. 3d 109, 125 (D. Mass. 2017) ("[T]o prevail on a claim of [IIED], a plaintiff must show [among other things] that . . . the defendant's conduct was extreme and outrageous to the extent it was utterly intolerable in a civilized society") (citation modified). Courts have acknowledged that this requirement is "notoriously difficult to establish." *Bazinet v. Thorpe*, No. CV 14-40082-TSH, 2014 WL 13109876, at *4 (D. Mass. Dec. 9, 2014). Plaintiff's bald allegations that Vertex's acts of "coercion, retaliation, and humiliation", including by managing his performance and behavior, placing him on a PIP, and enforcing the Immigration Policy (FAC ¶ 212) are inadequate and simply do not amount to "extreme and outrageous" conduct sufficient to state a claim for IIED. *See Fountain v. City of Methuen*, 630 F. Supp. 3d 298, 306, 319  (D. Mass. 2022) (granting judgment on the pleadings for defendant on IIED claim because "insulting remarks" and "public criticism" were not extreme and outrageous conduct sufficient to establish IIED); *McConney v. City of Worcester*, NO. 03-CV-11920-JLA, 2006 WL 8458061, at *8 (D. Mass. Aug. 15, 2006) (supervisor's alleged conduct towards employee, "[a]lthough certainly rude and unprofessional . . . is more similar to common workday insults and threats than conduct that would be considered intolerably in a civilized society"); *Burns v. City of Worcester*, 772 F. Supp. 3d 109, 145-46 (D. Mass. 2025) (Guzman, J.) (dismissing IIED claim because plaintiff's claim that

defendant fabricated allegation that he was on drugs while on fire duty with the knowledge about plaintiff's child custody and livelihood issues did not rise to the level of extreme and outrageous behavior). Thus, even if accepted as true, the allegations in the FAC do not rise to the level of IIED and Count VIII should be dismissed.

**V.      PLAINTIFF FAILS TO STATE A CLAIM UNDER THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT (COUNT V)**

The TVPRA claim is similarly implausible.[9] Even under the broadest reading of the case law, Plaintiff, a highly sophisticated professional (*see* FAC ¶ 8), has not alleged he was trafficked into forced labor. A finding to the contrary would be an affront to true victims of human trafficking and "severe forms of worker exploitation," which the TVPRA is designed to combat. *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1030 (7th Cir. 2024) (citation modified). TVPRA cases "typically involve certain hallmarks, such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others . . . and exploitation of the victim's lack of education and familiarity with the English language." *Claros v. Marvin's Refrigeration Corp.*, 800 F. Supp. 3d 391, 398 (N.D.N.Y. 2025) (citation modified). Saliently, the statute was not designed to address routine employment disputes. *Khalid v. Microsoft Corp.*, 409 F. Supp. 3d 1023, 1034 (W.D. Wash. 2019) ("The TVPRA was passed by Congress to reach cases of modern-day human trafficking[.]").

In order for Plaintiff to plead a TVPRA claim, he must plausibly allege that: (1) Vertex obtained his labor or services, (2) by one of the enumerated unlawful means in the statute, and (3) that Vertex did so knowingly. 18 U.S.C. § 1589(a); *Yassin v. AR Enters., LLC*, No. 16-cv-12280,

---

[9] Plaintiff's TVPRA claim, even as amended, continues to consist of "labels and conclusions, and a formulaic recitation of the elements of [the] cause of action," which are insufficient to enable a plaintiff to survive a Rule 12(b)(6) motion. *Twombly*, 550 U.S. at 555.

2017 WL 6625027, at *2 (D. Mass. Dec. 28, 2017). There are four enumerated unlawful means under the TVPRA: (1) "force, threats of force, physical restraint, or threats of physical restraint to Plaintiff", (2) "serious harm or threats of serious harm to Plaintiff," (3) "abuse or threatened abuse of law or legal process," and (4) "any scheme, plan, or pattern intended to cause Plaintiff to believe that, if he did not perform such labor or services, Plaintiff would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a) (citation modified). Moreover, Section 1589 contains **an express scienter requirement** meaning that Plaintiff must adequately plead the existence of evidence from which a jury could find that Vertex intended to cause Plaintiff to believe he would suffer serious harm. *See United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008) ("The presence of a scienter element to the offense makes the [plaintiff's] burden very difficult to carry.").

