UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KRANTHI SAGAR PACHIKORU, | ) | |
| Plaintiff, | ) | Civil Action |
| v. | ) | No. 4:25-cv-40184-MRG |
| | ) | Pages 1 to 45 |
| VERTEX PHARMACEUTICALS, INC., | ) | |
| Defendant. | ) | |

BEFORE THE HONORABLE JUDGE MARGARET R. GUZMAN
UNITED STATES DISTRICT JUDGE

MOTION HEARING

July 15, 2026
2:00 p.m.

Harold D. Donohue Federal Building and U.S. Courthouse
Courtroom No. 2
595 Main Street
Worcester, Massachusetts

Jessica M. Leonard, CSR, FCRR
Official Court Reporter
United States District Court of Massachusetts
595 Main Street
Worcester, MA 01608
Jessica@wickedsteno.com

APPEARANCES:

On Behalf of the Plaintiff:

By: Kranthi Sagar Pachikoru
2 Congress St
Ste 18
Milford, MA 01757
571-570-3607
Email: Kranthi@tuta.io

On Behalf of the Defendant:

SEYFARTH SHAW
By: Lynn A. Kappelman
2 Seaport Lane
Suite 1200
Boston, MA 02210-2028
617-946-4888
Lkappelman@seyfarth.com

SEYFARTH SHAW
By: Christopher Kelleher
Two Seaport Lane
Suite 1200
Boston, MA 02210
617-946-4811
Ckelleher@seyfarth.com

**STENOGRAPHER'S NOTE:** All quotations from exhibits or other documents are transcribed as they were read into the record and do not necessarily reflect the exact wording of the original document.

Quotation marks in the transcript are used for readability and stylistic purposes and may not represent a direct quote.

Proceedings reported and produced by computer-aided stenography.

**P R O C E E D I N G S**

THE CLERK: This is Civil Action No. 4:25-cv-40184, *Kranthi Pachikoru v. Vertex Pharmaceuticals, Incorporated*.

Would the parties and counsel please note your appearance for the record beginning with the plaintiff? Introduce yourself please.

MR. PACHIKORU: My name is Kranthi Pachikoru. I'm the plaintiff.

THE COURT: And good afternoon, sir. Thank you. You may have a seat.

ATTORNEY KAPPELMAN: Good afternoon, Your Honor. Lynn Kappelman from Seyfarth Shaw representing Vertex Pharmaceuticals, Incorporated.

ATTORNEY KELLEHER: Good afternoon, Your Honor. Chris Kelleher also for defendant Vertex.

ATTORNEY BASARIA: Good afternoon, Your Honor. Saraa Basaria, I'm in-house counsel at Vertex.

THE COURT: All right. Thank you all very much. You may have a seat. I appreciate you being here today. Let's talk about some practical things. I understand that the defendants have -- what is it intended to be on the screen?

MS. KAPPELMAN: So both sides have a PowerPoint, Your Honor. And we started with -- because you asked us to focus on TVPRA and the 1981 claims first, those are the first claims that we address. We talk a little bit about overall themes

about the TVPRA and 1981 as well as a timeline to put everything in context.

And then we launch into the actual elements of TVPRA, as Your Honor requested, and then apply that to the facts of the case as Your Honor requested. Then we launch into 1981, elements, facts of the case. And then we also dealt with the other counts if Your Honor has time or inclination to hear argument on those. If not, we will take direction from you.

THE COURT: Okay. And thank you very much. So I have the handout which should mimic what's on the screen?

ATTORNEY KAPPELMAN: Yes, Your Honor.

THE COURT: And Mr. Pachikoru, you provided copies of it?

MR. PACHIKORU: Yes, Your Honor.

THE COURT: I have one that -- is this your cover?

MR. PACHIKORU: One is the presentation; the other part is just an add-on appendix.

THE COURT: Very good.

Let me just start by saying -- thank you, counsel. Let me start by saying that we have reviewed all of the filings multiple times, had numerous discussions about it and are prepared with some very specific questions.

I will allow the parties -- since this is a significant matter for both parties -- to have argument. You can point to whatever you want to. So I'm going to ask you to

give your overall argument to start with and then you can direct me to look at whatever it is you'd like and then I'll allow the defendants to do that.

I want us to limit our argument to the federal claims.

ATTORNEY KAPPELMAN: Yes, Your Honor.

THE COURT: If the federal claims don't stand, then we don't have a case here. So it is imperative that we deal with what are the most important -- the two primary allegations. They're the most serious allegations. And I think that will help us focus and keep us on -- in the areas of argument that are most beneficial to the parties. So we will start with the plaintiff. And sir --

ATTORNEY KAPPELMAN: Even though it's our motion, Your Honor?

THE COURT: I'm sorry. I apologize.

ATTORNEY KAPPELMAN: No apology necessary.

THE COURT: The PowerPoints have thrown me when you bring in technology. We're a hand-drawn kind of a court.

ATTORNEY KAPPELMAN: Understood. I apologize, Your Honor. I thought because it was such a long count, a long complaint with nine counts and so many paragraphs, we thought it might be better just to truncate our arguments.

THE COURT: That's absolutely fine. And I'm sorry about the mishap. So you may start with your argument, counsel.

ATTORNEY KAPPELMAN: Thank you so much, Your Honor.

And, Your Honor I just wanted to start by saying we just had a few opening themes, which is that there are a lot of acronyms, first of all, in this case. And as I go along, I'm going to try to spell out what they are.

The Trafficking Victims Protection Act, which we'll call the TVPRA, it targets human trafficking and not necessarily skilled professional employment disputes like this one. And the Court's own trafficking precedent, *Dias de Souza*, compels dismissal. We are aware Your Honor had a TVPRA case in *Dias de Souza* and we looked at all the other TVPRA cases and we tried to cite them clearly in our briefs, including on page 3 of our reply brief.