Here, Plaintiff fails to plead any of the requisite elements of a TVPRA claim. Plaintiff's use of the word "threat" within his FAC does not entitle him to protections under the TVPRA. Rather, his allegation that his manager "threatened" him when she told him "his visa was at risk if he did not meet management's [performance] expectations" (FAC ¶ 55(a)) was a "permissible warning of adverse but legitimate consequences" of poor performance. *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (citation modified); *see Taylor*, 110 F.4th at 1031 (a "legitimate consequence" of the terms of a program and a "legitimate warning" about the consequences of actions did not support a forced labor claim but were "simply components of participation in [defendant's] program"); *see also Walia v. Veritas Healthcare Sols., LLC*, No. 13 Civ. 6935 (KPF), 2015 WL 4743542, at *4 (S.D.N.Y. Aug. 11, 2015) ("Courts must distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences.") (citation modified).

18

Further, Plaintiff's allegation that Vertex "schemed" against him by requiring compliance with the Immigration Policy and delaying the immigration process is facially flawed. FAC ¶ 223. He voluntarily agreed to the terms set forth in the Immigration Policy (*see id.* ¶¶ 33, 41, 42(c)), and he has not otherwise alleged that the "scheme" *forced* him to continue to work for Vertex. Nor has he alleged facts nearing the severe "hallmarks" of a TVPRA case. *Claros*, 800 F. Supp. 3d at 398; *cf. Calimlim*, 538 F.3d at 708-09 (defendants engaged in an actionable scheme under TVPRA because they took their victim's passport, forced her to work 16-hour days, seven days a week for 19 years, rarely paid her, constricted her freedom of movement, never attempted to legalize her status in the U.S., and gave her warnings that they might report her). Indeed, Plaintiff's allegation that he was discharged from Vertex—against his will—belies any allegation that he was forced to continue working for Vertex. FAC ¶¶ 149, 154, 152, 183.

Given Plaintiff's failure to plead the requisite elements, including the absence of any allegations of scienter, the TVPRA claim fails.

## VI.    PLAINTIFF FAILS TO STATE A CLAIM FOR WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (COUNTS VI & VII)

Wrongful termination in violation of public policy ("WTPP") is a narrowly construed common law claim that provides a remedy for an at-will employee who is "terminated contrary to a well-defined public policy." *Wright v. Shriners Hosp. for Crippled Child.*, 412 Mass. 469, 472 (1992). Courts (primarily the Massachusetts Supreme Judicial Court ("SJC")), not the legislature, define what constitutes a public policy for purposes of WTPP claims. The SJC "consistently has interpreted the public policy exception narrowly, reasoning that to do otherwise would convert the general rule that an employment at-will contract can be terminated at any time for any reason or for no reason at all into a rule that requires just cause to terminate an at-will employee." *King v. Driscoll*, 418 Mass. 576, 582 (1994) (citation modified).

To state a WTPP claim, Plaintiff must show that he engaged in conduct covered by a well-established public policy and was terminated "for a reason contrary to a well-established public policy." *Shea v. Emmanuel Coll.*, 425 Mass. 761, 764 (1997). He fails to make this showing.

**A.      Plaintiff's WTPP Claim in Count VI Fails Because Plaintiff Has Not Identified a Public Policy Sufficient to Ground that Claim.**

Plaintiff has not identified a clear public policy sufficient to ground his claim in Count VI, which alleges that Vertex violated Massachusetts public policy by terminating his employment in retaliation for Plaintiff allegedly making complaints to management about alleged drug product quality and patient safety concerns, allegedly in violation of the U.S. Food and Drug (FDA) regulations under 21 C.F.R. Part 211 and Part 11. FAC ¶¶ 6, 232, 239.

**1.      Alleged Violations of Federal Regulations Cannot Ground WTPP.**

Alleged violations of federal regulations alone cannot be the basis of a WTPP claim. *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 91 (1st Cir. 2016) (rejecting plaintiff's WTPP claim that he was terminated for making workplace complaints because "no . . . Massachusetts courts have ever relied on federal authority as the sole source for the state common law wrongful discharge claim"). Rather, the SJC has held that "[r]edress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149-50 (1989). Here, as in *Murray*, Plaintiff relies on alleged violations of federal regulations as the basis for his WTPP claim. FAC ¶¶ 232. But as the court held in *Murray*, raising concerns about alleged federal (in this case FDA) violations—particularly when identifying such concerns is part of the employee's job—while "generally socially desirable," is not enough to trigger a WTPP claim under Massachusetts law because such conduct is not a legally guaranteed

right or required by the law, nor does Plaintiff allege that Vertex required him, and that he refused, to engage in unlawful conduct. *Murray*, 821 F.3d at 89-91.