*Dias de Souza* was very different, and the other cases that preceded this were very different insofar as those were vulnerable, exploited employees who suffered, quote, "serious harm," because they were coerced or threatened with immediate deportation. They tended to be people that weren't as familiar with the immigration process. They certainly weren't like Mr. Pachikoru who had gone through the H-1B process before, was a skilled employee within the H-1B process, had gone through it with prior employers.

And there simply is nothing -- even though we've got nine counts and 275 paragraphs, you'll see nothing where anyone threatened him with serious harm. In *Dias de Souza*, for

example, these were people who had drug addictions and the employer was providing them with drugs. These were people who worked at an auto parts store and there was a threat, "If you don't work 70 hours a week with no overtime, we're going to deport you. If you tell the authorities what we're doing, we're going to deport you." That is the very kind of thing that the amendments to the TVPRA, at least, thought to protect.

Originally, the TVPRA was sort of for sex workers and exploited workers. The amendments then said well, there are other people who might be affected who've got serious harm, who are coerced, who are threatened. Exploited vulnerable people, just like *Dias de Souza*, just like page 2 of our reply brief. I won't bore you with the cites, but kitchen workers, sex workers. All those are the kinds of people you see the in TVPRA cases.

If Your Honor extend the TVPRA to people in the skilled labor who have -- who employers have sponsored for H-1B visas but it doesn't quite go as quickly as they want or the process isn't quite as simple as they want or we don't put them in the correct category that they think they should be in, then you're going to have a rush to the courthouse of people trying to bring cases under the TVPRA because they weren't happy with their H-1B sponsorship. Or they got terminated before their sponsorship could be completed and somehow they want the Court to repair that damage.

And that's what we have here. The request to repair is Mr. Pachikoru is asking the Court to grant him his immigration status; to get him his visa so he can stay in the United States. And that's just not something that this Court can do. And I think if the Court extends the TVPRA to Mr. Pachikoru's situation, it's going to create a very dangerous precedent and there's going to be a watershed of skilled people who aren't happy with their H-1B.

In this case, ironically, we're going to look at the actual facts. Because it's a motion to dismiss, we need to look at the four corners of the complaint. And in his own allegations you'll see, soon, when I get to the timeline, that Vertex actually performed its alleged promise: It sponsored Plaintiff for two years. It paid $20,000 to an outside law firm, BAL, to go through the H-1B process, to submit all the information to the USCIS, to respond to their requests for information.

And it wasn't until Mr. Pachikoru said "You know what? I'm not going through this performance improvement process, I resign" that Vertex said "Okay. Well, we're not going to keep shelling out money and time for your visa." And that's really what this case is about. And it's not okay for somebody to say, "I don't want to go through performance improvement, I want to resign, but somehow I want to punish you for not continuing to pay to sponsor my H-1B visa."

Throughout this complaint, although it is long and although it is detailed, Plaintiff misrepresents and misunderstands the actual immigration process.

What you will find, and we'll show you, we'll give you citations to his own complaint, is USCIS, the citizenship arm of the Government, actually reviewed and approved the petition that Vertex paid to get for the plaintiff. His voluntary resignation, his written voluntary resignation defeats the termination counts. There's just simply, as Mr. Kelleher will tell you, no plausible allegations anywhere of racial discrimination, harassment, or retaliation. Nor does he suggest that he ever said that to anyone in a way that needed to be investigated.

What I think is most helpful, though, Your Honor, because it's a motion to dismiss, is to refer you to the actual allegations that Mr. Pachikoru himself has pled.

April 4th, he accepted a job at Vertex, started in May of 2023. Uncontroverted, Your Honor.

April 6, Vertex hired outside immigration counsel, BAL, for Plaintiff, and for the next two years engaged in immigration sponsorship to try to get him immigration status in this country. He admits in the first amended complaint, paragraphs 13 and 15, that his H-1B transfer petition was filed by Vertex's outside counsel.

On May 4th in the complaint, paragraph 14, the

immigration service issued a request for evidence. That's an RFE, that's the acronym, saying "Hey, we've reviewed your application, Mr. Pachikoru. Give us more information about why you will not negatively affect U.S. jobs," which is what they have to look at. BAL has to pick an SOC code, a code for what he's doing in the United States, and they have to say to immigration "Here's why you should give this person visa status. They won't negatively affect anybody who's currently in the U.S. working and here's why." And some of that is a bit discretionary and you'll find that out as we go along.

But he admits in his complaint, paragraph 57, that he was asked if he wanted to be in a permanent application, a PERM, or an EB-2 and a waiver was submitted on his behalf. His own complaint says that the internal Green Card sponsorship form was approved. That's the first amended complaint, paragraph 52. If you look at paragraph 70, he signed the disclosure and joint representation status form more than a year after he started, September 1st, 2024. BAL, by the way, is the outside law firm that Vertex hired to help him.

March 7th, 2025, six months later, he was put on a 60-day performance improvement plan. That's not something that's unusual. We were trying to get him to improve. And his response, 13 days into a 60-day performance improvement plan, was to resign. Send an e-mail saying, "I'm going to resign today or tomorrow."

And so what did Vertex do? They said "Okay. We accept your resignation." Then, and only then, Your Honor, did his immigration sponsorship end. And this was after they had already paid $20,000 to an outside law firm, after two years of filling out forms and trying to help him get his sponsorship.

So not only is it not fraud, but this isn't somebody who suffered serious harm or who was threatened or coerced into not getting his status. This is somebody who was given support all along the way. So much so that an outside law firm filed form upon form upon form to try to get him status.

Now, what does he complain about, Your Honor? He complains that he doesn't think BAL used the right SOC code. And just so you know, there are a lot of acronyms. Again, an SOC code is a Standard Occupational Classification that an immigration lawyer chooses so they can submit it to the immigration folks and say, "This is the kind of job he's going to be doing; these are the duties he has, and we really don't think he's going to negatively impact our current U.S. workforce."