Finally, disagreeing with an employer's decisions is also insufficient to support a wrongful termination claim. *Id.* at 91; *Smith-Pfeffer*, 404 Mass. at 151 ("An employee, even one in a socially important occupation, who simply disagrees with [his] employer's policy decisions, may not seek redress in the courts."). Plaintiff's allegations supporting his WTPP claim are just that— disagreements with management over internal decisions related to manufacturing process and product quality investigations. FAC ¶¶ 232-236, 238-2399.

### 2. Expressing Concerns Regarding General Health and Safety Do Not Amount to a Public Policy for Purposes of a WTPP Claim.

Even if Plaintiff were to argue that generalized and unsupported concerns regarding public health and safety could ground a WTPP claim—which he does not—that claim would likewise fail because his allegations are "too remote or speculative" to state a WTPP claim. *Nelson v. Anika Therapeutics, Inc.*, No. 09–03231–A, 2011 WL 4056320, *6 (Mass. Super. Ct. Aug. 12, 2011), *aff'd,* No. 12–P–361, 2013 WL 1715307 (Mass. App. Ct. Apr. 22, 2013); *see U.S. ex rel. Provuncher v. Angioscore, Inc.*, No. 09–12176–RGS, 2012 WL 1514844, at *7-8, n.10 (D. Mass. May 1, 2012) (dismissing WTPP claim because a complaint about a decision to market a product despite concerns about safety "does not implicate the public policy exception" when there is no evidence that the product was "indeed defective").

Importantly, while Plaintiff allegedly raised "patient safety concerns" during the routine execution of his role as a GMP Operational Quality Manager (FAC ¶¶ 6, 94, 96, 99-100, 102, 239), he does not, and cannot, allege that his concerns were substantiated, or that the public was at-risk. Indeed, he ***expressly pleads*** that in May 2024, Vertex conducted a product quality investigation and determined that the allegedly contaminated particles "resembled [the product's] API [active

21

pharmaceutical ingredient]," and *not* some foreign substance. *Id.* ¶ 81. Thus, despite Plaintiff's allegations that Vertex failed to proceed with adequate testing, the FAC concedes that there was no contaminant for which to test as a potential safety risk. Moreover, he acknowledges that the ***FDA later approved the drug product batches*** he allegedly flagged. *Id.* ¶ 116.

Even accepting Plaintiff's allegation that Vertex accepted "non-conforming material" (*id.* ¶ 232(b), 239(d)), conclusorily describing the product as "non-conforming material" does not show there was an imminent threat of harm to the public. *Nelson*, 2011 WL 4056320, at *6 ("Generalized concerns that activities of the employer, could, possibly, result in alleged harm to health or safety are insufficient [to establish a well-defined public policy]."). Thus, to the extent Plaintiff purports to base his WTPP claim in Count VI on generalized health and safety concerns, that argument fails.

**B.     Count VII Fails Because Plaintiff Did Not Satisfy the Statutory Requirement of Providing a Written Rebuttal.**

Count VII should be dismissed because Plaintiff expressly failed to submit a written rebuttal to his PIP, as required under M.G.L. c. 149, § 52C and confirmed by *Meehan v. Medical Information Technology, Inc.* 488 Mass. 730 (Mass. 2021). Specifically, Section 52C provides if, after the employer has placed disciplinary documentation in an employee's record, "there is a disagreement with any information contained in a personnel record . . . the employee may submit ***a <u>written</u> statement explaining the employee's position*** which shall thereupon be contained therein and shall become a part of such employee's personnel record." M.G.L.c. 149, § 52C (emphasis added). In *Meehan*, the SJC ruled that an employee's exercise of his statutory right to file a written rebuttal for the personnel file is legally guaranteed by Section 52C, and therefore, "termination from employment for the exercise of this legally guaranteed right fits within the first public policy exception to employment at will[.]" 488 Mass. at 735. The *Meehan* decision makes

22

clear that the public policy exception to at-will employment under Section 52C applies when the employee submits a written rebuttal. *Id.* at 740.