And sometimes the lawyers decide to use one SOC code versus another because, in their discretion, it's a little more successful, right? They know that immigration isn't worried about bringing people in in a particular SOC code. But it doesn't affect whether somebody is going to get approved or not approved. In fact, the lawyers have every incentive to choose

an SOC code that's going to be the one that's going to help Mr. Pachikoru.

And so whether or not he disputes the SOC code, by the way, it was ultimately approved, his status. Every step along the way was ultimately approved.

And an LCA, by the way, is the Labor Condition Application that is submitted on their behalf. These are just some of the acronyms you're going to see. The RFE that you're going to see is when they review the application that the outside lawyers submit and they say "Hey, we just have a few more questions to satisfy ourself." All of those things happened on behalf of Mr. Pachikoru, paid for by Vertex.

So this is not someone who suffered serious harm. This is not someone who was coerced, who was threatened that they were going to have to leave the country. In fact, it's the opposite. It's someone for whom Vertex went out of their way to pay money to an outside law firm to sponsor him to give him every chance possible so he could stay and continue to work in the country.

Now, finally, and maybe most importantly, no threats of force, no threats of physical restraint, no serious harm or threats to Plaintiff. But no express scienter. And by that I mean Plaintiff can't show that the Vertex intended to cause Plaintiff harm or knew they were going to cause Plaintiff serious harm. When they hired him, they said "Sure, we're

going to get an outside law firm to try to get you immigration status in this country." And they did just that. So the notion that they hired him on some false pretenses, or that maybe they didn't know he was Indian when they hired him and submitted his application for immigration status but then all of a sudden decided they didn't like Indians, it just doesn't make sense in the context of this story.

So that is sort of the bottom line on the TVPRA claims. He was earning $136,000 a year. The other cases that we cite in our reply brief on page 2 cite squalid, coercive, undocumented labor, threats, folks who were given drugs like in *Dias de Souza*, folks who were asked to work overtime without getting paid.

Serious harm can be judged by the circumstances we just talked about: the timeline in which Vertex paid a lot of money, hired an outside counsel, and spent two years trying to help him get status until he resigned. And that, Your Honor, is why we should not expand the TVPRA in this circumstance and create a watershed of new claims for people who don't like the way their H-1B was handled.

At this time, if Your Honor would permit, I'd like to hand it over to Mr. Kelleher for the 1981 claims.

THE COURT: You may.

ATTORNEY KAPPELMAN: Thank you.

ATTORNEY KELLEHER: Thank you, Your Honor.

So as you know, Count 3, Section 1981, asserts within Count 3 three separate Section 1981 claims: disparate treatment, hostile work environment, and retaliation. I'll talk about those separately here today. And Your Honor asked about the legal elements for each of the particular claims and we've discussed them at length in our brief.

But I think the important elements with respect to a disparate treatment claim are, you know, you'll see the prima facie case. But in element 4, "Plaintiff must plausibly demonstrate on the face of the complaint a causal connection between his membership in a protected class and the adverse employment action." And, as the Supreme Court and other courts in the First Circuit have held, to prevail on such a claim, Plaintiff must initially plead and ultimately prove -- of course, this is a discrimination matter -- that, but for race, he would not have suffered the loss of a legally protected right.

Often times in our brief and today I'll use Title VII case law because it's applicable here. But he brings 1981 claims, which are race discrimination claims. Next slide, please.

I think the overarching issue with Mr. Pachikoru's complaint is that he doesn't allege facts on the face of the complaint that reflect discriminatory animus against Indian employees. As my colleague just pointed out, Vertex recruited,

hired, spent two years going through the immigration process with Mr. Pachikoru. Also, on the face of the complaint, Vertex regularly hires Indian employees and supports their immigration status. Interestingly, the same individuals who are alleged to have engaged in discriminatory behavior here were also the individuals who are responsible for recruiting, hiring, supporting his immigration status.

It's axiomatic under First Circuit precedent and in federal courts across the country that there's an inference against discrimination where the same actor both recruits, hires, and later terminates an individual who has a superficial protected characteristic. Here, the alleged protected category is race. They're being alleged to possess discriminatory animus based on race. There's no inference of discrimination when the same actor both hires and is alleged to have discriminated against the individual.

In the briefing, Mr. Pachikoru raises the cat's paw theory. I think the cat's paw theory is clearly inapplicable here. Interestingly enough, he alleges that the discriminatory actor in the cat's paw analogy -- and in case Your Honor is not intimately familiar with cat's paw. Typically, when a superior -- maybe a manager or an executive -- possesses discriminatory animus and wants somebody out, they'll push buttons to get a subordinate manager to ultimately terminate that individual unbeknownst to that individual that the reason

they're terminating the individual is because of that person's bias.

Here he alleges that Ms. Lee, as a subordinate, fabricated the performance improvement plan which ultimately led to his performance -- excuse me, his termination.

The cat's paw analogy doesn't hold up because he hasn't plausibly alleged any inference that the fabrication of the PIP was in any way related to racial animus. In fact, he expressly alleges that the fabrication of the PIP was due to his alleged whistle-blowing activity. And as I'll discuss in a minute, there's no connection to race whatsoever with respect to the fabrication of the PIP and therefore, Ms. Lee's fabrication could not violate Title VII.

Now, with respect to Mr. Pachikoru's other allegations of discriminatory animus, you'll see throughout the complaint Mr. Pachikoru attempts to create an inference of discrimination against Indians and him specifically. What's confusing to me is he refers to non-Indian employees who were treated more favorably, he references white American and at least, I believe, one quote/unquote non-Indian employee. But he also points to several Indian employees who were treated just fine.

In fact, in paragraph 55 he alleges that Ms. Miles viewed two other Indian employees as exemplary. And that's Rupesh Malhotra and Sreedhar Shapally. Those individuals aren't alleged to have been discriminated against.