Plaintiff, however, alleges only that he was "actively preparing" and "took affirmative steps to . . . submit a written rebuttal[,]" to his PIP (*id.* ¶¶ 149, 152, 248), but importantly, he concedes he ***never submitted*** a written rebuttal to his PIP prior to his resignation (*id.* ¶ 153). As such, he did not engage in conduct that is statutorily protected by Section 52C. Thus, he has no grounds to assert a WTPP claim under Section 52C and Count VII must be dismissed.

### C.     Plaintiff's WTPP Claims Fail Because Vertex Did Not Constructively Terminate Plaintiff's Employment.

Even putting these pleading deficiencies aside, Plaintiff fails to adequately plead that he was terminated or constructively discharged, as required for his WTPP claims.

On March 20, 2025, Plaintiff canceled a meeting with his manager and in that same communication, stated in unequivocal terms: "I will submit my resignation mostly, today; if not tomorrow," and "I will let you know once I submit." FAC ¶¶ 151, 250. His manager then accepted his resignation. *Id.* ¶ 152. There can be little doubt that Plaintiff voluntarily resigned. *See Torrech-Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 50 (1st Cir. 2008) (finding that an employee who had expressed an intention to resign in writing, but later denied he had resigned, was "hard to take seriously" because "words speak for themselves").

For Plaintiff's voluntary resignation to be considered a constructive discharge, he must adequately plead that Vertex imposed "working conditions so intolerable that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities." *Landrau-Romero v. Banco Popular de P.R.*, 212 F.3d 607, 612-13 (1st Cir. 2000) (citation modified). Constructive discharge "claims require a showing of harassment that is ***more severe than is required for a hostile work environment claim*** and may occur when an employer effectively

23

prevents an employee from performing her job." *Sauer v. Belfor USA Grp., Inc.*, 205 F. Supp. 3d 209, 219 (D. Mass. 2016) (citation modified). "The standard for a constructive discharge is an objective one, it cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held." *Stratton v. Bentley Univ.*, 113 F.4th 25, 38 (1st Cir. 2024) (citation modified).

Plaintiff provides no facts establishing that his working conditions were "so severe and oppressive" that a reasonable person in his position would have felt compelled to resign. *Ara v. Tedeschi Food Shops, Inc.*, 794 F. Supp. 2d 259, 264 (D. Mass. 2011); *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 28 (1st Cir. 2002). Instead, he alleges that his March 20, 2025, *voluntary resignation* constituted a constructive discharge because his managers managed his performance, enforced the performance requirements set forth in the Immigration Policy, and later placed him on a 60-day PIP. FAC ¶¶ 120, 141, 151, 183, 212. However, courts routinely hold that placement on a PIP, and/or required compliance with performance protocols, does *not* rise to the level of a work environment "so severe and oppressive" to constitute constructive discharge. *See Aulisio v. Baystate Health Sys., Inc.*, No. 11–30027–KPN, 2012 WL 3947738, at *9-10 (D. Mass. Sept. 7, 2012) (finding PIP placement did not establish constructive discharge). To the contrary, Plaintiff's placement on a 60-day PIP shows Vertex was providing Plaintiff with an opportunity to improve and meet his job expectations before considering any further action. *Luciano v. Coca-Cola Enters., Inc.*, 307 F. Supp. 2d 308, 320-21 (D. Mass. 2004) ("At a minimum, a reasonable person would have expected [Plaintiff] to [perform under the PIP] before tendering h[is] resignation.").