In paragraph 83, he alleges that three individuals of Indian descent received commentary about their performance and two out of three were eventually placed on a performance improvement plan. One out of those three was not placed on a performance improvement plan. So what I'm gathering for the complaint is some individuals in Mr. Pachikoru's estimation were not treated favorably; some Indian individuals were treated perfectly favorably. There's no inference of discrimination here on the face of the complaint.

With respect to Mr. Pachikoru's comparison of himself to other non-Indian employees -- the white American employees and the one quote/unquote non-Indian employee -- it's important for the Court to understand that in order for Mr. Pachikoru to properly plead a claim here, he needs to establish on the face of the complaint that these individuals are similarly situated to him.

I believe the case we cited in our brief was *Matthews v. Ocean Spray*, but the First Circuit has the standard in *Goncalves v. Plymouth*, 2011. "Plaintiff must show that the purported comparators were similarly situated to him in all material respects, including in terms of performance, qualifications, and conduct without such differentiating or mitigating circumstances that would distinguish their situations."

And that's really important here, because he's

comparing himself to individuals who, on this complaint, are not alleged to be similarly situated to him. For example, Mr. Pachikoru alleges that one of the instances of discrimination occurred by selective enforcement of the Vertex immigration policy. It's referred to as the VUSIP in some of the briefing. But the individuals he alleges were treated more favorably weren't subject to the policy. They weren't immigrant employees; they weren't going through the immigration process.

He also alleges no facts whatsoever about other employees' performance. Now, it's clear throughout this complaint that, as Mr. Pachikoru concedes, Vertex was very concerned about his performance, and his performance prompted a great number of actions on behalf of Vertex. Often times, to show that an individual is similarly situated to establish an individual's a proper comparator, the complaint at least needs to set out some facts establishing that those individuals demonstrated similar performance deficiencies, occupied similar roles, et cetera.

There's no allegations on the face of the complaint that the individuals whom he claims were treated more favorably were similarly situated to him. On the other hand, Your Honor, he refers to several anonymous Indian employees. I believe these are referred to as Employees B, C, and D. And you can generally refer to paragraphs 83 and 164-172. He refers to

anonymous individuals, not by name, and alleges that upon "information and belief," I quote, that they experienced discriminatory treatment while quote/unquote "upon information and belief white employees did not receive such treatment."

These type of allegations do not satisfy the federal pleading standard under Iqbal/Twombly and there's a host of cases finding that bare conclusory allegations of treatment of other employees without plausible factual support whatsoever is insufficient at the Rule 12 stage to state a claim.

I jotted down a few cases preparing for this argument: *DM Research, Inc. v. College of American Pathologists*, 170 F.3d, 53, it's a First Circuit decision out of 1999. "Discovery process is not available where, at the complaint stage, a plaintiff has nothing more than an unlikely speculation."

A lot of these cases use the same terminology that Mr. Pachikoru used. Upon information and belief, these people were treated better than me or these people were treated worse for me. Second, although the standard review -- clearly, we all have a lot of experience with this. The standard review for a motion to dismiss is deferential to the well-pleaded factual allegations. It doesn't require the Court to give credence to unsupported factual allegations made upon information and belief. Conclusory, speculative, unsupported factual allegations are not assumed to be true for purposes of

a motion to dismiss.

Now, here, Mr. Pachikoru alleges -- he makes many conclusory allegations in the paragraphs that I've just referenced of non-specific, speculative, and overly broad allegations regarding the treatment of other individuals. And as the First Circuit said just last year in *Waleyko v. Phelan*, "Such prognostications are precisely the conclusory kinds of allegations that remain in the realm of mere conjecture and accordingly receive no credit in evaluating a motion to dismiss."

So that's the disparate treatment discussion, Your Honor. I think it's really important to focus on his allegations in the paragraphs that I have referenced. And while Mr. Pachikoru states in conclusory fashion that one individual or another was treated more favorably than him, the plausibly pled factual allegations do not support that any similarly situated individual is treated more favorably on account of race.

Now, with respect to the hostile work environment claim. Here, as with Title VII claims, the elements are similar, Plaintiff must demonstrate that he experienced harassment, that the harassment was racially based -- that's really important in a 1981 claim -- and the harassment was so severe or pervasive so as to create an abusive working environment. And the harassment must be objectively and

subjectively offensive.

Now, the severe or pervasive standard, the famous severe or pervasive standard, is a high bar for Mr. Pachikoru to reach and the face of the complaint contains no allegations demonstrating that a hostile work environment is present here. The severe or pervasive standard requires Mr. Pachikoru to show that the workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe and pervasive to alter the conditions of employment can create an abusive working environment.

I remember when I first started practicing, we had a case where there was a noose in a warehouse. And I -- the Court in the noose line of cases often finds a hostile work environment because it's racially connected, severe, and the courts often consider the length of time that the noose is in the warehouse. Those are the types of cases when you consider hostile work environment that you might consider, Your Honor.

The other factors that the courts consider are the frequency of racially discriminatory conduct, the severity and whether the conduct is physically threatening or humiliating. Here, Your Honor, I think I touched on this in the disparate treatment section, there are no allegations of race-based harassment. It's entirely absent from the complaint. There are certainly -- there's certainly workplace tension, there's performance concerns. That's not a hostile work environment

and Mr. Pachikoru hasn't pled facts suggesting the existence of an objectively and subjectively abusive environment based on his race.

Often times in these types of cases, there will be specific language connecting the employer's actions to race. One of the cases we referenced in our complaint referred to an African-American employee being called the "N" word in the workplace, for instance. That was a hostile work environment.

And I want to just point out a few of the allegations that he makes in the complaint. Mr. Pachikoru alleges that he was both overworked and that Vertex took work away from him. He essentially plays both sides of the fence there. He can't have it both ways. But in any event, being overworked or underworked is not evidence of hostile work environment.

He alleges certain unspecified -- and by the way, that's paragraphs 44 and 118. He alleges certain unspecified quote/unquote "disparaging remarks" that Vertex made about his Indian colleagues, but he doesn't provide any more context or plausible factual allegations to support his conclusion that these were, in fact, disparaging or anti-Indian.