Plaintiff also alleges that Vertex changed his responsibilities and provided opportunities to others instead of him (*see* FAC ¶¶ 27-28, 34, 37, 39, 43, 77, 85), but, importantly, he expressly pleads that his managers' decisions were grounded in their assessment of his strengths and weaknesses in his role. For example, he pleads that he was moved to a "slower-moving project"

24

based on his managers' perception of his performance deficiencies (*id.* ¶¶ 117-118), and that on one occasion, Ms. Miles provided travel and development opportunities to Ms. Lee[10] instead of Plaintiff because, while Plaintiff was "technically good," Ms. Lee was a superior communicator, and Vertex wanted to put Plaintiff in the best position to succeed. *Id.* ¶ 77. While the FAC may reflect that Plaintiff disagreed with his managers' assessments of his strengths and weaknesses, he cannot establish a constructive discharge claim by subjectively characterizing these circumstances as "intolerable." *See Serrano-Cruz v. DFI P. R., Inc.*, 109 F.3d 23, 26 (1st Cir. 1997) (because constructive discharge claims are analyzed from the standpoint of the "reasonable person," an employee seeking to bring such a claim may not be "unreasonably sensitive to a change in job responsibilities" or performance criticism). Accordingly, Counts VI and VII must be dismissed.

## VII.    THE PROMISSORY ESTOPPEL CLAIM FAILS (COUNT VIII)

To state a claim for promissory estoppel, Plaintiff must plausibly allege that: (1) Vertex made an unambiguous promise intended to induce him to rely on the promise; (2) he reasonably relied upon that representation; and (3) his reliance was to his detriment. *Dexter v. Dealogic, LLC*, 390 F. Supp. 3d 233, 245 (D. Mass. 2019). Plaintiff has failed to establish any of these elements.

Regarding the first two elements, Plaintiff does not plausibly allege that Vertex promised unconditional green card sponsorship or that he reasonably relied on any such representation. Vertex maintained a clear policy requiring him to meet certain performance expectations as a condition of employment and green card sponsorship, as any company would be expected to maintain. FAC ¶ 42. As noted *supra*, Sec. II(A)(1), even if the Immigration Policy was not shared with him prior to employment, his employment was at-will. It would thus not be reasonable for

---

[10] Because Ms. Lee was Plaintiff's manager (among other reasons), she was not similarly situated to Plaintiff and is not a proper comparator. S*ee Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 38 (1st Cir. 2001) (putative comparator must be "similarly situated in all or even most relevant respects") (citation modified).

Plaintiff, a highly sophisticated individual, to believe that any pre-offer comments created an unconditional promise of green card support.

Plaintiff also fails to satisfy the third element of his promissory estoppel claim because he does not adequately demonstrate that he relied on Vertex's alleged promise of "immediate" sponsorship to his detriment. In fact, he alleges that Vertex asked him to remain employed with Vertex long-term—albeit requiring him to improve his poor job performance, but he *resigned* from his employment before the immigration process could be completed. *Id.* ¶¶ 46, 151. Based on the express allegations, it was not Vertex's alleged "promise" that caused Plaintiff harm, but rather his own decision to end his employment instead of attempting to comply with Vertex's policies. *See Daniels v. Alvaria, Inc.*, No. 23-cv-10419-DJC, 2024 WL 758172 at *8-9 (D. Mass. Feb. 23, 2024) (dismissing promissory estoppel claim because plaintiff's complaint "does not permit the inference that [she] relied upon [defendant]'s promises to pay her to her detriment" given she remained employed despite being told she would not be paid commissions).

Further, the facts pled do not establish that Plaintiff walked away from any tangible benefit with his former employer despite his allegation that he lost his "priority date with his previous employer" during the PERM labor certification process. FAC ¶ 11, 189. Under the governing regulatory framework, a foreign national does not acquire a legally cognizable "priority date" or vested expectation of permanent residence merely by participating in a pending or in-process PERM labor certification. The regulations make clear that a priority date is established only upon the filing of an approved immigrant visa petition (Form I-140), not at the labor certification stage. *See* 8 C.F.R. § 204.5(d) ("The priority date of an petition filed for alien who is seeking classification under [employment based preference categories] . . . shall be the date the completed, signed petition . . . is properly filed with USCIS"); *see also* USCIS Policy Manual, Vol. 7, Pt. A,

26

Ch. 6(C)(3) (confirming that the priority date is generally the date the immigrant visa petition (Form I-140) is properly filed). An in-process PERM application—standing alone—does not confer a priority date or any protectable interest capable of forfeiture. *See Gould v. Bank of N.Y. Mellon*, 123 F. Supp. 3d 197, 204 (D. Mass. 2015) (dismissing promissory estoppel claim because "there are still no facts suggesting that Plaintiffs suffered any detriment . . . the [plaintiffs are in] the exact position they were in prior to any negotiations with [defendant]").