He alleges that Ms. Miles warned him regarding his job performance. These are day-to-day workplace tensions that does not rise to the level of workplace harassment.

And he also alleges on information and belief that other Indian colleagues believe Ms. Miles expected them to

remain silent and deferential. Again, he's not bringing a claim on behalf of other colleagues, but at the very least, there's no evidence of hostile work environment against Mr. Pachikoru based on these allegations.

And I want to briefly bring in the *Faragher* decision, kind of highlight the bar that the Supreme Court intended to set with the severe or pervasive standard. Justice Souter in the *Faragher* decision said, "These standards for judging hostility are sufficiently demanding to ensure that Title VII --" and again, Title VII and 1981 can be compared for purposes of a hostile work environment claim "-- to ensure that Title VII does not become a general civility code.

"Properly applied, it will filter complaints attacking the ordinary tribulations of the workplace such as the sporadic use of abusive language, gender-related jokes," that was a gender-related case, "and occasional teasing. We have made it clear that the conduct must be extreme to amount to a change in the terms and conditions of employment sufficient to state a hostile work environment claim."

Even these instances that Justice Souter points out of behavior that does not rise to the level of hostile work environment, the facts in our complaint don't even get there.

So two more points on hostile work environment, Your Honor. Mr. Pachikoru appears to state in the opposition or surreply papers that the severe or pervasive or standard is

somehow reduced or lessened or weakened by the fact that he's going through the immigration process. He cites a case *Simas v. First Citizens' Federal Credit Union*, but upon review of that case, it does not deal with hostile work environment or the severe or pervasive standard and the severe or pervasive standard applies across the board to everyone.

He also brings in *Pricewaterhouse*, the famous case from 1989 where a female employee was told, to her face, in order to improve the chances of promotion to walk more femininely, talk more femininely, dress more femininely, wear makeup, have her hair styled, and wear jewelry. That was a direct evidence case, it has no relationship to the facts here.

Your Honor, I'll touch upon retaliation briefly if that's okay.

Like the Title VII claims, to establish a claim for retaliation, Plaintiff must plausibly allege that he engaged in statutorily protected activity -- that's under Section 1981, race discrimination -- he suffered an adverse action, and there's a causal connection between the protected activity and the adverse action. Protected activity here, this is a race discrimination statue, consists of actions taken to oppose or report racial discrimination.

The primary issue with respect to the retaliation claim is that Plaintiff, in fact, concedes expressly that there was no complaint of race discrimination that was made or

ancestry discrimination or anything that can be construed as a complaint of race discrimination. He points to certain generalized workplace grievances such as the anonymous pulse surveys that he alleges to have submitted. But, again, he specifically pleads that he did not raise the concept of race discrimination in any of those complaints. Courts routinely dismiss claims for retaliation for failure to engage in activity protected by the statute at issue here, Section 1981.

And I just -- I pulled up *Morales-Cruz v. University of Puerto Rico*, 676 F.3d, 220, First Circuit 2012, affirming the District Court's dismissal of a retaliation claim under Title VII finding that the factual allegations do not support a reasonable inference that she was engaging in protected conduct when she opposed the remarks made. Similar to the situation here.

There's another case, *Fantini*, 557 F.3d, 22, holding that the plaintiff failed to show that she engaged in protected activity since the alleged conduct was not a violation of the statute at issue, there Title VII.

So here, as in those two First Circuit cases, Plaintiff has failed to establish that he engaged protected activity, and as a result he can't state a claim. And I'll just briefly touch on the lack of causal connection. I touched on this before. There's also -- the third element is not present here either, because he attributes the alleged

retaliation that he suffered to his alleged whistleblowing, not race. So there's really no connection between any protected activity and any adverse action that he suffered.

Thank you for your time, Your Honor. We're happy to answer your questions on either of those or any of the other accounts that are at issue.

THE COURT: All right. Thank you.

I'd like to hear from you, sir. You can come up to the podium.

MR. PACHIKORU: Sorry, Your Honor?

THE COURT: You come right up to the podium. There's a microphone there. Do you have charts or graphs that you want to show? You don't need them, sir.

MR. PACHIKORU: Okay. Thank you.

THE COURT: Unless you have them, but I want to just hear from you. You can give an introductory remark; you can respond to what you heard, but I also have some specific questions.

MR. PACHIKORU: Thank you, Your Honor.

I -- obviously I don't have an immigration or labor or employment law background; I'm a chemist. I don't have that legal speak. I just will say things plainly. I hope that's okay with the Court.

THE COURT: I'm a pretty plain-spoken person, sir.

MR. PACHIKORU: Thank you, Your Honor.

I think opposing counsel has a good amount of arguments that they made. I don't want to engage in them or recategorize them right now because in this particular time I have put everything that's required in the presentation. It was my understanding that when the Court requests that you bring a presentation, you just put in the right substance in the margins and that's how I present it. But I will speak about it.

THE COURT: How about I ask you a question that I had written down before I realized there were charts and graphs?

MR. PACHIKORU: I actually love that.

THE COURT: You filed a complaint which was over 100 pages. If you were told you have to tell me in a few sentences really what the claim is, the most important claim, can you do that for me now?

MR. PACHIKORU: Yes. Can I say it all?

THE COURT: Yes.

MR. PACHIKORU: In a few words as possible, what's happened is, me being an Indian person, there was an expectation of how I should be, how I should talk, how I should basically represent myself and the skill set that I've got. And as I was not conforming to the traditional Indian diaspora, it became a challenge for my management in some sense that they did not want all the issues with the drug manufacturing and the serious problems we were constantly facing, because often

people tend to recede from those issues so that they can just keep their job and they stay subservient because they've got their visas and they've got other sort of problems.