Moreover, Vertex honored its alleged promise to sponsor his green card, which further undermines any allegation of detrimental reliance. Plaintiff expressly pleads that after he accepted the job offer, Vertex engaged and paid outside counsel to submit the necessary paperwork so that he would be able to work lawfully in the U.S. and continued those efforts during his employment. FAC ¶¶ 12, 14, 17, 57, 67, 101, 147. Accordingly, Plaintiff's promissory estoppel claim fails.

## VIII.   PLAINTIFF'S WAGE ACT CLAIM FAILS (COUNT IX)

Plaintiff's Wage Act claim fails because the FAC does not plausibly allege that Vertex paid Plaintiff his wages in an untimely manner.

### A.   The Premise of Plaintiff's Wage Act Claim is Wrong – His Final Wages Were Not Due the Same Day as His Separation Because He Voluntarily Resigned.

As a preliminary matter, the entire premise of Plaintiff's Wage Act claim—that he was due his final wages on March 20, 2025—is wrong. FAC ¶ 273. Under the Wage Act, employees are due their final wages on the same day of termination, if involuntarily terminated, but not until the "following regular pay day" if the termination is voluntary. M.G.L. c. 149, § 148. As described *supra*, Sec. VI(C), Plaintiff voluntarily resigned from his employment, and as such, his final wages were not due on March 20, 2025, as he alleges. There is no allegation demonstrating that Plaintiff failed to receive his wages in a timely manner.

**B.      The VOCAP Bonus and ESPP Payment Were Not "Wages" and Therefore Did Not Carry Any Mandatory Payout Date.**

To the extent Plaintiff seeks to recover a Vertex Outstanding Contribution Award Program ("VOCAP") bonus, or for a late payment under the Employee Stock Purchase Plan ("ESPP"), his Wage Act claim also fails. Massachusetts courts construe the term "wages" in a limited manner, to mean "salary (or more colloquially pay), holiday and vacation pay, and definitely delineated commissions." *O'Connor v. Kadrmas*, 96 Mass. App. Ct. 273, 287 (2019); *Prozinski v. Ne. Real Est. Servs., LLC*, 59 Mass. App. Ct. 599, 603 (2003)). "Commissions are the only contingent compensation recognized expressly by the act." *Alfieri v. Merrimack Pharms., Inc.*, 99 Mass. App. Ct. 1119 (M.A.C. R. 23.0) (citation modified). Further, Massachusetts law explicitly excludes payments under employee stock purchase plans from the definition of wages. M.G.L. c. 154, § 8; *Weems v. Citigroup Inc.*, 453 Mass. 147, 157 (2009). "The extraordinary relief the Wage Act provides – individual liability, treble damages, and possible criminal liability – is directed at particularly egregious behavior, i.e., not paying wages for work actually performed, and not at other employment violations." *Calixto v. Coughlin*, 481 Mass. 157, 161 (2018).

Because Plaintiff has not alleged (and could not allege) facts showing the VOCAP bonus or ESPP payment constituted "wages," Vertex could not have violated the Wage Act by failing to make or issuing that payment "late." FAC ¶ 274(a), (d). Thus, to the extent he seeks to recover for so-called "late" payment under the ESPP, or for failure to pay a VOCAP bonus, his claim fails.

Plaintiff's Wage Act claim must be dismissed in its entirety because Plaintiff has failed to plausibly allege that Vertex paid any wages in an untimely manner.

## <u>CONCLUSION</u>

Vertex respectfully requests an order dismissing the FAC in its entirety, with prejudice.

DATED: April 14, 2026

Respectfully submitted,

VERTEX PHARMACEUTICALS,
INCORPORATED,

By Its Attorneys,


*/s/ Lynn A. Kappelman*

Lynn A. Kappelman (BBO No. 642017)
lkappelman@seyfarth.com
Christopher W. Kelleher (BBO No. 705508)
ckelleher@seyfarth.com
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
Boston, Massachusetts 02210-2028
Telephone:   (617) 946-4800
Facsimile:    (617) 946-4801

## CERTIFICATE OF SERVICE

I, Lynn A. Kappelman, hereby certify that on April 14, 2026, a true and accurate copy of the foregoing document was electronically filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ Lynn A. Kappelman*
Lynn A. Kappelman