And as I was making those issues become obvious in how we have to resolve them, it was not taken well. And that's where the intersection of discrimination as well as the disciplining act have come together. And the leverage that was used was basically the visa. Because my H-1B is for six years and usually two years ahead of time the Green Card process starts. And it's a lengthy process. Especially being an Indian you've got a 20, 25-year backlog.

So the application of the entire immigration apparatus has been used to coerce or has been used to silence me. But the challenge was, do I do my job, or do I keep my mouth shut or how do I resolve the problem that we are facing in the manufacturing aspect? So in the -- in the essence, the TVPRA is about the immigration practice and how we are manipulating it to ensure that a person is coerced to behave in a way that they want to behave in a traditional sense of how an Indian would be. That's what my 100-page case is about.

THE COURT: What would you say -- certainly, when they recruited you -- I mean, I think it's very well known that there's a belief and an action that targets Indian nationals who -- the technology industries in India are more advanced than some of our areas and so they go there to get employees.

And that's what happened with you, correct?

So it wasn't -- certainly, it wasn't a surprise that they were -- whoever was recruiting you, you were an Indian national. So the issue of your nationality certainly wasn't a negative in their search for you, correct?

MR. PACHIKORU: I --

THE COURT: And it wasn't a surprise to them that you were Indian.

MR. PACHIKORU: Yes.

THE COURT: And so when -- what occurred that made you think that you were being treated differently as a result of your national origin?

MR. PACHIKORU: Your Honor, so the way I've written up the complaint, but the way also I have conducted my own life in my employment at Vertex. I don't think it's more about my passport from India or it was more about my birthplace. It was really about the expectation of how a person who is an Indian is supposed to be, because of the huge amount of data that's out there that says that a certain person is supposed to be like this when they've got certain skill sets and they've got certain vulnerabilities.

And it is -- I don't want to say anything conclusory; I'm just being mindful of it. It is that collective dataset and data points that shows that I was very non-conforming in terms of the expectations of how an Indian person should be.

So that's where I was really getting into the race and ancestry aspect. It is about the conduct of how I am and the way of being. It was not necessarily that I've got a passport from India or I was born in India.

THE COURT: So Section 1981, that claim, has to be tied to racial or ethnic discrimination; and discrimination means unequal treatment. And that treatment is based on racial animus. And where is the allegation in your complaint that they soured on the relationship? Certainly not when they started, not when they recruited you, not when they brought you here, not when they filled out the applications.

You're saying that at some point -- is that what you're saying? -- that at some point their motivation was tied to negatively impact you specifically because of your race or ethnicity? And that's where the allegation has to be very specific, especially since you're overcoming the purposes of you being here.

So when we're talking about the case that we had, the auto body case, they knew that these individuals that they employed were vulnerable to immigration consequences. They were from a Spanish-speaking country. They didn't have tech skills. They didn't have beautiful singing voices and sing in the opera. They didn't have a medical degree. They were new immigrants who didn't speak English and they literally were targeted. They had people who were looking for these

individuals when they were hired. They knew and treated them right from the beginning and continuously harshly. And it wasn't because they had a beef with any individual one. They knew that they used their immigration status and the vulnerability to being deported against them. That's what 1981 was intended to provide as a refuge for people who find themselves in the workplace at a disadvantage.

So how does your circumstances -- how can that possibly fit into the 1981 framework when you indicate that your whole being here was a result of a perception that you had an advanced knowledge and skill that they could use in their benefit and to your benefit?

MR. PACHIKORU: Your Honor, can I speak my mind out?

THE COURT: Sure.

MR. PACHIKORU: I just don't know that I can say certain things so I'm very careful about how they would be evaluated, because I also don't want to say something that might be offensive in nature that I might not particularly understand.

THE COURT: Offensive things get spoken in this court every day. It's part of what we do. And I'm not a gentle flower so you can speak plainly to me. And your filings in your case will be judged on its merit. Your argument here is to help me understand how these claims fit in the framework that -- the legal framework that you have used -- and I'm

struggling to find where you do fit in based on the claims that you have raised. This is your opportunity now, so don't worry about what you say or how you say it, just be sure you say it because now is your time, sir.

MR. PACHIKORU: Your Honor, in a simple way, if I were to interact with people on an everyday basis -- and I'd say I've got a good amount of ego in me. So I would say I'm sort of a God-complex person, and I will treat other people who are obviously lesser than me -- in my own thinking, I would say, "Okay, you know what? I am greater than this person." I would basically try to take advantage of them. So the idea of exploitation has to also come, in some sense, from the idea that I am above somebody else.

So often people who have power are people who are inherently not disadvantaged, as I was due to my visa issue as well as due to where I come from or how I do my job or how I am conducting myself. So the exploitation angle of the immigration issue or the visa issue really comes from that aspect.

The other part where the Indian mindset of how an Indian should be is from my line management back in the day who were my bosses. They understood that this is how these people conduct no matter how you treat them. They will just stay in for the job; they can no go anywhere.

Then you've got the H-1B where the immigration policy

that Vertex carries applies to all immigrants. I'm not saying it just applies to me. But the point is, they've got multiple avenues in there to expedite or speed it up. They didn't do it. They held it for a very long time until it literally came to the edge and then even it did not go forward.

So that's where I was talking about the exploitation in the immigration issue. But the discrimination is really about not giving the opportunities or not letting me travel or really look into the manufacturing process that we were doing at the other organizations or the sites and then also not giving me those opportunities which are given to my own team members that I was there back in the day. So it's not, like, one or two instances: There were multiple instances. Obviously, evidence will prove the facts what I've stated.

I didn't know or understand how much more I should put in because I felt 100 pages was too much, so I didn't want to expand each and every detail of the conversation over there. So when the idea of 1981 comes in, it's really about, have I been treated equally? Have I been given those equal rights or equal protections now? Even when I complained to HR it was more like "We'll look into it." And the moment I say I find something, I'm just out. And I have explained my situation in lengthy conversations with HR, too. Even with my managers back in the day but nobody seemed to care. So I find it -- sorry.

THE COURT: Here's where the conflict comes. You came

with expectations that there would either -- that you would be doing something and there was disagreement with the way you were doing it or how you were doing it or they were critical of you and there was, at least by your pleadings, that there were numerous requests for you to have achievement, raise your level of employment, your performance. It was your own action that ended the employment. You -- rather than do that, you resigned. So that's just how the pleadings go.

The reason we have this discussion about how your claim and your facts fit within the federal framework is really, really important. You have many claims -- and I'm not discussing them because they're state law claims -- and some of them may have deeper resonance in the law. But you have used statutes, federal statutes, that were created specifically to address -- there are Indian people of Indian origin, Indian nationality, born in India, who are forced to work as nannies and maids in foreign countries and they get no pay. They can be beaten if they are not compliant. This is known. They are taken or hired or sold.

That is what that statute was intended to prevent, the dehumanization. We call it employment, but it's dehumanization.

MR. PACHIKORU: Yes, Your Honor.

THE COURT: To put yourself in that same category is extremely difficult. It's not impossible, but it's extremely

difficult. And the facts that you allege have to be read on their face; and it's very difficult for me to see how that falls into that same category.

I understand that you have disappointment, but your disappointment is not your disenfranchisement. It's not your dehumanization. It's not the abuse of your physicality or your humanity. That's what many a people who fall into that statute and get relief in this country under that statute, that's the rub we have here.

So your facts are very important to you, and they have hurt you, this experience, and you clearly feel aggrieved. But we can only fight the legal battle that your aggrievement fits into. And it's very difficult for me to see how any of your allegations, despite reading -- we've read it a number of times -- can put you in that place.

MR. PACHIKORU: Thank you, Your Honor, for asking that question.

So I understand that you are talking both about the 1981 as well as the 18 U.S.C. 1589 frameworks. So I started with the TVPRA act first. So when Vertex hired me, they knew I was a skilled professional. So the way the act goes or the way the law says is that I'm skilled labor; I'm a person with specialized and skilled labor and services that Vertex will take for its own benefit so that the company can benefit.

Now, there is no mention in the William Wilberforce

Act of 2008 that it should be for a person who is a low-wage worker or who is predominantly disadvantaged from a working condition. What it basically says is that you can coerce a person in a modern life event, it's called a sort of modern slavery, white-collar slavery, where you come in, you work for the money, you have no family, you have no connection, you have no cultural roots here, you just come in for the money, you work and you go back. So in some senses you're isolated. Probably in all senses you're isolated.

Now, that's one challenge where you can have these problems of visa and non-sponsorship. Who do you go talk to? Like, if you talk to somebody, you can immediately lose your job. In 60 days, you have to find a new job or else you have to leave the country. The only reason I'm able to stay here right now in this country is because USCIS has given me a temporary order and they haven't really said anything. If -- usually they would send you a letter and say, "You've got 14 days to leave." I just leave.

So that's in the essence how H-1B works. And the idea that I'm disappointed in how I was treated, I really haven't thought about it, or I really haven't and seen it that way. What I have faced or experienced and what I have really come to a point where I've got no visa, my ten years of study and everything that my parents have put in me, invested in me, and my family has put in me over here, is just gone. Like, I go

back to India, I just restart my entire life with my family.

And I have no financial support. I don't have any means to survive in this country right now or work and that's really where the financial hump really comes in and psychological coercion, because in 2008 --

THE COURT: But wouldn't that always be the case when you're hired on one of those particular work visas?

MR. PACHIKORU: Usually H-1B is for six years. Once it's done you have to apply --

THE COURT: But they're conditional, right?

MR. PACHIKORU: Yes.

THE COURT: Conditional. And you know that when you're going in on that.

MR. PACHIKORU: They are conditional. But I have specifically asked multiple times "are you going to provide me sponsorship? If you don't, I'm not going to find a different employer, I'm going to stay back and stick with the employer that I have right now who will actually give me whatever security I'm looking for so that I can put food on the table and put food on the table for my family."

THE COURT: I understand that sir. I really do. But the way the federal jurisdiction works is you can't take a situation and try and fit it into a -- try and bring your situation to change the federal claim so that it matches your situation. The federal claim has to encompass, without forcing

it, that your particular set of facts fit within that framework. And that is -- that's the requirement.

The jurisdiction in the state court is different. Those claims are different. Those are state claims. Some of those are common law claims. The federal court's jurisdiction is based on statute. And the statutes that are at issue here are very specific about what is needed to be shown in order for the matter to remain in the federal court.

MR. PACHIKORU: So, Your Honor --

THE COURT: I'm just going to give you a couple minutes to wrap up the argument. Your arguments are helping me, but it's your filings that will dictate what happens on the motion for the defendants. And I'm going to end up giving them an opportunity to respond, but I want you to have an opportunity to give me your best arguments now.

MR. PACHIKORU: Your Honor, when I first came to the U.S. or when I go for the visa consulate to get my visa, I just get stamped and I fill in a bunch of paperwork and then I come to this country. And usually, that paperwork always says you have to abide by a certain set of laws. Not the standard U.S. laws but the immigration laws and if anytime you find it to be problematic, we'll just revoke you and you go back home.

So there's an element of known uncertainty. There's an element of someday you have to just wake up and realize the fact that you have to leave this country. I was okay with

that. What I was not okay with is somebody defrauding me into taking employment and then getting me into a situation where the sponsorship cannot be provided or extended based upon some subjective data points or a collective set of subjective data points saying that "oh you're not like this, you're not like that so we're not going to send you here. We're not going to sponsor you. We're not going to do this or promote you or give you some better aspects within the job or move you around."

And those opportunities have been given to other people who were not of my race or ancestry. And at the same time, they don't face the visa situation that I face in general. They don't -- they don't understand what it is to travel back to India, come back here, get a visa stamp just to wait for months and months for whether you will get it or you will not get it. Then you have your family here and then you just don't know what's going to happen.

All of these are known, but nobody would manufacture or fabricate issues because I didn't fit their model and eventually you were just kicked out. Because often when we go to this consulate, we get this William Wilberforce pamphlet and that's how I knew about it. And it gives a good amount of detail about how certain things happen, how coercion happens, how psychological it is, and what you need to do when you come across that situation.

And as I have pleaded in the fraud count, I was very

afraid to ask about, you know, "Can you share my filing with me so that I can understand?"

So after this whole fiasco, I have to go to the immigration agencies and ask them. That's when I realized that a lot of the information they put in my application is not true because now I have -- I don't have the duty to mitigate -- basically saying that I'm going to file my own employment application; I don't have that ability to.

So when I look at all these situations about the element of fraud that has happened, the scheme that was cooked up and also how the Vertex's U.S. immigration policy has been applied to me in a very select, non-random pathway, it is not treated equally in terms of how I wanted to really speak or have an opportunity to engage with people. Because the moment you are -- I think one of the points you made is the H-1B.

The known vulnerability is like, you know, you lose your job; you go back to India. But it's not like somebody was manufactured. And then you don't have an I-140; you can't move to a different job. 60 days you're just out of the country. That's the key that has literally closed all pathways for me.

And when I was talking about psychological coercion, I've experienced what I've experienced when I was interacting with these personnel. Other people haven't experienced that.

THE COURT: You can only speak for yourself. Your experience is your experience and I'm going to -- you were

going to wrap it up right now.

We will take the contribution you made to us to help us clarify some of the pleadings that you're making and the claims that you're making and we will consider those in light of the statute, the law, and any precedent that may touch on this. And we will read your pleadings in as generous a way as we can. We have to do that. We have to read your pleadings generously with the benefit of the doubt. And we will make a determination.

It is our intent to rule on the two federal claims only. Meaning, if these claims fail, you still -- these claims may be brought in the state court. And so that is -- I'm not quite sure where we're going to go with the decision, but I appreciate your advocacy on your own behalf and the filings will have to be the last word for you.

MR. PACHIKORU: I just want to say that -- I don't know if it's unfortunately how my parents brought me up, I just tend to stay quiet when -- many things have happened while I was employed at Vertex, starting with the immigration application and how all things have unraveled. And I always struggled with the whole idea.

I also did not want to name other people. It is my understanding in the Federal Rule of Civil Procedure that you don't have to name people; there's a time and place for that are or a protective order, so that's the reason I didn't really

name them. I wanted to keep them anonymous.

THE COURT: It's not failure to name someone. Your claim is based on the facts, and the facts don't generally come with a name. It could be Person 1, it could be Employer, it could be Boss, it could be Co-Worker.

MR. PACHIKORU: Thank you, Your Honor.

So what I was stating is not trying to fit something into a law in a manner that, you know, if I do this, I'll get money. That was not the intent, even as of today. So at the pleading stage, it is my understanding you get the facts straight and based upon the facts you decide whether there's an approval or not. Because a lot of opposing counsel statements and case laws, it was my interpretation that that was sort of a stare decisis -- more of a judgment or a -- saying "This has happened here and this is what has happened here."

And one of the cases I very early on read when I didn't know anything was Board v. Brown and understanding the case it was like you can't say people are separate and then equal. And that's pretty much how I slowly started understanding okay, this is what happens here.

And coming back with the aspect of immigration vulnerability, again, the only reason I'm here --

THE COURT: Again, the claim has to stand on the facts that you have pled. Okay? The argument is helpful to get me to see if there is nuances to what you're talking about. I get

to put a name to the faces. We hear from you. There's been clarity on how you got here and the search for employment, all of that.

I thank you very much. I appreciate your advocacy on your own behalf and I'm going to have you have a seat because I'm going to give the defendants an opportunity to say something in closing.

MR. PACHIKORU: Thank you, Your Honor.

ATTORNEY KAPPELMAN: Thank you, Your Honor, for a brief moment.

Without belaboring it, because I know that Your Honor is very familiar with the TVPRA based on your *Dias de Souza* decision, so I won't cite that back to you. You told me a little bit about the facts here today and I had just read it myself. But I would direct you and your clerks to Document 32 which was our reply brief on the record.

And on page 2 of that document, we do cite a number of TVPRA cases which outline exactly when the statute should be used and the kind of vulnerable exploited workers to whom that should apply. Exactly as Your Honor said, the context to which the kind of facts which one would expect to see a TVPRA claim and we would hope the Court would protect these workers.

For example, undocumented kitchen workers subjected to criminal forced labor in the *United States v. Papantoniadis* case. Housekeeping attendants who were working without pay

and, in *United States v. Rivera*, defendants used threats of violence and deportation to force undocumented women into sex work.

These are all the cases that led to *Dias de Souza*. And while the amendments did say it doesn't have to be someone who is, you know, as vulnerable, it did say there has to be serious harm, there has to be coercion, and there has to be threats of deportation.

And we've seen from plaintiff's own complaint and from the timeline that we elaborated on earlier today, the specific allegations in the complaint show, in fact, the opposite. We show that Vertex hired him knowing he was Indian; Vertex, in fact, purposely hired him for his technical skills. He had prior experience with H-1B sponsorship. Vertex hired an outside counsel and paid them on Mr. Pachikoru's behalf and for two years supported his immigration status sponsorship. And it was not until he resigned that that ended because he did not want to go through the performance improvement process.

So these facts are not the kind of facts that fit within the TVPRA or the 1981 statutes we've been discussing here that provide federal precedent. And so we thank you Your Honor for your patience.

THE COURT: All right. Thank you all very much.

(Whereupon the hearing concluded.)

CERTIFICATE OF OFFICIAL REPORTER

I, Jessica Leonard, Certified Shorthand Reporter and Federal Certified Realtime Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 29th day of July, 2026.

/s/ Jessica M. Leonard

Jessica M. Leonard, CSR, FCRR

Official Court Reporter